**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                    No. CR 10-1915 JB

MYRON HARRY,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence

Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75)("Motion to Suppress").

The Court held an evidentiary hearing on September 19, 2012.  The primary issues are: (i)

whether the Court should suppress the text messages that Defendant Myron Harry sent to Dimitri

Wauneka on May 6, 2011, because Plaintiff United States of America failed to preserve

Wauneka's outgoing text messages to Harry; (ii) whether the Court should prohibit the United

States from using at trial the text messages from Harry at trial because their prejudicial effect

substantially outweighs their probative value; and (iii) whether the Court should prohibit the

United States from using at trial the text messages from Harry because they are impermissible

character evidence.  The Court determines that Wauneka's outgoing text messages had a

potentially useful value, at best, and that the United States did not fail to preserve them in bad faith,

and, thus, the United States' failure to preserve Wauneka's outgoing text messages did not violate

Harry's due-process rights.  The Court further concludes that, because Wauneka's outgoing

messages are not likely to have determined Harry's innocence, the absence of the outgoing

messages will not render Harry's trial unfair.   The Court also concludes that the prejudicial effect of the text messages from Harry is not so great as to outweigh the probative value of the messages as demonstrative of Harry's state of mind immediately after the alleged assault of Jane Doe. Lastly, the Court concludes that the text messages from Harry are not impermissible character evidence, and, even if the text messages are indicative of Harry's character, the United States may use the messages to prove Harry's state of mind immediately after the alleged assault, as the United States seeks to do.   The Court, thus, denies the Motion to Suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.   See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").   This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.   The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.   See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).   In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.   See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.   In so deciding, the court is not bound by evidence rules, except those on privilege.").   Thus, the Court may consider hearsay in ruling on a motion to suppress.   See United States v. Garcia, 324 F. App'x 705, 708

(10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s [2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"), cert. denied, 130 S. Ct. 223 (2009); United States v. Merritt, 695 F.2d at 1269; United States v. Christy, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

1.     On May 5, 2010, a group of young people, including Jane Doe and Harry, attended a birthday party at the home of Stephanie Johnson and Wauneka in Shiprock, New Mexico.   See Transcript of Hearing, taken Sept. 19, 2012 at 22:16-23:14 (Adams, Joe)("Tr.").[3](Navajo Nation Criminal Investigator Jefferson Joe testifying that he was informed by Jane Doe that, on the

---

[1]   United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .   However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that United States v. Garcia has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

[2]   Crawford v. Washington stands for the proposition that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.   See 541 U.S. at 53-54.

[3]   The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

evening of May 5, 2010, Harry attended a birthday party for Jane Doe at the home of Johnson and Wauneka in Shiprock, New Mexico.   Jane Doe informed Joe that the party lasted into the morning of May 6, 2010.)   There were between nine and twelve guests at the party.   See id. at 69:7-8 (Nayback, Wauneka); id. at 95:7-8 (Adams, Johnson)(Wauneka states that there were "about" nine guests at the party; Johnson states that she believes there were twelve guests at the party).[4]   All guests at the party were close friends of Wauneka's.   Harry was one of Wauneka's "best friends" at the time.   Id. at 69:7-17 (Nayback, Wauneka)(Nayback: "Q did you know [Harry] at the time?" A: "He was one of my friends, best friends.").   All the guests at the party, except for Johnson, consumed a large amount of alcohol.   See id. at 86:5-7 (Samore, Wauneka)(Q: "Pretty large amounts of alcohol consumed by everyone except Stephanie, right?" A: "Yes.").

       2.       Wauneka was very drunk at the party.   See Tr. at 86:12-13 (Wauneka).

       3.       The attendees at the party decided, between 1:00 a.m. and 2:00 a.m. on May 6, 2010, that the remaining female guests would sleep in one of the two bedrooms of the home, an apartment, and the remaining male guests would sleep in the living room.   See id. at 70:14-24 (Nayback, Wauneka); id. 95:24-25 (Adams, Johnson).

       4.       Johnson awoke around 5:00 a.m. and found Harry awake.   See id. at 96:9-10

---

    [4] Johnson's and Wauneka's testimony is inconsistent regarding the total number of guests at the party.   Joe's report from his interview with Johnson on May 6, 2010, provides a list of the guests Johnson recalls were present at the party: she lists eleven individuals, including herself, Wauneka, and their child.   See Government Exhibit S7 at 1 (Navajo Nation Report of Interview with Stephanie Johnson dated May 6, 2010).   Thus Johnson's and Wauneka's testimonies are closer to consistent if Wauneka did not include Johnson and their child in his count, and if Johnson did.   The Court concludes that it need not parse the testimonies to determine an exact number of guests at the apartment on May 5-6, 2010, because the parties do not assert that this is a material fact, and because Johnson and Wauneka testified to approximately the same number of guests. Further, as guests frequently will come and go over the course of a party, at one point in the night Wauneka's count may have been accurate, while Johnson's may have been accurate at another point in the night.

(Adams, Johnson)(Q: "[Did] you wake up at any point in the evening?" A: "Yes.   I believe it was around five."); id. at 98:3-12 (Johnson)("I was walking straight to my room . . . , I turned the light back on and that's when Myron was standing there . . . .").   Other female guests at the party were also awake and were accusing Harry of assaulting Jane Doe.   See Tr. at 99: 11-16 (Johnson)("So Joe had Myron's keys, and when he came back in that's when, you know, everybody was accusing . . . [of] taking advantage of [Jane Doe].").   Harry left quickly thereafter.   See id. at 98:1-25 (Johnson); id. at 99:11-16 (Johnson).   Wauneka awoke to yelling.   See id. at 75:2-5 (Nayback, Wauneka)(Q: "[Y]ou woke up to screaming[,] yelling and fighting; is that right?"   A: "Yes."). Other guests at the house told Wauneka that Harry assaulted Jane Doe.   See id. at 75:20-8 (Nayback, Wauneka).

5.      Wauneka texted Harry between 5:00 a.m. and 7:00 a.m. on May 6, 2010 regarding the incident.   See Tr. at 76:9-11 (Nayback, Wauneka)(A: "I texted Myron and asked him what happened."); Government Exhibit S10[5] (indicating that he exchanged text messages with Harry between 5:00 a.m. and 7:00 a.m. on May 6, 2010).

6.      Wauneka asked about the alleged assault on Jane Doe.   See Tr. at 101:3-18 (Johnson, Adams); id. at 102:5-8 (Johnson)(Johnson testifying that she could see some of Wauneka's outgoing text messages to Harry and that messages were asking Harry about the alleged assault on Jane Doe).

7.      Wauneka may have sent less than eight text messages to Harry on the morning of May 6, 2010.   See Tr. at 81:9-16 (Nayback, Wauneka)(Q: "[D]o you know if you sent one text for

---

[5] Government Exhibit S10 is the Printed Results of Forensic Download of Dimitri Wauneka's cellular telephone.   See Government's Exhibit List for Hearing on Defendant's Motion to Suppress Evidence Based on Spoliation or Incompleteness at 2, filed Sept. 18, 2012 (Doc. 91)("Exhibit List").

every text you received?   There were eight text messages that you receive[d]."   A: "I don't really remember.   I think it might have been less maybe."   Q: "Might have been less?"   A: "Yes less.").

8.      Wauneka and Harry did not correspond via text messaging regarding anything except the alleged assault on the morning of May 6, 2010.   See id. at 79:21-80:3 (Nayback, Wauneka)(Q: "You were asking him about what happened, correct?" A: "Yes."   Q: "Were there any texts that you had that morning with Myron that were about some other subject matter?"   A: "No.")

9.      Johnson saw Wauneka texting Harry and had the opportunity to look at Wauneka's cellular telephone's screen while Wauneka was texting Harry.   See id. at 82:14-83:6 (Nayback, Wauneka)(Wauneka responding to the United States' question whether Johnson had the "opportunity to look at your cell phone screen" while he texted Harry, "Yes.   She wanted to know what was going on, also").

10.      Wauneka showed Johnson every text message which he sent to Harry that morning. See id. at 82:14-83:6 (Nayback, Wauneka); Tr. at 88:4-12 (Samore, Wauneka)(Q: "And are you telling this court you were also showing her each of the things you were sending to him?" A: "Yes."   Q: "Every single one?"   A: "Yes.").

11.      Johnson read one of Harry's text messages to Wauneka, in which Harry stated that he would accept charges for what he had done, but Johnson did not see the exact wording of any other text messages exchanged between Wauneka and Harry.   See Tr. at 105:3-18 (Johnson, Samore)(A: "I did see the one where it says 'I will take the charges.'"   Q: "And that's the only one you saw?"   A: "Yes."   Q: "And you didn't see any of the exact wording what Dimitri was

sending to my client, did you?"   A: "Well, no, I don't --"   Q: "Other than what you've said?"   A: "Yes.").

12.     Neither Joe, nor Louis St. Germaine, a criminal investigator for the Navajo Nation, were working alongside the United States, either with Federal Bureau of Investigation ("FBI") agents, or with United States prosecutors, before, at the earliest, May 24, 2010.  See Tr. at 21:19-22:3 (Adams, Joe)(A: "I'm a Navajo Nation criminal investigator."   Q: How long have you been employed with the Navajo Nation?"   A: "Approximately 22 years."); id. at 29:1-31:4(Adams, Joe); id. at 37:1-10 (Samore, Joe)(Q: "To whom [did Wauneka] give the cell phone, sir?" A: "To another investigator by the name of Louis St. Germa[ine]."); Government Exhibit S6[6] (report from Joe and St. Germain'e interview with Wauneka, indicating that St. Germain and Joe are criminal investigators with the Navajo Nation); Complaint, filed May 24, 2010, at 1, 7 (Joe signed the Complaint and affidavit filed therewith in support.).[7]

---

[6] The Government Exhibit S6 is a Navajo Nation Report of Interview of Dimitri Wauneka, dated May 11, 2010.   See Exhibit List at 2.

[7] The evidence identifies Joe and St. Germaine as criminal investigators for the Navajo Nation.   See Tr. at 21:16-21 (Adams, Joe)(Joe testifying that he is a "Navajo Nation criminal investigator"); id. at 37:5-10 (Samore, Joe)(Joe testifying that Wauneka gave his cellular telephone to St. Germaine, "another investigator"); Government Exhibit S6 (identifying Joe and St. Germaine as investigators with the Shiprock Police Department).   Joe testified that, after interviewing Wauneka, he contacted the Farmington Police Department for help retrieving Wauneka's outgoing messages from Wauneka's cell phone.   See Tr. at 29:14-29 (Adams, Joe)(Q: "[Did] you do anything else to try to obtain the messages sent from Dimitri to Myron?" A: "I contacted the local agency of Farmington Police Department to see if they could retrieve any outgoing or any messages related to the investigation.").   In July, 2012, Joe contacted a forensic examiner with the FBI regarding forensically interrogating Wauneka's cellular telephone.   See Government Exhibit S9 (report from Joe regarding his July 9, 2012 contact with a FBI forensic examiner and the results of the forensic examination of Wauneka's cellular telephone).   The Court concludes that, because Joe did not contact a FBI forensic examiner until after the Indictment was filed, and Joe did not testify that in his capacity as a criminal investigator for the Navajo Nation he works alongside the United States' investigators or attorneys, Joe was not

13.     Joe interviewed Harry on May 12, 2010.   See Government Exhibit S3. [8] (indicating that Joe interviewed Harry on May 12, 2010).

14.      Harry informed Joe that he texted with Wauneka on May 6, 2010, regarding the incident at Wauneka's home.   See Tr. at 46:23-24 (Adams, Joe)(A: "So when did you first learn about the text messages?"   A: "When I interviewed Myron Harry."); 47:3-19 (Adams, Joe); Government Exhibit S2[9] at 14:11-15:13 (Harry states that, after leaving Wauneka's apartment, he and Wauneka were texting regarding the alleged assault on Jane Doe).

15.     Joe did not make an effort to obtain text messages from Harry's cellular telephone. See Tr. at 48:11-17 (Court, Joe).

16.     Joe interviewed Wauneka on May 21, 2010, regarding the incident.   See id. at 25:6-12 (Adams, Joe)(Q: "Do you recall the date when you interviewed [Dimitri]?"   A: "I believe

_____

working alongside the United States when he interviewed Wauneka and attempted to retrieve Wauneka's outgoing text messages from the Farmington Police Department and Wauneka's telephone company.   See Tr. at 44:3-10 (Samore, Joe)(Samore: "When did you check with these folks in Farmington about trying to get the text messages back . . . before . . . charges were filed in this case . . . about June 29, 2010?" Joe: "Yes.").   There is no evidence that St. Germaine is now, or ever was, working alongside the United States or on its behalf.   Joe may have begun working alongside the United States when he signed the affidavit accompanying the Complaint, filed May 24, 2010 (Doc. 1).   See Complaint at 6.   On the other hand, that he did not contact a forensic investigator with the FBI until July, 2012, and he testified that he contacted the Farmington Police Department, rather than the FBI, in an attempt to retrieve Wauneka's outgoing messages before "about June 29, 2010," when the Indictment was filed, indicates that Joe was not working alongside the United States until a later date.   Tr. at 44:3-10 (Samore, Joe).   See Indictment at 1, filed June 24, 2010 (Doc. 14).   Regardless, there is no evidence that the United States was involved in the case before May 24, 2010, and thus, neither Joe nor St. Germaine working on behalf of the United States until, at the earliest, May 24, 2010.

[8] The Government Exhibit S3 is a Shiprock Police Report of Interview of Myron Harry, dated May 12, 2010.   See Exhibit List at 2.

[9] The Government Exhibit S2 is a Transcript of Myron Harry's Statement taken on May 12, 2010.   See Exhibit List at 2.

it was the 21st of May, . . . 2010."   Q: "And you mentioned that you asked [Wauneka] about some text messages?"   A: "Yes.")

17.   Joe's specific purpose for contacting Wauneka was to discuss the text messages that he exchanged with Harry on May 6, 2010.   See id. at 48:18-21 (Court, Joe)(Q: "[W]hen you had the conversation with Mr. [Wauneka] . . . did you go to him specifically to talk to him about these text messages?"   A: "Yes, sir."   Q: "Al[]right.   So that was the purpose of that meeting?"   A: "Yes.").

18.   Wauneka allowed Joe to look at his cellular telephone on May 21, 2010.   See id. at 25:18-21 (Adams, Joe).

19.   Joe took photographs of the following messages from Wauneka's cellular telephone on May 21, 2010:

"From: Myron   Whats going on? Im lost! ilmygirls :] [sic] CB:505-486-0099 May 6, 5:36 am Stored: May 6, 6:00 am" Government Exhibit S13.

"From: Myron   Ok. I know u dnt. Ill guess I have 2 accept the charges.   I still love u guys though. [sic]  CB: 505-486-0099 May 6, 6:05 am" Government Exhibit S14.

"From: Myron   Im sorry 4 what I did.   I didn't want 2 disrespect u in ur home. That's all I can say. Im sorry. il mygirls :-] [sic] CB:505-486-0099 May 6, 5:53 am" Government Exhibit S15

"From: Myron   Ok. Im sorry. ilmygirls :] [sic] CB: 505-586-0099 May 6, 6:15 am" Government Exhibit S16

"From: Myron   I knw. She was all over me the whole nite.   I remember that. ilmygirls :] [sic] CB: 505-486-0099 May 6, 6:29 am" Government Exhibit S18

"From: Myron   Well tel bean that Im sorry n That I am an idio n a stupid mafucker. Im sorry.   I wasn't in my right mind 2 do that 2 her.   Im stupid.   [sic]   That's all I can say.   CB: 505-486-0099"   Government Exhibit S19

"From: Myron   I know. It was me.   I messed up.   I should have known better.

Im sorry.   ilmygirls :] [sic] CB 505-486-0099 May 6, 6:41 am" Government Exhibit S2010

Id. at 25:4-28:7 (Adams, Joe).

20.     "Bean" is a nickname for Jane Doe.   See Tr. at 27:18-25 (Adams, Joe); id. at 68:20-25 (Nayback, Wauneka).

21.     The "CB" telephone number on the text messages in Wauneka's cellular telephone labeled as "From: Myron" matches the telephone number which Harry provided to Joe as that of his cellular telephone. Government Exhibits S13-S20.   See Tr. at 32:1-5 (Adams, Joe).[11]

22.     When Joe interviewed Wauneka, Wauneka's outgoing text messages were still on his cellular telephone.   See Tr. at 77:17-22 (Nayback, Wauneka)(Q: "At that point [did] you realize that, 'hey, my texts that I sent . . . Harry, they're not here?" A: "No.   It was all there."   Q: "It was all there?" A: "Yes.").

23.     Wauneka showed his outgoing text messages to Joe, and the two looked at both sides of the text conversation during the interview.   See Tr. at 92:2-17 (Court, Wauneka)(Q: "When Mr. Joe came and talk to you for the first time, that's when you gave him your telephone, correct?" A: "Yes." . . . Q: "You're pretty certain that when you gave him the phone it had the text messages from Mr. Harry as well as your . . . text messages to him?" A "Yes."   Q: "And so you

---

[10] The Government Exhibits S13-S20 are Photos taken of May 6 Text Messages from Myron Harry.   See Exhibit List at 2.

[11] The parties did not define the meaning of "CB" displayed on the pictures of the text messages on Wauneka's cellular phone.   The "CB" appears to refer to the originating number for the text messages.   See Tr. at 32:2-7 (Adams, Joe)(Adams: "[C]ould you read the phone number for the Court's record?"   Joe:   "I asked him for his cell phone number.   [Harry] gave me 505-486-0099."   Adams: "Was that the same cell phone number that you saw in Dimitri's phone, a[s] well?"   Joe: "Yes.").

recall that day looking at the phone and looking at your messages, as well?"   A: "Yes.");[12] Government Exhibit S6[13] at 1 (Joe's report from his interview of Wauneka states: "Dmitri showed the investigators his cellular telephone that still had the text communications between him and Myron.").

24.     Joe's fellow investigator, Louis St. Germaine took custody of Wauneka's cellular telephone at the interview.   See Tr. at 25:20-21 (Adams, Joe)(Q: "And you received Mr. [Wauneka's] permission to obtain his phone?" A: "Yes."); id. at 37:1-10 (Samore, Joe)(Joe stating, regarding his May 21, 2010 interview with Wauneka, that on that date Wauneka gave his phone to another Navajo National criminal investigator, Louis St. Germaine); Government Exhibit S6 (Report prepared by Joe regarding his interview with Wauneka stating, in reference to Harry's text messages, that: "Dimitri's cell phone was placed in evidence to preserve the above text messages. Pictures of the text messages were taken as well.").

25.     Wauneka's outgoing messages were on his cellular telephone when he gave it to St. Germaine, but when Joe tried to retrieve the outgoing messages at a later date he was unable to. See Tr. at 77:17-22 (Nayback, Wauneka)(A: "At that point [did] you realize that, 'hey, my texts

---

[12]  Joe's testimony contradicts Wauneka's on this point.   See Tr. at 28:8-22 (Adams, Joe)(A: "[Did] you have an opportunity to review any messages that were sent to Myron . . . from [Dimitri]?"   A: "There was nothing that I could see that he could pull up that there was any outgoing.").   The Court concludes that Wauneka's testimony is accurate.   It is most likely that Joe does not remember looking at Wauneka's outgoing text messages: Harry's messages were the focus of his inquiry, demonstrated by Joe only taking pictures of Harry's messages.   Wauneka may have only shown the outgoing messages to Joe for a few seconds, as Wauneka moved between Harry's messages.   Additionally, the United States asserted at the hearing that Joe is "spread thin" in his investigative duties, which further causes the Court to believe that Joe had the opportunity to see Wauneka's outgoing text messages on May 21, 2012, and he does not remember accurately this detail from the interview.   Tr. at 119:12-17 (Nayback).

[13]  The Government Exhibit S6 is a Shiprock Police Report of Interview of Dimitri Wauneka, dated May 11, 2010.   See Exhibit List at 2.

- 11 -

that I sent . . . Harry, they're not here?" A: "No.   It was all there."   Q: "It was all there?" A: "Yes."); id. at 92:2-17 (Court, Wauneka)(Q: "When Mr. Joe came and talk to you for the first time, that's when you gave him your telephone, correct?" A: "Yes."   Q: "You're pretty certain that when you gave him the phone it had the text messages from Mr. Harry as well as your . . . text messages to him?" A: "Yes."); Government Exhibit S6 (Report prepared by Joe regarding his interview with Wauneka stating, in reference to Harry's text messages, that: "Dimitri's cell phone was placed in evidence to preserve the above text messages.   Pictures of the text messages were taken as well.").[14]

26.      The exculpatory value of Wauneka's outgoing text message was not immediately apparent to Joe when he saw them at his May 21, 2010 interview.   See Government's Exhibit S2 at 14:11-15:13 (Harry)("Dimitri was texting me, and telling me, 'How could you do this?   I was

_____

[14] The Court concludes that Wauneka's outgoing text messages were still on his cellular phone when he gave it to Joe, even though Joe states that "[t]here was nothing I could see that he could pull up that there was any outgoing." Tr. at 28:12-13 (Joe).   Joe's statement is not necessarily contradictory with Wauneka's statement regarding the presence of the outgoing text messages on the cellular phone.   Joe may not have looked for Wauneka's outgoing messages immediately because his focus appears to have been on retrieving Harry's messages.   See Government Exhibits S13-S20 (photographs of Harry's messages on Wauneka's phone); Government Exhibits S6 (Report from Joe regarding his May 21, 2010 interview with Wauneka, recording Harry's messages but not Wauneka's).   Harry has admitted that outgoing text messages may only be retrievable for a certain period of time, between fifteen and thirty days, and this information is supported by the United States' forensic investigator.   See Motion to Suppress Evidence Based on Spoliation or Incompleteness at 2 n.1, filed June 26, 2012 (Doc. 75)("Based on information, texts are not recoverable by the cell companies after thirty (30) days."); Tr. at 29:1-5 (Joe)("[B]y calling the all tell company to see if that was feasible [or] [] possible, I was told that what's in a two-week range their policy was they couldn't save or retrieve what was sent out from a particular [] telephone."); Tr. at 57:16-19 (Guilmette)("Certain phones when they'll do is like say the phone has a memory that will only hold 50 messages.   If another message comes in it then it [h]as to delete one of the 50 messages that it has in order to make room for that new one.").   The Court concludes that, at the time Joe took possession of Wauneka's cellular phone, the cellular phone contained Wauneka's outgoing messages, but that, when Joe attempted to retrieve Wauneka's outgoing messages at some later date, the messages were no longer retrievable.

your friend.  How could you do this to me?'  . . . I was like, 'What did I do, Dimitri?' . . .

'[S]omebody said you raped [Jane Doe].'"); Tr. at 76:9-11, 79:21-80:3 (Nayback,

Wauneka)(Wauneka testifying that he was asking Harry about "what happened?"); id. at 101:3-18,

102:5-8 (Johnson, Adams)(Johnson testifying that Wauneka was asking Harry about "what

happened").[15]

      27.    Outgoing text messages are only recoverable from Wauneka's cellular telephone

for a certain period of time.  See Motion to Suppress at 2 n.1 ("Based on information, texts are not

recoverable by the cell companies after thirty (30) days."); Tr. at 29:1-5 (Joe)("Through

---

[15] The Court cannot hypothesize anything that Wauneka could have written to Harry that would exculpate him, to which Harry responded: "Ill guess I have 2 accept the charges [sic]," Government Exhibits S14, "tel bean that Im sorry," Government Exhibit S19, and "I know. . . . I messed up.  I should have known better," Government Exhibit S20.  Nor have the parties presented any theories as to how Wauneka's outgoing text messages could exculpate Harry.  Even though the Court concludes that Joe saw Wauneka's text messages when he interviewed Wauneka on May 21, 2010, there is nothing to indicate that Wauneka's questions to Harry about the alleged assault on Jane Doe was evidence "that might be expected to play a significant role in the suspect's defense."  California v. Trombetta, 467 U.S. 479, 488-89 (1984).  Joe's testimony indicates that, to his knowledge, Wauneka's text messages were limited to inquiring about the alleged assault; this line of questioning does not have an apparent exculpatory value.  The only possible exculpatory information which could be produced from Wauneka's outgoing text messages could perhaps be that he and Harry were not discussing Jane Doe's alleged assault, contrary to Wauneka's, Harry's, and Joe's testimonies at the hearing.  See United States v. Parker, 72 F.3d 1444, 1452 (10th Cir. 1995)("[T]he only way the erased video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as Trooper Bushell related, that is, that he was lying about the events . . . essentially a question of credibility for the district court.").  Any assertion that Wauneka's text messages would be exculpatory to Harry is "based purely on speculation and conjecture," which does not meet the standard of apparent exculpatory value that California v. Trombetta requires.  United States v. Martinez, 744 F.2d 76, 80 (10th Cir. 1984)(holding that a defendant's argument that evidence "might have contained exculpatory information" goes to the "weight and sufficiency of the government's case," but does not demonstrate that the failure to preserve the evidence was a constitutional violation under California v. Trombetta).  The Court thus concludes that, factually, Wauneka's outgoing text messages to Harry were not apparently exculpatory to Joe when he viewed them while interviewing Wauneka on May 21, 2010.  The Court will also conclude, legally, that the messages were not apparently exculpatory.

- 13 -

experience also and by calling the [] tel[ephone] company . . . , I was told that [] in a two-week range their policy was they couldn't save or retrieve what was sent out from a particular [] tel[ephone]."); id. at 57:16-19 (Guilmette)(explaining that "[c]ertain phone what they'll do is like . . . only hold 50 messages.  If another message comes in it then [h]as to delete one of the 50 messages that it has in order to make room for that new one.").

28.     Sometime after May 21, 2010, and before June 24, 2010, Joe requested the assistance of the Farmington, New Mexico Police Department in retrieving Wauneka's side of the text conversation.  See Tr. at 44:3-19 (Samore, Joe)(Q: "When did you check with these folks in Farmington about trying to get the text messages back . . . .  So it was before . . . about June 29, of 2010.  Does that sound right?"   A: "Yes."   Q: "And you interviewed [Dimitri] and took custody on May 21, prior to that?   Yes?"   A: "Yes.").   The Farmington Police Department was unable to retrieve Wauneka's outgoing messages from the morning of May 6, 2010.  See Tr. at 29:14-21 (Adams, Joe).

29.     The United States filed a criminal complaint against Harry for this matter on May 24, 2010.  See Complaint at 1.  Joe signed the affidavit accompanying the United States' Complaint.  See Complaint at 7.

30.     Joe is now the lead agent in the United States' investigation for this matter.  See Tr. at 22:4-5 (Adams, Joe)(Q: "Are you the lead agent in U.S. v. Myron Harry?" A: "Yes.")

31.     On July 9, 2012, Joe contacted a forensic examiner with the FBI regarding forensically examining Wauneka's cellular telephone.  See Government's Exhibit S9. [16]

---

[16] The Government Exhibit S9 is a Shiprock Police Report of Communications with FBI dated July 6, 2012 and July 9, 2012.  See Exhibit List at 2.

32.     The forensic examination of Wauneka's cellular telephone produced some text messages which correspond to those of which Joe took photographs.   <u>Compare</u> Government Exhibit S10, <u>with</u> Government Exhibits S13-S20.

33.     Certain messages are identified as "locked."   Government Exhibit S10.   <u>See</u> Tr. at 56:3-60:17 (Nayback, Guilmette).

34.     The significance of certain text messages being "locked" is unknown.   Tr. at 60:16-17 (Nayback, Guilmette)(Q: "What does locked mean?" A: "I'm not sure what locked means.").

35.     The date and time on Wauneka's cellular telephone may be altered, and thus, the date and time displayed on the messages retrieved from Wauneka's cellular telephone may be inaccurate by up to twenty-minutes.   <u>See</u> Tr. at 59:18-60:5 (Nayback, Guilmette); Government Exhibits S10, S13-S20.

36.     The forensic examiner would have found Wauneka's outgoing messages from May 6, 2010, if they were still physically on his cellular telephone.   <u>See</u> Tr. at 63:21-23 (Nayback, Guilmette); <u>id.</u> at 64:7-11 (Samore, Guilmette).

37.     There is no evidence that Wauneka's outgoing text messages were deleted.   <u>See</u> Tr. at 65:6-8 (Samore, Guilmette).

38.     In early July, 2010, Harry's counsel requested Wauneka's outgoing messages from the United States' attorney prosecuting this case.   <u>See</u> Tr. at 18:5-16 (Samore)("[P]robably early July, . . . I said Kyle where's the other side of these conversations.").   The United States did not have Wauneka's outgoing messages at that time, and could not procure them from any other source.   <u>See id.</u> at 18:12-16 (Samore)("[H]e got back to me and he sa[id] we don't have it we can't

- 15 -

get them back."); Motion to Suppress at 2 ("The prosecutor . . . did his diligent best to recover those records and eventually informed defense counsel that they could not be produced.").

39.     When he requested Wauneka's outgoing text messages, Harry did not inform the United States that the outgoing text messages were potentially exculpatory evidence.   See Motion to Suppress at 2 (asserting that Mr. Samore "personally contacted the prosecutor to request that the missing text messages from Dimit[r]i's side of the conversation by produced," but not stating that Mr. Samore told the United States that Wauneka's messages were material exculpatory evidence); Tr. at 18:5-16 (Samore)(Harry stating that he requested Wauneka's outgoing messages in "early July," but not stating that he told the United States that Wauneka's outgoing messages were material exculpatory evidence).

## PROCEDURAL BACKGROUND

On June 24, 2010, a grand jury indicted Harry for having knowingly engaged in a sexual act with Jane Doe, who was physically incapable of declining participation and could not communicate her unwillingness to engage in the sexual act, in violation of 18 U.S.C. §§ 1153, 2242(2), and 2246(A).   See Indictment at 1, filed June 24, 2010 (Doc. 14).   Trial in this matter is presently set for March 4, 2013, at 9:00 a.m.   See Agreed Order to Vacate and Reset Trial and Extend the Time for the Filing of Pre-Trial Motions at 4, filed January 16, 2013 (Doc. 110).

Harry moves to suppress his side of the text messages exchanged with Wauneka on May 6, 2010, as well as "any testimony concerning the content of text messages or even [that] the text messages were sent."   Motion to Suppress at 5.   Harry asserts that, because the text messages will contain only his side of the conversation, "the record is incomplete and misleading."   Motion to Suppress at 2.   Harry asserts that Wauneka cannot be accurately cross-examined regarding the

text messages, because Wauneka does not remember the conversation.   Harry thus asserts that the

text messages will be "subject to great speculation."   Motion to Suppress at 2.   Harry contends

that the text messages were entirely within the law enforcement officers' control and that it was the

officers' responsibility to preserve the record for trial.   Harry asserts that permitting the text

messages to be offered into evidence in an incomplete form violates rules 403 and 404 of the

Federal Rules of Evidence.   See Motion to Suppress at 2-3.

Harry asserts that law enforcement officers have a duty to preserve text messages in their

possession, because the messages may be producible under both Jencks v. United States, 353 U.S.

657 (1957),[17] and Brady v. Maryland, 373 U.S. 83 (1963).[18]   Harry asserts that he cannot

impeach Wauneka's testimony, because the text messages in the record contain only Harry's side

of the conversation.   See Motion to Suppress at 3.

Harry further asserts that the FBI agents participating in this case are "responsible for

failure to maintain relevant evidence that is exculpatory."   Motion to Suppress at 3 (citing United

---

[17] In Jencks v. United States, the Supreme Court of the United States held that a

criminal action must be dismissed when the Government, on the ground of
privilege, elects not to comply with an order to produce, for the accused's
inspection and for admission in evidence, relevant statements or reports in its
possession of government witnesses touching the subject matter of their testimony
at the trial.

353 U.S. at 671-72.   Congress codified this holding in 18 U.S.C. § 3500, which provides that the
United States does not have to produce the statements or reports until after a witness testifies at
trial.   See 18 U.S.C. §§ 3500(a),(b). E.g., United States v. Kimoto, 588 F.3d 464, 475 (7th Cir.
2009)("[T]he Jencks Act, 18 U.S.C. § 3500 . . . . was enacted in response to the Supreme Court's
holding in Jencks v. United States . . . .").

[18] In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution
of evidence favorable to an accused upon request violates due process where the evidence is
material either to guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution."   373 U.S. at 87.

States v. Bagley, 473 U.S. 667 (1985)).   Harry argues that he need not show that the FBI agents acted with bad faith, or intentionally withheld or destroyed the text messages, but that he need show only that "'the evidence is so immaterial [sic] that he cannot receive a fair trial without it.'" Motion to Suppress at 3 (quoting United States v. Wilks, 629 F.2d 669, 674 (10th Cir. 1980)(citing United States v. Agurs, 427 U.S. 97 (1976); United States v. Brumley, 466 F.2d 911, 916 (10th Cir. 1972)).   Harry contends that the prosecution is responsible for FBI agents' failure to preserve "critical evidence," and that the failure to preserve such evidence is "'functionally equivalent [to] destruction of evidence by FBI agents.'"   Motion to Suppress at 4 (quoting United States v. Vella, 562 F.2d 175, 276 (3d Cir. 1977)).   Harry asserts that, in a "strikingly" similar case, the United States District Court for the District of New Jersey found that the government's failure to produce "certain electronic text messages related to its investigation warranted" the suppression of other text messages.   Motion to Suppress at 4 (citing United States v. Suarez, No. CR 09-932, 2010 WL 4226524 (JLL) (D.N.J. Oct. 2, 2010)).   Harry asserts that, just as in United States v. Suarez, Wauneka's text messages were in the government's control, the governments or its agents failed to take the necessary steps to preserve the text messages, the text messages are relevant to Harry's claims and defenses, and "it was reasonably foreseeable by the Government that in the context of this investigation, the text messages would have proven discoverable."   Motion to Suppress at 4. Harry argues that Wauneka's testimony at trial would be insufficient for Harry's defense, as "a single word or, as text messages go, brief abbreviations, exclusions, or paraphrasing would be unreliable and speculative, likely misleading the jury, and frustrating the search for truth." Motion to Suppress at 4.   Harry asserts that, if the Court does not suppress the text messages, the Court should "[a]t the very least" "'give an adverse inference instruction regarding the missing

text messages.'"   Motion to Suppress at 5 (quoting United States v. Suarez, 2010 WL 4226524, at *8).

The United States asserts that the Court should not suppress the text messages unless Harry is able to show that the missing text messages have considerable exculpatory value or that the evidence was destroyed in bad faith.   See Response ¶¶ 5-7, at 3-4 (citing Arizona v. Youngblood, 488 U.S. 51 (1988); Brady v. Maryland; United States v. Hargus, 123 F.3d 1358, 1364 (10th Cir. 1997)).   The United States contends that Harry has not argued that the text messages were destroyed in bad faith, and, further, has failed to show that "allegedly missing texts had some exculpatory value."   Response ¶ 7, at 4.   The United States argues that the fact that evidence was lost or was "potentially useful" is insufficient to show that the United States acted in bad faith in destroying the evidence.   Response at 4-5 (citing United States v. Bohl, 25 F.3d 904, 910 (10th Cir. 1994)).   The United States asserts that, because Harry has not shown that the United States ever possessed the texts, Harry cannot show that the evidence was destroyed.   The United States contends that, when there is other "ample evidence" in the record to support the charge against a defendant, the other evidence supports a conclusion that the missing evidence was "'potentially useful' at best."   Response ¶ 7, at 4 (quoting United States v. Hargus, 123 F.3d at 1364).   The United States maintains that the other evidence, including eyewitness testimony that Harry was on top of Jane Doe while she slept, that Harry quickly left the premises while apologizing for his actions, and that Harry's DNA was found inside of Jane Doe, is inculpatory evidence that indicates that the missing text messages were potentially useful evidence, at best.   See Response ¶ 8, at 5. The United States argues that the possibility of the text messages exonerating Harry is insufficient to warrant the suppression of Harry's text messages under Arizona v. Youngblood.   The United

States contends that Harry has not raised any argument that the text messages have "even the slight potential to exonerate defendant Myron Harry."   Response ¶ 10, at 6.   The United States further asserts that its failure to preserve the text messages alone is not sufficient evidence of bad faith. See Response at 5.   The United States argues that, in United States v. Hargus, the United States Court of Appeals for the Tenth Circuit found that a defendant's similar failure to show that the government acted with bad faith, in addition to other evidence in the record supporting the defendant's guilt, warranted admission of the evidence which the defendant sought to suppress under Arizona v. Youngblood.   The United States asserts that the Court should come to the same conclusion here.   See Response ¶ 11, at 6.

The United States further asserts that the admission of Harry's text messages would not result in prejudice.   The United States argues that unfair prejudice occurs only where the admission of evidence "'makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to the guilt or innocence of the crime charges.'"   Response ¶ 12, at 7 (quoting United States v. Tan, 254 F.3d 1204, 121-12 (10th Cir. 2001)).   The United States asserts that, "where there exists other evidence in support of the defendant's guilt," lost evidence does not prejudice a defendant.   Response ¶ 13, at 7 (citing Fero v. Kerby, 39 F.3d 1462, 1471 (10th Cir. 1994)).   The United States argues that lost evidence is prejudicial to a defendant only where "'he could not receive a fair trial without it.'"   Response ¶ 13, at 7 (quoting United States v. Wilks, 629 F.2d at 674).   The United States asserts that the possibility that evidence might be helpful to Harry is insufficient for its absence to be prejudicial.   See Response ¶ 13, at 7 (citing United States v. Agurs, 427 U.S. 97, 109-10 (1976); United States v. Wilks, 629 F.2d at 674).

The United States asserts that, unless the missing text messages would exonerate Harry, which the United States argues they would not, their absence at trial is not prejudicial to him.  See Response ¶ 14, at 7 (citing United States v. Wilks, 629 F.2d at 674).   The United States asserts that even the absence of evidence which is "considerably favorable" is not automatically prejudicial to a defendant, when the culmination of other evidence indicates the defendant's guilt.   Response ¶ 15, at 8 (citing Fero v. Kerby, 39 F.3d at 1471).   The United States contends that Harry has not met his burden of showing "that the text messages carried significant probative value with regard to the defendant's guilt or innocence," and thus their absence is not prejudicial to him, and the remaining text messages should not be suppressed.   Response ¶ 16, at 8.

Harry argues that Arizona v. Youngblood and United States v. Bohl, 256 F.3d 904, 910 (10th Cir. 1994), support his position that the Court should suppress the text messages, because he needs to show only that the value of the Wauneka's text messages was "'not apparent before the evidence was destroyed.'"   Reply to Response to Defendant's Motion to Suppress Evidence Based on Spoliation or Incompleteness at 1, filed July 20, 2012 (Doc. 77)("Reply")(quoting United States v. Bohl, 256 F.3d at 910).   Harry asserts that all that will be left to the jury from the text messages is "dangerous speculation," because Wauneka's side of the conversation is missing. Reply at 1.   Harry further contends that the text messages' exculpatory value is not for the prosecution to decide and that exculpatory evidence is "arguably all evidence that is not inculpatory."   Reply at 2.   Harry further asserts that "[n]either party will ever know the extent of what is exculpatory due to the negligence of the agents who had the cellular telephone in their custody at a time when the whole exchange could have been preserved."   Reply at 2 (internal quotations omitted).   Harry contends that allowing the text messages into evidence would violate

rule 403 and 404.   He also contends that the United States "is mistaken if [it] presumes that any apologies in the Harry side of the conversation are for criminal conduct."   Reply at 2.

The Court held an evidentiary hearing on September 19, 2012.   See Transcript of Hearing (taken September 19, 2012)("Tr.").[19]   The United States asserted that Harry's text messages are "incriminating" and "highly probative of the defendant's state of mind," and stated that it will seek to introduce them into evidence under rule 801(d)(2), 802(1), or 803(2) of the Federal Rules of Evidence.   Tr. at 13:7-23 (Nayback).   The United States asserted that it "has never had in its possession the other half of the text message conversation."   Tr. at 13:24-14:1 (Nayback).   The United States asserted that some telephone companies will only store text messages for two weeks, or possibly thirty-days, but that, if the United States does not subpoena the messages in time, there is no way to obtain them after the telephone companies deletes them.   See Tr. at 14:1-8 (Nayback).   The United States stated that it never possessed Harry's cellular telephone.   See Tr. at 14:25-15:1 (Court).   The United States asserted that, when it acquired Wauneka's cellular telephone, his outgoing messages were not in it.   See Tr. at 15:2-14 (Nayback, Court).   The United States asserted that it called Wauneka's telephone company to try to procure the messages, but was informed that, after two weeks, those messages are no longer available.   See Tr. at 15:24-16:5 (Nayback).   The United States thus argued that the cases in which a court found that the destruction of evidence was prejudicial are inapplicable to Harry's arguments, because the United States never had the text messages in its possession.   See Tr. at 16:8-19 (Nayback).   The Court inquired why the outgoing messages would have been deleted but not the incoming

---

[19] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

messages on Wauneka's cellular telephone, and the United States responded that it does not know why, but asserted that its forensic witness may be able to provide plausible reasons for their absence.  See Tr. at 17:4-12 (Court, Nayback).  Harry pointed out that the United States had access to Wauneka's cellular telephone the day Joe interviewed him, and that the United States informed Harry after the Indictment, a few months later, that it could not acquire the Wauneka's side of the conversation.  See Tr. at 18:5-25 (Samore).

Before witnesses began testifying, the Court ordered, upon the United States' request, that the other witnesses remain outside of the courtroom while a witness testified, and ordered the witnesses not to speak with each other, but allowed the witnesses to discuss their testimony with the attorneys.  See Tr. at 19:16-22 (Nayback, Court).  The parties stipulated to the admission of all exhibits in the United States' Exhibit List, filed September 18, 2012 (Doc. 91), and the Court admitted the exhibits into evidence.  See Tr. at 20:6-15 (Court, Samore).  The United States called Joe, see Tr. at 21:4-6 (Wild, Joe), Jeremy Guilmette, a computer forensic examiner with the FBI, see id. at 52:12-14 (Wild, Joe), Government Exhibit S8,[20] Wauneka, see Tr. at 66:6-14 (Nayback, Wild, Wauneka), and Johnson, see id. at 93:8-15 (Adams, Court, Wild).  Harry did not call witness but conducted cross-examination of the United States Witnesses.  See Tr. at 35:1-46:7 (Samore, Joe)(cross examination of Joe by counsel for Harry, John F. Samore); id. at 49:7-51:4 (re-cross examination of Joe by Mr. Samore); id. at 64:3-65:12 (cross-examination of Guilmette by Mr. Samore); id. at 83:15-89:5 (Samore, Wauneka)(cross-examination of Wauneka by Mr. Samore); id. at 103:10-106:16 (cross-examination of Johnson by Mr. Samore).

After the Court took testimony, Harry argued that, based on Wauneka's testimony, when

---

[20] The Government Exhibit S8 is a Curriculum Vitae of Jeremy Guilmette.  See Exhibit List at 2.

he turned his cellular telephone over to Joe both Wauneka's outgoing texts and Harry's incoming texts were still on the cellular telephone.   See Tr. at 109:23-110:5 (Samore).   Harry noted that, at least for a period of time, the United States had both sides of the messages on the cellular telephone, and, thus, Harry initially asserted that the United States may be liable for spoliation of the evidence.   See Tr. at 110:20-24 (Court, Samore).   Harry maintained, however, that his main argument is that the Court should suppress the text messages, as spoliation is rarely if ever used in criminal cases, and he believes the proper remedy is for the Court to exclude the text messages in their entirety.   See Tr. at 110:25-111:8 (Samore).   Harry argued that the text messages are unreliable evidence and inadmissible under rules 403 and 404: he pointed out that the guests had consumed a large amount of alcohol at the party and that the jury would be inclined to speculate regarding the meaning of the text messages.   See Tr. at 111:17-112:7 (Samore).   Harry asserted that his primary argument is not that admission of the evidence would be unconstitutional, but that the evidence is more prejudicial than probative under rule 403.   See Tr. at 112:9-11 (Samore). Harry argued that Wauneka's testimony at the hearing, regarding Johnson viewing the text messages as he sent them, was new information which Wauneka did not mention in his grand-jury testimony or previous interviews.   See Tr. at 113:4-16 (Samore).

The Court stated that, had there been no allegations of spoliation or destruction of evidence, then the admissibility of the text messages would likely be determined by the best evidence rule, and Harry agreed.   See Tr. at 113:25-114:5 (Court, Samore).   Harry asserted, however, that allowing Johnson and Wauneka to testify to the contents of the outgoing texts, and admitting the contents of Harry's messages into evidence, would be unfairly prejudicial to him. See Tr. at 114:11-115:14 (Court, Samore).   The Court inquired whether Harry believed it was

possible that Wauneka sent a few general text messages regarding the alleged assault, to which Harry replied with the eight messages.  See Tr. at 115:15-24 (Court, Samore).  Harry asserted that, even if that scenario occurred, admitting the text messages would still be unfair to him, and Harry asserted that the United States may have been leading Wauneka when he testified that he might have sent only a few messages to Harry.  See Tr. at 116:1-12 (Samore).  Harry argued that, if the Court admits the text messages, the trial will be determined by supposition and Harry's personal history, rather than on reliable evidence.  See Tr. at 117:2-8 (Samore).  Harry asserted that just as a letter is not admissible without its response, the text messages should not be admissible with Wauneka's half of the conversation.  See Tr. at 117:8-10 (Samore).  Harry asserted that cross-examining the United States' witnesses will not be effective without Wauneka's text messages.  See Tr. at 117:10-12 (Samore).  Harry asserted that "the reliability of anything any of these folks said is already under[mined] because of the alcohol consumption." Tr. at 117:13-15 (Samore).  Harry asserted that Wauneka did not remember everything that happened that night.  See Tr. at 117:15-17 (Samore).  Harry conceded that he "really can't establish intentional spoliation," but argued that the text messages do not satisfy the best evidence rule, and thus the messages should not be admitted at trial.  Tr. at 118:1-4 (Samore).

The United States admitted that Joe's report from interviewing Wauneka did not affirmatively state whether Wauneka's cellular telephone had his text messages in it, and admitted that a logical reading of Joe's report would lead one to "think that it had both" sides of the conversation.  Tr. at 119:2-3 (Nayback); id. at 119:7-8 (Nayback).  The United States nonetheless stated that there is not a constitutional issue with admitting the text messages from Harry, which the United States asserts are "very reliable evidence [and] material to the

Government's case."   Tr. at 120:44-13 (Nayback).   The United States asserted that, even if Joe was found to be a not credible witness and the United States at some point possessed the text messages from Wauneka, Harry had not shown that the messages were destroyed in bad faith, as would be necessary to suppress them under Arizona v. Youngblood and United States v. Suarez. See Tr. at 12:13-24 (Nayback).   The United States argued that the text messages would provide "fertile ground for cross-examination," and that the lack of Wauneka's side of the conversation did not make Harry's statements over text inadmissible.   Tr. at 121:1-12 (Nayback).   The United States asserted that, although the text messages may be prejudicial to Harry, they are also probative of his state of mind, and Harry can take the stand and testify about the text messages if he wishes to diminish the prejudicial effect.   See Tr. at 121:16-22 (Nayback).

Harry asserted that he may have been apologizing just as part of his polite nature and noted that, when Joe interviewed him, he did not mention sexual assault or doing anything against somebody's will.   See Tr. at 122:12-22 (Samore).   Harry conceded that he was not arguing that admitting the text messages would violate his due-process rights, and stated that "I don't think there's sufficient [evidence] that there was bad faith in destroying it.   I want to confirm that."   Tr. at 123:1-7 (Samore).   Harry argued, nonetheless, that even if his text messages were destroyed in negligence, the United States had access to his side of the conversation for "well over a year" after the alleged assault and before Harry was charged, and thus the "only fair remedy" is suppression of the messages.   Tr. at 123:5-16 (Samore).

The Court stated that it does not believe there is evidence of bad faith, but it is troubled by the tension between Joe's testimony and Wauneka's testimony regarding the existence of Wauneka's outgoing text messages.   See Tr. at 123:18-23 (Court).   The Court noted that Joe

appears to be "stretched pretty thing and may not have conducted a very good investigation, but I

don't see any intentional conduct or bad faith."   Tr. at 123:24-124:1 (Court).   The Court stated

that, if the primary issue is whether the messages are admissible under rule 403, the Court is

inclined to allow the text messages into evidence.   See Tr. at 124:6-8 (Court).   The Court noted

that the evidence is "highly probative, given the facts here," although also "highly prejudicial," but

the Court stated that it did not believe the messages were unfairly prejudicial.   Tr. at 124:6-10

(Court).   The Court noted that in many scenarios one side of a conversation may be admissible but

not the other.   See Tr. at 124:10-14 (Court).   The Court also stated that it does not believe that the

messages are "terribly unreliable," and that Johnson's and Wauneka's testimony gives the Court

some sense of the context for the text messages.   Tr. at 124:15-22 (Court).   The Court stated that

"most of the defendant's objections go to the weight of the evidence and criticisms of it and

reinterpretations, but that doesn't seem to me to be a reason to exclude the evidence."   Tr. at

124:22-25 (Court).   The Court stated that the parties should assume that there is not a problem

with the text messages from a "constitutional or spoliation or Brady issue," and that the Court is

inclined to think that the evidence is admissible under rule 403.   Tr. at 125:1-7 (Court).

## LAW REGARDING DUE-PROCESS VIOLATIONS UNDER BRADY V. MARYLAND

"The Due Process Clause of the Constitution requires the United States to disclose

information favorable to the accused that is material to either guilt or to punishment."   United

States v. Padilla, No. CR 09-3598, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning,

J.).   In Brady v. Maryland, the Supreme Court explained that "the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution."  373 U.S. at 87.  In Giglio v. United States, 405 U.S. 150 (1972), the Supreme

Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in

impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405

U.S. at 153; United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment

evidence is considered exculpatory for Brady purposes."); Douglas v. Workman, 560 F.3d 1156,

1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a

defendant and 'evidence that the defense might have used to impeach the [United States']

witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676

(1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment

evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the

Supreme Court has refined Brady v. Maryland and clarified that it is not necessary that a defendant

request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and

constitutional error results from its suppression by the government 'if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v.

Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's

obligation to disclose exculpatory evidence does not turn on an accused's request."); United States

v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to

disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

"[T]he Due Process Clause does not require the government to disclose before trial the names of its

witnesses, just so the defense can have sufficient time to investigate their backgrounds for

impeachment information."  United States v. Ashley, 274 F. App'x 693, 697 (10th Cir.

2008)(unpublished).  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.").

"An 'open file' policy is neither mandated by the Constitution . . . nor is it ipso facto constitutionally sufficient." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 828 (10th Cir. 1995)(internal citations and quotations omitted).  "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 828 (internal quotations omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. at 438 (internal citations omitted).

The United States' good faith or bad faith is irrelevant in determining violations of Brady v. Maryland.  See Brady v. Maryland, 373 U.S. at 87.  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."  514 U.S. at 433 (internal quotations omitted).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every

possible shred of evidence that could conceivably benefit the defendant."   Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.   "'[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure' and it acts at its own peril by failing to comply adequately with an order requiring disclosure of Brady material." United States v. Lujan, 530 F. Supp. 2d 1224, 1230 (D.N.M. 2008)(Brack, J.)(quoting United States v. Presser, 844 F.2d 1275, 1281 (6th Cir. 1988)).

Under Brady v. Maryland, the Supreme Court has held that an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."   Kyles v. Whitley, 514 U.S. at 437.   On the other hand, "[t]here is no Brady violation where the defendant knew or should have known of the material, exculpatory information or where the information was available to him from another source."   United States v. Lujan, 530 F. Supp. 2d at 1230 (citing United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007).

1.     **Suppression.**

Brady v. Maryland requires disclosure of information only in the government's possession or knowledge, whether actual or constructive.   See United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999), cert denied, 529 U.S. 1077 (2000); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (noting that, because a district attorney's office had actual knowledge that there was a separate investigation by authorities in a separate county, it was reasonable to impute knowledge possessed by the separate county to prosecution).   The Tenth Circuit explained in Smith v. Sec'y of N.M. Dep't of Corr. that, "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a Brady claim, such proof is by no means necessary."   50 F.3d at 824.   Under Kyles v. Whitley, the

prosecution's actual possession of the information is irrelevant.  Every federal prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."  Kyles v. Whitley, 514 U.S. at 437.  Under Brady v. Maryland, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989).   On the other hand, "[i]t is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.)(holding that the United States does not have duty under Brady v. Maryland to produce evidence it does not possess, or to "seek information from other governments," such as the Navajo Nation, and thus the United States was not required to produce Navajo Nation Police records, even though the United States may have been able to "get the information [Defendant] Badonie seeks merely by requesting them").

"[A] prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."  Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  The "prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."  United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)(citing Scott v. Mullin, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002)).   "A prosecutor may have a duty to search files maintained by other

'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).   The Tenth Circuit in United States v. Beers held that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of Brady v. Maryland where there is no joint investigation by federal and state officials.   See 189 F.3d at 1304.   See also United States v. Romo, 914 F.2d 889, 899 (7th Cir. 1990)(holding that court did not err in denying request to compel prosecutors to make various inquires of local police in absence of showing by defendant that specific material, exculpatory information existed of which government knew).   The Tenth Circuit in United States v. Beers, however, left open the question whether knowledge possessed by state officials would be imputed to the federal prosecutor where the federal government participated in a joint investigation with state officials.   See 189 F.3d at 1304, 1304 n.2.   The Court has previously determined that the New Mexico State Police ("NMSP") is not closely aligned with a federal prosecution when NMSP officers are government witnesses in the federal prosecution of an illegal alien in possession of a firearm.   United States v. Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 3834061, at *1, *3, *8 (D.N.M. Aug. 12, 2010)(Browning, J.); United States v. Huerta-Rodriguez, No. CR 09-3206, Complaint at 1-2, filed Oct. 27, 2009 (Doc. 1); United States v. Huerta-Rodriguez, No. CR 09-3206, Indictment at 1, filed Nov. 4, 2009 (Doc. 11).   In United States v. Huerta-Rodriguez, the Court, accordingly, found that it could not compel the United States to produce the NMSP officers' personnel files, because the files were stored at the NMSP office and, thus, not in the United States' possession.   See 2010 WL 3834061, at *4, *10 (holding that the United States cannot be compelled to produce NMSP

- 32 -

officers' personnel files, because the United States was only allowed to review the files at the NMSP office, and could not remove or photocopy any documents without a subpoena).

A prosecutor does not have a duty to obtain evidence from third parties.   See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties); United States v. Baker, 1 F.3d 596, 598 (7th Cir. 1993)("Certainly, Brady does not require the government to conduct discovery on behalf of the defendant."); United States v. Flores, 540 F.2d 432, 437 (9th Cir. 1976)(noting that government has no duty to fish through public records equally accessible to defense to collate information); United States v. Lujan, 530 F. Supp. 2d at 1231 (stating there is no affirmative duty to discover information in possession of independent, cooperating witness and not in government's possession)(internal citations omitted).   Accordingly, in United States v. Badonie, the Court determined that it could not compel the United States to produce Navajo Nation files, including the personnel files from Navajo Nation officers whom the United States intended to call at trial, because the United States did not possess the files.   See 2005 WL 2312480, at **1-3. The Court explained that, although "the United States may have an obligation to seek information from 'closely aligned' United States agencies, . . . its obligations does not require it to seek information from other governments," such as the Navajo Nation.   2005 WL 2312480, at *3 (quoting United States v. Brooks, 966 F.2d at 1503).   The Court held, thus, that because the personnel files and other evidence which the defendant sought to be produced were in the possession of the Navajo Nation, the United States could not be compelled to produce the evidence, even though the United States may have been able to "get the information Badonie seeks

merely by requesting" it.   2005 WL 2312480, at *3.[21]

_____

[21] The Tenth Circuit has cited United States v. Brooks with approval, but has not indicated that it would adopt the same interpretation of Kyles v. Whitley's holding -- that a state prosecutor has a "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police'" -- as the United States Court of Appeals for the District of Columbia Circuit did in United States v. Brooks.   United States v. Combs, 267 F.3d at 1175 (quoting Kyles v. Whitley,514 U.S.at 438)(citing United States v. Brooks, 966 F.2d at 1500-04). Unlike the District of Columbia Circuit, which, in United States v. Brooks, held that a federal prosecutor had a duty to learn of exculpatory material which the metropolitan police possessed, in United States v. Beers, the Tenth Circuit held that, absent a joint federal-state investigation, a federal prosecutor had no duty to learn of exculpatory materials which state officials possessed. Compare United States v. Brooks, 966 F.2d at 1501, 1503, with United States v. Beers, 189 F.3d at 1304 (holding that, in regards to a federal prosecutor's duty under Brady v. Maryland, "we decline to extend this principle for federal prosecutors to exculpatory materials in the possession of the state government").   The Tenth Circuit explicitly left open the question whether state law enforcement officers' knowledge could be imputed to federal prosecutors if the state officials were jointly investigating the same crime with the federal government.   See United States v. Beers, 189 F.3d at 1304 n.2 ("We note that there is no evidence that the federal government participated in a joint investigation of Lujan with New Mexico state officials. . . .   [W]e do not decide whether we would impute knowledge possessed by state law enforcement officials in that situation.")

In United States v. Brooks, the District of Columbia Circuit held that an Assistant United States Attorney had the duty, under Brady v. Maryland, to search, or "have a suitably responsible person in the Metropolitan Police Department review . . . any homicide and any Internal Affairs Division files of the Department that may contain material exculpatory information" pertinent to the credibility of a police officer -- the United States' key witness -- who was killed shortly after testifying against the defendant.   See 966 F.2d at 1501, 1504.   The District of Columbia Circuit focused on the "close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both federal and District crimes, in both the federal and Superior courts), a relationship obviously at work in this prosecution," and held that the United States' duty under Brady v. Maryland "must reach the police department's homicide and Internal Affairs Division files."   966 F.2d at 1503.   Regarding the implication of United States v. Brook's in determining "how much knowledge possessed by various arms of the State should be imputed to the prosecution," the Tenth Circuit has described the District of Columbia Circuit's holding as unclear.   Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (citing United States v. Brooks and stating that the "District of Columbia . . . [has] not clearly defined the extent of the obligation").   The Tenth Circuit has discussed United States v. Brooks in two cases: United States v. Combs, 267 F.3d 1167 (10th Cir. 2001), and Smith v. Sec'y of N.M. Dep't of Corr.   In neither case did the Tenth Circuit indicate that it would adopt a similar stance as the District of Columbia Circuit.   See United States v. Combs, 267 F.3d at 1172, 1175 (discussing United States v. Brooks in regards to whether United States Pretrial Services' knowledge could be imputed to federal prosecutors, and suggesting that the District of Columbia Circuit "suggests that

- 34 -

Brady is broadly construed to apply to agencies in reasonable proximity to the prosecution," but declining to "resolve this . . . in this case," because the evidence allegedly withheld was immaterial); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (discussing United States v. Brooks with respect to whether Torrance County district attorneys' knowledge may be imputed to Bernalillo County district attorneys, "two arms of the State," and describing the District of Columbia Circuit's holding as "not clearly defined," but finding that, because the Bernalillo County district attorneys had actual knowledge of Torrance County's criminal investigation into the same homicide, "it is reasonable to impute the knowledge possessed by each entity to the prosecution under Brady," and noting that this holding "relieves us from having to determine the full extent of when knowledge possessed by an arm of the State will be imputed to the prosecution"). The Tenth Circuit, therefore, has focused on whether state prosecutors have actual knowledge of potentially exculpatory evidence possessed by another arm of the state or whether the suppressed evidence was material, and has declined to determine whether and when police officers or state law enforcement officers' knowledge may be imputed to federal prosecutors. There is a great need for clarity and bright lines in this area, so that Assistant United States Attorneys know precisely their duties; United States v. Brooks creates too much fuzziness, and, the Court is not inclined to follow it without more express direction from the Tenth Circuit.

The Court determines, however, that, if the Tenth Circuit adopted United States v. Brooks' holding, the Court's decision of United States v. Badonie and United States v. Huerta-Rodriguez would still be sound. Unlike the "close working relationship" between the United States Attorney for the District of Columbia, "who prosecutes both federal and District crimes, in both federal and Superior courts," United States v. Brooks, 966 F.2d at 1503, the United States Attorney for the District of New Mexico does not prosecute tribal crimes, in tribal court. Thus, the presence of Navajo Nation officers as testifying witnesses in United States v. Badonie does not alone indicate that the Navajo Nation was closely aligned with the United States Attorneys in its prosecution, or that the officers were working on the United States' behalf for purposes of Brady v. Maryland, and therefore, neither the Navajo Nation's possession nor knowledge of exculpatory information could be imputed to the United States. Similarly, the Tenth Circuit has held that the federal government cannot be compelled to produce evidence which state investigators possess where the federal and state entities are not jointly investigating a criminal case. See United States v. Beers, 189 F.3d at 1304. Thus, because the NMSP officers in United States v. Huerta-Rodriguez were only testifying witnesses, and not joint investigators, the Court determined that the United States cannot be compelled to produce personnel files which the NMSP possess.

> [The] Assistant United States Attorney . . . informed the Court that it is the procedure of the United States Attorney's office to request to view the personnel files of testifying witnesses from the New Mexico State Police . . . . [T]he New Mexico State Police Department does not turn over the officers' personnel files without a subpoena.

United States v. Huerta-Rodriguez, 2010 WL 3834061, at *4

- 35 -

The Brady v. Maryland doctrine is nonetheless interpreted broadly to encourage prosecutors to carry out their "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" United States v. Combs, 267 F.3d 1167, 1174-75 (10th Cir. 2001)(quoting Kyles v. Whitley, 514 U.S. at 437-38). "Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." United States v. Beers, 189 F.3d at 1304. Accordingly, in Smith v. Sec'y of N.M. Dep't of Corr., the Tenth Circuit held that Torrance County's knowledge from a criminal investigation could be imputed to Bernalillo County's district attorney's office investigation into the same matter, because the Bernalillo County district attorney's office had actual knowledge of Torrance County's investigation, and because both entities were "two arms of the State." 50 F.3d at 825 n.36.

The Constitution "does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.'" United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. 657, 667 (1957). A defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files. See Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). The Brady v. Maryland rule is not an evidentiary rule that grants broad discovery powers to a defendant, because there "is no general constitutional right to discovery in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 559 (1977).

> [T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.

United States v. Agurs, 427 U.S. at 109-10 (internal quotations and citations omitted), rev'd on other grounds by United States v. Bagley, 473 U.S. 667.   See Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir.2000)("Brady does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up.").

> ### 2.   **Material Exculpatory Evidence.**

The holding in Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment."   373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   United States v. Bagley, 473 U.S. at 682.   See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).   A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).   The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."   United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).   The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material."   Douglas v. Workman, 560 F.3d at 1173.   Further, "[t]o be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)).

The Supreme Court, in Cone v. Bell, 556 U.S. 449 (2009), recently noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.   See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley

(and, hence, in <u>Brady</u>) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").   <u>See also</u> ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.   Favorable evidence is only material and thus subject to mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."   <u>Cone v. Bell</u>, 556 U.S. at 470 (quoting <u>Kyles v. Whitley</u>, 514 U.S. at 435).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first point out that such materials exist.   <u>See Kyles v. Whitley</u>, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached."); <u>United States v. Deutsch</u>, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), <u>overruled on other grounds by</u> <u>United States v. Henry</u>, 749 F.2d 203 (5th Cir. 1984); <u>United States v. Padilla</u>, 2011 WL 1103876, at *6.   The United States' good faith or bad faith is irrelevant.   <u>See Brady v. Maryland</u>, 373 U.S. at 87; <u>United States v. Quintana</u>, 673 F.2d at 299 ("Under <u>Brady</u>, the good or bad faith of government agents is irrelevant.").   "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."   <u>Kyles v. Whitley</u>, 514 U.S. at 439.   The United States has an obligation to "volunteer exculpatory evidence

never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).   On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.   Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the Government." United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667)(internal quotation marks omitted).   Applying these principles, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, recently granted a defendant's motion for a new trial where the government did not disclose that its key witness -- a law enforcement investigator -- "extorted assets from a drug dealer, assisted Mexican drug cartels, and assisted in alien smuggling." United States v. Ricky Reese, No. CR 11-2294 RB, Memorandum Opinion and Order at 5, filed Feb. 1, 2013 (Doc. 404).   Because the investigator's credibility "was vitally important at trial," given that the "prosecution focused on the contradiction in the testimony of Deputy Batts and [Defendant] Terri Reese in closing arguments," and on that basis questioned the defendant's credibility, Judge Brack determined that the impeachment information "could have easily altered the outcome of the trial."   No. CR 11-2294 RB, Memorandum Opinion and Order at 10 (Doc. 404).

## RELEVANT LAW ON GOVERNMENT DESTRUCTION OF EVIDENCE

The Tenth Circuit has held that:

"The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. Brady and its progeny address exculpatory

> evidence still in the government's possession. Arizona v. Youngblood, 488 U.S.
> 51 . . . (1988) and California v. Trombetta, 467 U.S. 479 . . . (1984) govern cases in
> which the government no longer possesses the disputed evidence."

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34 (quoting Fero v. Kerby, 39 F.3d at

1472)(internal alterations omitted). Accord United States v. Gomez, 191 F.3d 1214,

1218-19 (10th Cir. 1999). The remedy provided when the government violates a defendant's

due-process rights under either California v. Trombetta or Arizona v. Youngblood is severe:

"[W]hen evidence has been destroyed in violation of the Constitution, the court must choose

between barring further prosecution or suppressing . . . the State's most probative evidence."

California v. Trombetta, 467 U.S. at 487. See United States v. Bohl, 25 F.3d at 914

("Accordingly, after concluding that there has been a violation of Youngblood, the decision to

either suppress the government's secondary evidence describing the destroyed material or to

dismiss the indictment turns on the prejudice that resulted to the defendant at trial."); United States

v. Fletcher, 801 F.2d 1222, 1225 n.3 (10th Cir. 1986)(remanding for a hearing on whether the

government violated California v. Trombetta, and, if so, whether the proper remedy would be to

suppress evidence derived from the lost or destroyed material, or to dismiss the indictment).

"Under the two-prong Trombetta test, the government violates a defendant's right to due

process when: (1) it destroys evidence whose exculpatory significance is 'apparent before'

destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other

reasonably available means.'" United States v. Bohl, 25 F.3d at 909-10 (quoting California v.

Trombetta, 467 U.S. at 489). "To invoke Trombetta, a defendant must demonstrate that the

government destroyed evidence possessing an 'apparent' exculpatory value." United States v.

Bohl, 25 F.3d at 910 (quoting California v. Trombetta, 467 U.S. at 489). The government

commits a constitutional violation when it destroys evidence "that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. at 488-89. "We think the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." United States v. Wilks, 629 F.2d at 675.[22] In United States v. Wilks, the Tenth Circuit found that lost evidence was not so

_____

[22] The Tenth Circuit does not cite to either California v. Trombetta or Arizona v. Youngblood in United States v. Wilks. See United States v. Wilks, 629 F.2d at 671-75. In United States v. Wilks, the Tenth Circuit analyzed whether the United States' loss of a lemonade can that was found in a defendant's cell and contained the heroin for which the defendant was charged violated the defendant's due-process rights. See 629 F.2d at 674-75. The Tenth Circuit did not cite to either California v. Trombetta or Arizona v. Youngblood in its decision. See 629 F.2d at 671-75. The defendant's argument, however, was that "the trial court abused its discretion in refusing to dismiss the case because an item of evidence was lost by the government." 629 F.2d at 674. A trial court may dismiss a case when the government's destruction of evidence violates a defendant's due-process rights under California v. Trombetta or Arizona v. Youngblood. See California v. Trombetta, 467 U.S. at 487 ("[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence."). The defendant, thus, sought a remedy which would only be available under California v. Trombetta or Arizona v. Youngblood. The Tenth Circuit noted that the defendant was not alleging "bad faith or intentional withholding or destruction on the part of the government," and, thus, the defendant's theory was not that the government violated his due-process rights under Arizona v. Youngblood. United States v. Wilks, 629 F.2d at 674. See United States v. Bohl, 25 F.3d at 910 ("The Court in Youngblood extended Trombetta to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." (quoting Arizona v. Youngblood, 488 U.S. at 58)). The trial court, therefore, could only have dismissed the case if the government's loss of the lemonade can violated the defendant's due-process rights under California v. Trombetta. Additionally, the Tenth Circuit cited to United States v. Agurs when it announced that, when a defendant does not demonstrate that evidence was destroyed intentionally or in bad faith, "the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." United States v. Wilks, 629 F.2d at 674. The Supreme Court applied United States v. Agurs' standard of "constitutional materiality" in California v. Trombetta, indicating that the United States v. Agurs' standard of materiality is applicable when determining whether the government's loss of evidence violates a defendant's due-process rights under California v. Trombetta. California v. Trombetta, 467 U.S. at 488-89 (citing United States v. Agurs, 427 U.S. at 109-110). The Court concludes, thus, that in United States v. Wilks, the Tenth Circuit was applying California v. Trombetta's test to determine

material that that its loss rendered a defendant's trial unfair, because the evidence "could not prove defendant's innocence . . . . " 629 F.2d at 675.   The defendant was charged with possessing heroin with an intent to distribute, but the government lost a lemonade can containing the heroin that was found in the defendant's cell.  629 F.2d at 672, 675.  The defendant asserted that the lemonade can was the one piece of evidence which could exculpate him, because, if his fingerprints were not on the can, the government would have no evidence that he possessed the heroin.   The Tenth Circuit noted that the absence of the defendant's fingerprints on the lemonade can would be material to his defense, but disagreed that the loss of the can caused his trial to be unfair, because the can could not, alone, prove his innocence.   Another inmate had testified that he placed the can with the heroin in the defendant's cell, but the United States undermined this confession with other evidence.   The Tenth Circuit determined that the "absence of Wilks' fingerprints on the can . . . would provide cumulative evidence," given that another inmate confessed to the offense.   629 F.2d at 674-75.   Because the lemonade can could not alone prove the defendant's innocence, and would be cumulative to the other inmate's confession, the Tenth Circuit determined that the loss of the lemonade can did not render the defendant's trial unfair and violate his due-process rights.   See United States v. Wilks, 629 F.2d at 674-75.

If the exculpatory value of evidence that the United States failed to preserve is "indeterminate," then the defendant must show: (i) that the evidence was "'potentially useful' for the defense;" and (ii) "that the government acted in bad faith in destroying the evidence."   United States v. Bohl, 25 F.3d at 910 (quoting Arizona v. Youngblood, 488 U.S. at 58).   "Potentially

_____

whether the government's loss of the lemonade can violated the defendant's due-process rights, even though the Tenth Circuit does not cite to California v. Trombetta in its opinion.

useful evidence" is "evidence of which 'no more can be said than that it could have been subjected to tests, the results of which <u>might</u> have exonerated the defendant.'"   <u>United States v. Bohl</u>, 25 F.3d at 910 (emphasis in original)(quoting <u>Arizona v. Youngblood</u>, 488 U.S. at 57).   Unlike asserted violations of <u>Brady v. Maryland</u>, for which the prosecutor's state of mind is irrelevant, if a defendant asserts that the prosecution violated his or her due-process rights by failing to preserve potentially exculpatory evidence, the defendant may prevail under <u>Arizona v. Youngblood</u> only if he or she demonstrates that the prosecution's failure to preserve the evidence was done in bad faith.   See <u>United States v. Pedraza</u>, 27 F.3d 1515, 1527 (10th Cir. 1994)("[I]f the government destroys or otherwise fails to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so.").

> Thus, while the state of mind of the prosecutor is irrelevant to the question under <u>Brady</u> of whether the prosecution failed to <u>disclose</u> material exculpatory evidence, "the Due Process Clause requires a different result when we deal with the failure of the State to <u>preserve</u> evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57 . . . (1988)(emphasis added).

<u>Smith v. Sec'y of N.M. Dep't of Corr.</u>, 50 F.3d at 824 n.34.

The "inquiry into bad faith 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'"   <u>United States v. Bohl</u>, 25 F.3d at 911 (alterations in original)(quoting <u>Arizona v. Youngblood</u>, 488 U.S. at 57 n.*).   "[T]he district court's determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates . . . ."   <u>United States v. Richard</u>, 969 F.2d 849, 853 (10th Cir. 1992)(internal quotations omitted).   "The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." <u>United States v. Richard</u>, 969 F.2d at 853-54 (citing <u>United States v. Zambrana</u>, 841 F.2d 1320,

1343 (7th Cir. 1988)).   "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."   United States v. Bohl, 25 F.3d at 912 (citing Arizona v. Youngblood, 488 U.S. at 58).   In determining whether the government failed to preserve evidence in bad faith, the Tenth Circuit first considers whether the government was on notice of the potentially exculpatory evidence, and whether the potential exculpatory value of the evidence is based on more than mere speculation or conjecture.   See United States v. Bohl, 25 F.3d at 911 (noting that the government "was explicitly placed on notice that [defendants] Bell and Bohl believed the tower legs were potentially exculpatory," and that the "potentially exculpatory value was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests on the legs might lead to exculpatory evidence").   Second, the Tenth Circuit also looks to whether the government had "possession or the ability to control the disposition" of potentially exculpatory evidence at the time the government is put on notice to its existence.   United States v. Bohl, 25 F.3d at 912.   Third, the Tenth Circuit weighs whether the evidence "was central to the government's case," as opposed to the government possessing evidence "more probative on the issue."   United States v. Bohl, 25 F.3d at 912 (noting that, in defense to the charge of conspiring to defraud the United States by failing to conform with construction contracts that required a particular structural composition, "the evidence disposed of here was central to the government's case," and "nothing was more probative on the issue of the steel composition," and thus, because the evidence was destroyed, the defendants could only "rebut the government's test results . . . [with] a general denial of the allegations and seek to undermine the credibility of the government's chemical analyses of the allegedly nonconforming steel").   Fourth, the Tenth Circuit considers whether the government is

able to offer an "innocent explanation for its failure to preserve" potentially exculpatory evidence. United States v. Bohl, 25 F.3d at 912-13 ("[E]ven if the government destroys or facilitates the disposition of evidence knowing of its potentially exculpatory value, there might exist innocent explanations for the government's conduct that are reasonable under the circumstances to negate any inference of bad faith.").

## RELEVANT LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.   See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."   United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991))(emphasis in original).   "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."   Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000).   The "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's

discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).   As the Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .   This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to the defendant's guilt or innocence of the crime charged.   See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).   "Evidence is not unfairly prejudicial merely because it is damaging to an opponent's case."   United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003).   Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"   United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note)(emphasis in original).

## LAW REGARDING APPLICATION OF RULE 404

Rule 404(a) provides that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion."   Fed. R. Evid. 404(a).   "This rule is necessary because of the high degree of prejudice

- 46 -

that inheres in character evidence.   In most instances, [the United States Court of Appeals for the Tenth Circuit is] unwilling to permit a jury to infer that an individual performed the alleged acts based on a particular character trait."   Perrin v. Anderson, 784 F.2d 1040, 1044 (10th Cir. 1986)(citing rule 404 advisory notes).

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."   Fed. R. Evid. 404(b).   The same evidence, however, may be admissible for other purposes.   Permissible purposes include proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.   See Fed. R. Evid. 404(b).   The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b). See Huddleston v. United States, 485 U.S. 681, 691-92 (1988).   The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)).   See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996).

Rule 404(b)'s prohibition is based in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of the defendant's character.   See United States v. Dudek, 560 F.2d 1288, 1295-96 (6th Cir. 1977); 22A Charles A. Wright & Kenneth W. Graham,

Federal Practice and Procedure: Evidence § 5239, at 260-62 (2012).   In United States v. Phillips,

599 F.2d 134 (6th Cir. 1979), the United States Court of Appeals for the Sixth Circuit noted, in

addressing rule 404(b)'s precepts, that the rule addresses two main policy concerns:

> (1) that the jury may convict a "bad man" who deserves to be punished not because
> he is guilty of the crime charged but because of his prior or subsequent misdeeds;
> and (2) that the jury will infer that because the accused committed other crimes he
> probably committed the crime charged.

United States v. Phillips, 599 F.2d at 136.

   The Tenth Circuit has stated that district courts must "identify specifically the permissible

purpose for which such evidence is offered and the inferences to be drawn therefrom."   United

States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d

1426, 1436 (10th Cir. 1985)).   "[A] broad statement merely invoking or restating Rule 404(b) will

not suffice."   United States v. Youts, 229 F.3d at 1317.   "Uncharged, unrelated crimes or bad acts

may be probative to show knowledge, . . . whether the acts involved previous conduct or conduct

subsequent to the charged offense if the uncharged acts are similar to the charged crime and

sufficiently close in time."   United States v. Valencia-Montoya, No. CR 11-2990, slip op. at 11

(D.N.M. Sept. 17, 2012)(Browning, J.)(citing United States v. Olivo, 80 F.3d 1466, 1468-69 (10th

Cir. 1996)).   See Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986)(per

curium)(holding that the admission of evidence of prior arrests is proper for purposes of

determining whether the plaintiff running from the police officers was result of a mistake or to

avoid arrest).

## ANALYSIS

   The Court will not suppress Harry's text messages retrieved from Wauneka's cellular

telephone.   Because there is no evidence that Wauneka's outgoing text messages to Harry are in

the United States' possession, Harry's challenge to the admissibility of his text messages is governed by Arizona v. Youngblood and California v. Trombetta.   The Court finds that Wauneka's outgoing text messages to Harry were not of apparent exculpatory value when Joe learned of their existence, and the Court finds that neither the United States' prosecutors nor investigators failed to preserve Wauneka's outgoing text messages in bad faith.   Harry has not, therefore, demonstrated that the United States violated his due-process rights by failing to preserve Wauneka's outgoing text messages.   Text messages from Harry may qualify as admissions by a party-opponent under rule 801(d)(2)(a).   Although Harry's text messages are prejudicial, as he appears to acknowledge a level of wrongdoing, the prejudice the messages pose does not outweigh their probative value, as the messages provide a look into Harry's state of mind shortly after the incident.   The United States may not use the text messages to demonstrate Harry's character, unless Harry opens that door at trial, but the United States may use the messages to demonstrate Harry's motive, intent, lack of mistake, or state of mind, or for another permissible purpose under rule 404.

## I.      THE UNITED STATES HAS NOT VIOLATED HARRY'S DUE-PROCESS  RIGHTS.

Harry initially argued that admitting text messages from him without Wauneka's outgoing messages could "amount to a Constitutional error" under Brady v. Maryland.   Motion to Suppress at 3 (citing Brady v. Maryland, 373 U.S. at 87).   He also argues that the United States' failure to preserve the text messages is "functionally equivalent to spoliation."   Motion to Suppress at 5. The United States contends that, because Wauneka's outgoing text messages are not in its possession, California v. Trombetta or Arizona v. Youngblood, governs the Court's determination of the Motion to Suppress, and not Brady v. Maryland.   See Response ¶ 6, at 4.   The United

States asserts that Harry has not met the tests set forth to establish a constitutional violation under either case.  See Response at 4-6.  At the hearing, Harry conceded that the evidence does not demonstrate that the United States violated his constitutional rights.  See Tr. at 123:1-7 (Samore)("I don't think there's sufficient [evidence] that there was bad faith in destroying it.   I want to confirm that."); id. at 112:13-14 (Samore)("I'm not going to [have] any constitutional argument . . . .").   The Court agrees with Harry that the evidence does demonstrate that the United States violated his constitutional rights by failing to preserve Wauneka's outgoing text messages.

There is no evidence that the United States possesses Wauneka's outgoing text messages to Harry sent on the morning of May 6, 2010.  Accordingly, either Arizona v. Youngblood or California v. Trombetta governs Harry's Motion to Suppress.  See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34 ("Arizona v. Youngblood, 488 U.S. 51, . . . and California v. Trombetta, 467 U.S. 479 . . . govern cases in which the government no longer possesses the disputed evidence.").

The Court does not believe that the exculpatory value of Wauneka's outgoing text messages to Harry would have been immediately apparent.  Harry informed Joe that he and Wauneka were texting about the alleged assault on the morning of May 6, 2010.  See Tr. at 47:3-19 (Adams, Joe); Government's Exhibit S2 at 14:11-15:13 (Harry).   Wauneka and Johnson both stated that Wauneka was texting Harry about the incident generally.  See Tr. at 76:9-11 (Nayback, Wauneka); id. at 101:3-18 (Johnson, Adams); id. at 102:5-8 (Johnson); id. at 79:21-80:3 (Nayback, Wauneka).  Joe similarly informed the Court that he understood, from Harry, that Wauneka asked him about the alleged assault and nothing more, when the two exchanged text messages on the morning of May 6, 2010.  The Court cannot hypothesize

anything that Wauneka could have written to Harry that would exculpate him, to which Harry responded: "Ill guess I have 2 accept the charges [sic]," "tel bean that Im sorry," and "I know. . . . I messed up.   I should have known better."   Government Exhibits S14; Government Exhibit S19; Government Exhibit S20.   Nor have the parties presented any theories as to how Wauneka's outgoing text messages could exculpate Harry.   Even though the Court concludes that Joe saw Wauneka's text messages when he interviewed him on May 21, 2010, there is nothing to indicate that Wauneka's questions to Harry about the alleged assault on Jane Doe was evidence "that might be expected to play a significant role in the suspect's defense."   California v. Trombetta, 467 U.S. at 488-89.   Although Wauneka's testimony contradicted Joe's testimony -- in that Wauneka testified that the outgoing messages were on his cellular telephone when Joe interviewed him on May 21, 2010 -- that is the only wrinkle in the witnesses' testimonies, and does not undermine the consistency of Wauneka's and Johnson's statements that Wauneka and Harry corresponded regarding only the alleged assault, and that Wauneka's outgoing messages were limited to generally inquiring why Harry acted as he did.   Joe's testimony indicates that, to his knowledge, Wauneka's text messages were limited to inquiring about the alleged assault; this line of questioning does not have an apparent exculpatory value.   The only possible exculpatory information which could be produced from Wauneka's outgoing text messages could perhaps be that he and Harry were not discussing Jane Doe's alleged assault, contrary to the testimony of Wauneka, Harry, and Joe at the hearing.   See United States v. Parker, 72 F.3d 1444, 1452 (10th Cir. 1995)("[T]he only way the erased video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as Trooper Bushell related, that is, that he was lying about the events . . . essentially a question of credibility for the district court.").   Any assertion

that Wauneka's text messages would be exculpatory to Harry is "based purely on speculation and conjecture," which does not meet the standard of apparent exculpatory value that <u>California v. Trombetta</u> requires.   <u>United States v. Martinez</u>, 744 F.2d 76, 80 (10th Cir. 1984)(holding that a defendant's argument that evidence "might have contained exculpatory information" goes to the "weight and sufficiency of the government's case," but does not demonstrate that the failure to preserve the evidence was a constitutional violation under <u>California v. Trombetta</u>).   Because there is no evidence showing that Wauneka's outgoing text messages "possess an exculpatory value that was apparent before the evidence was destroyed," the Court will apply the analysis of <u>Arizona v. Youngblood</u> to the Motion to Suppress.   <u>California v. Trombetta</u>, 467 U.S. at 489.

The first prong of <u>Arizona v. Youngblood</u> requires the defendant to demonstrate that the lost evidence was "potentially useful," because "it could have been subject to tests, the results of which might have exonerated the defendant."   <u>United States v. Bohl</u>, 25 F.3d at 910 (internal quotations omitted).   Harry asserts that, in the context of text messages, "abbreviations, exclusions, or paraphrasing" can be misleading without the benefit of Wauneka's side of the conversation.   Motion to Suppress at 4.   He also argues that he cannot effectively cross-examine Wauneka without the outgoing messages.   <u>See</u> Motion to Suppress at 2.   This assertion is the functional equivalent of arguing that the text messages could be "subject to tests," through impeachment and cross-examination, which might "exonerate the defendant."   <u>United States v. Bohl</u>, 25 F.3d at 910.   In <u>United States v. Bohl</u>, the Tenth Circuit determined that the defendants established that the destruction of tower legs used in radar and radio transmission towers, which the defendants constructed pursuant to a Federal Aviation Administration ("FAA") contract, was a violation of the defendants' due-process rights under <u>Arizona v. Youngblood</u>, because the tower

legs were potentially useful evidence and the government destroyed them in bad faith.   25 F.3d at

906-07, 910.   The composition of the tower legs was material to whether the defendants complied

with their contract, and thus the tower legs were potentially useful, because "accurate testing could

not be conducted on the shavings that the government provided to [the defendants]; . . . the

government's testing procedure may have contaminated the shavings themselves; and . . . the

government's testing procedure failed to comply with accepted industry standards and may have

led to an inaccurate finding" of the tower legs' composition -- the primary issue in the case.   25

F.3d at 910.   Harry, on the other hand, objects to the admission of his text messages; he asserts

that the messages are open to too much speculation without Wauneka's side of the conversation.

See Motion to Suppress at 4.   Harry's argument that the text messages will be subject to

speculation goes more to the "weight and sufficiency of the government's case," and not to the

potential usefulness of Wauneka's outgoing messages.   United States v. Martinez, 744 F.2d at 80

(holding that the absence of evidence -- the government did not chemically test a package to

determine whether it contained explosive material -- "goes to the weight and sufficiency of the

government's case against Martinez rather than to the evidence's 'exculpatory value that was

apparent before it was destroyed'").   Nor are Wauneka's text messages subject to "substantial

dispute," as were the testing methodologies used in United States v. Bohl, which further indicates

that Wauneka's outgoing messages would be of minimal usefulness to Harry's defense.   25 F.3d

at 910.   On the other hand, the Court is wary of engaging in the "treacherous task of divining the

import of materials whose contents are unknown."   Arizona v. Youngblood, 488 U.S. at 58.

Wauneka's outgoing text messages may have been useful for Harry's cross-examination of

Wauneka or for impeachment.   As Harry conceded at the hearing, because neither party possesses

the Wauneka's outgoing text messages, the Court cannot determine whether the messages were exculpatory or potentially useful: "[W]e really don't have for sure what was said.   It might have been supportive of the Government['s] position; it might not have."   Tr. at 111:2-5 (Samore). Assuming that Wauneka's outgoing text messages were, at best, potentially useful, the Court nonetheless determines that their destruction was not done in bad faith.   See United States v. Parker, 72 F.3d at 1452 ("Defendants are further required to demonstrate bad faith on the part of the government in destroying the evidence because the exculpatory value of the missing video tape is indeterminate and 'potentially useful' at best.").

The second prong of Arizona v. Youngblood, the "inquiry into bad faith[,] 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'"   United States v. Bohl, 25 F.3d at 911 (alterations in original)(quoting Arizona v. Youngblood, 488 U.S. at 57 n.*).   There is no evidence that the United States' prosecutors or investigators were on notice of the exculpatory value of Wauneka's outgoing text message before they were lost.   When Joe interviewed Harry, Harry's description of Wauneka's outgoing messages was non-specific, as Harry informed Joe that Wauneka was questioning him regarding only the alleged assault.   See Tr. at 47:3-19 (Adams, Joe); Government's Exhibit S2 at 14:11-15:13 (Harry).   Harry does not assert that he told the United States that the outgoing messages were exculpatory or potentially useful when he requested them; rather, Harry seems to have only inquired into their existence.   See Motion to Suppress at 2 (asserting that Mr. Samore "personally contacted the prosecutor to request that the missing text messages from Dimit[r]i's side of the conversation by produced," but not stating that Mr. Samore told the United States that Wauneka's messages were material exculpatory evidence); Tr. at

- 54 -

18:5-16 (Samore)(Harry stating that he requested Wauneka's outgoing messages in "early July," but not stating that he told the United States that Wauneka's outgoing messages were material exculpatory evidence).   Unlike in <u>United States v. Bohl</u>, where the defendants informed the United States that, because the tower legs from radio and radar transmission towers were constructed pursuant to the FAA contract the defendants allegedly breached, and thus needed to be preserved because their composition was material to the issue whether the defendants complied with the contract, Harry did not inform the United States that Wauneka's outgoing text messages were material exculpatory evidence to his defense.

Moreover, the United States does not seem to have ever possessed the outgoing text messages.   Harry asserts that, "[b]ased on information, texts are not recoverable by the cell companies after thirty (30) days," and the United States' witnesses at trial suggested a similar, limited time period in which text messages could be recovered from cellular telephones.   Motion to Suppress at 2 n.1.   <u>See</u> Tr. at 29:1-5 (Joe)("Through experience also and by calling the [] tel[ephone] company . . . , I was told that [] in a two-week range their policy was they couldn't save or retrieve what was sent out from a particular [] tel[ephone]."); <u>id.</u> at 57:16-19 (Guilmette)(explaining that "[c]ertain phones what they'll do is like . . . only hold 50 messages.   If another message comes in it then [h]as to delete one of the 50 messages that it has in order to make room for that new one.").   The United States filed criminal charges on May 24, 2010.   <u>See</u> Complaint at 1.   It was not until at least two months after the incident, and after Harry was indicted, that he requested Wauneka's outgoing text messages.   <u>See</u> Tr. at 18:6-16 (Samore).

> The third factor we deem significant to our inquiry into bad faith is that the record reveals that the government still had possession or the ability to control the disposition of the tower legs at the time it received notice from Bell and Bohl about the tower legs' potential exculpatory value.

United States v. Bohl, 25 F.3d at 912.   Joe testified that when he attempted to retrieve the text messages before June 29, 2010, he realized they were unavailable on the cellular telephone, and his efforts to procure Wauneka's outgoing text messages through other means did not work.   See Tr. at 44:3-15 (Samore, Joe).   The only time frame, therefore, during which Wauneka's outgoing text messages were available was after May 21, 2010, through the undetermined time in which Joe realized that the text messages were not available any longer, before the Indictment was filed.

The only government which possessed Wauneka's outgoing text messages for any period of time seems to have been the Navajo Nation, through Joe or St. Germaine before either of those criminal investigators began working alongside the United States.   Although Harry asserted at the hearing that, at some point, the United States possessed the cellular telephone with both sides of the messages, the evidence demonstrates that the text messages were lost before the end of June, 2010, which is most likely before Joe began working alongside or on behalf of the United States. Compare Tr. at 110:20-24 (Court, Samore)(Q: "So you think . . . at least for some period of time the Government had the phone with both sides of the messages there?"   A: "That clearly is part of our argument."), with id. at 44:3-13 (Samore, Joe)(in response to Samore's question whether Joe realized Wauneka's outgoing messages were not on his cellular telephone before the Indictment was filed in June, 2010, Joe answers "Yes").   See Response at 5 ("[T]he government never had possession of the texts . . . ."); Tr. at 28:23-29:5 (Adams, Joe)(Q: "So knowing that none of Dimitri's text messages were available on the phone, did you do anything to try to obtain his text messages that he may have sent to Myron?"   A: "Through experience also and by calling the [] tel[ephone] company to see if that was feasible [or] possible, I was told that what's in a two-week range . . . they couldn't save or retrieve what was sent out from a particular [] tel[ephone]"); id. at

- 56 -

64:11 (the United States' forensic examiner informing Harry that if Wauneka's outgoing text messages from May 6, 2010 "were still on the phone I would have found them.").   Although Joe is now the lead agent in the United States' investigation, the evidence does not demonstrate that he took on that role until sometime after June, 2010, as he testified that, rather than contacting the FBI forensic examiners regarding Wauneka's outgoing text messages, Joe contacted the Farmington Police Department to attempt to retrieve the text messages.   See Tr. at 22:4-5 (Adams, Joe)(Q: "Are you the lead agent in U.S. v. Myron Harry?" A: "Yes."); Tr. at 44:3-10 (Samore, Joe) (Q: "When did you check with these folks in Farmington about trying to get the text messages back . . . before . . . charges were filed in this case . . . about June 29, 2010?" A: "Yes.").   That Joe did not contact a forensic investigator with the FBI until July, 2012, indicates that he was not working on behalf of the United States until a much later date.   See Government Exhibit S9 (report by Joe regarding Wauneka giving Joe consent to take Wauneka's cellular phone for a forensic examination by FBI agents in Albuquerque, New Mexico).   The Court has previously determined that evidence obtained pursuant to Navajo Nation criminal investigators' work is not imputed to the United States where the Navajo Nation criminal investigators' role is limited to that of testifying witnesses in a federal prosecution.   See United States v. Badonie, 2005 WL 2312480, at **1-3 (denying a defendant's motion to compel the testifying Navajo Nation officers' personnel records and the "entire Navajo Nation Police 'commission' file" because the United States' "obligation does not require it to seek information from other governments").   Similarly, the Court determines that Joe and St. Germaine were not "acting on the government's behalf in the case" when they first interviewed Wauneka and took possession of his cellular telephone.   United States v. Combs, 267 F.3d at 1174-75.   Thus, even though Joe possessed Wauneka's outgoing text

messages for a period of time, Joe's possession cannot be imputed to the United States until some later date, after Joe realized the text message were not available.

Further, assuming Joe began working alongside or on behalf of the United States as early as May 24, 2010, the evidence demonstrates that Joe was negligent, at most, in not retrieving Wauneka's outgoing text messages while they were available.   Even if Joe knew that he had to immediately preserve Wauneka's outgoing messages because they may not be available later, his failure to retrieve the messages, was negligence, given that the exculpatory value of the outgoing messages was not apparent.   "Mere negligence is not sufficient to establish . . . bad faith." United States v. Parker, 72 F.3d at 1452 (holding that, even though a law enforcement officer "knew his patrol car video camera would inadvertently switch on occasionally and that with that knowledge he should not have left the video tape in the camera . . . at most establish that" the officer was "negligent in preserving the videotaped evidence").

Wauneka's outgoing text messages do not appear to be central to the United States' case. See United States v. Bohl, 25 F.3d at 912 (explaining that, because the evidence destroyed was central to the government's case, the government was more likely to have destroyed it in bad faith).   The United States has other witnesses to the incident that it may present at trial, and, although Harry's messages are probative regarding his state of mind, they are also subject to multiple interpretations and may be questioned for reliability, given Harry and Wauneka's recent intoxication.   Harry's state of mind after the alleged assault does not establish that he possessed the requisite legal state of mind when the incident occurred.   Lastly, the United States has an "innocent explanation for its failure to preserve" the outgoing text messages, as Harry and the United States assert that Wauneka's outgoing text messages could only have been retrieved for a

- 58 -

limited time period, and that, by the time Harry requested the messages, that time period had likely

passed.   United States v. Bohl, 25 F.3d at 912-13.   The Court determines, thus, that the United

States' failure to preserve Wauneka's outgoing text messages, which were of a potentially useful

value at best, was not done in bad faith and, therefore, was not a violation of Harry's due-process

rights.[23]   Additionally, because Wauneka's outgoing messages were, at best, potentially useful to

Harry, Harry will not be denied a fair trial by the absence of those messages in evidence.   See

United States v. Wilks, 629 F.2d at 674 (holding that, in the absence of a showing of "bad faith or

---

[23] Harry conceded, at the hearing, he "really can't establish intentional spoliation."   Tr. at 118:1 (Samore).   The Court agrees.   Spoliation of evidence has five elements:

> (1) the existence of a potential lawsuit; (2) the defendant's knowledge of the potential lawsuit; (3) the destruction, mutilation, or significant alteration of potential evidence; (4) intent on the part of the defendant to disrupt or defeat the lawsuit; (5) a causal relationship between the act of spoliation and the inability to prove the lawsuit; and (6) damages.

Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 37, 127 N.M. 729, 744, 987 P.2d 386, 401, overruled on other grounds by Herrera v. Quality Pontiac, 2003-NMSC-018, 134 N.M. 43, 73 P.3d 181.   See Pandolfo v. Labach, No. CIV 08-0231 JB/DJS, 2009 WL 1255529, at *4 (D.N.M. Apr. 15, 2009)(Browning, J.)(allowing plaintiffs leave to amend to add a claim for intentional spoliation of evidence where defendants disposed of a vehicle upon which a victim was working with the defendants when a fire started inside the vehicle resulting in severe burns to the victim). Just as Harry has not established that Wauneka's outgoing text messages were destroyed in bad faith, the Court will not properly impose an adverse inference on the United States' evidence, because this remedy may only be imposed when a defendant intentional spoils evidence in bad faith.   See Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 863 (10th Cir. 2005)(stating that although it is within the court's discretion to impose sanctions for spoliation of evidence, if the aggrieved party seeks an adverse inference to remedy the spoliation, it must prove bad faith; "[m]ere negligence in losing or destroying records is not enough" (citing Aramburu v. The Boeing Co., 112 F.3d 1398, 1407 (10th Cir.1997))).   Moreover, as with the alleged violation of Harry's due-process rights, Harry has not demonstrated that the United States ever possessed Wauneka's outgoing text messages, and thus the Court will not impose any other sanction for spoliation, such as a jury instruction that the jury may draw an adverse inference against the United States because of the loss of evidence.   Harry remains free, however, to argue that position in closing, if he desires.

intentional withholding or destruction on the part of the government . . . the test to be applied . . . is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it.").

## II.     THE PREJUDICAL EFFECT OF HARRY'S TEXT MESSAGES DOES NOT OUTWEIGH THEIR PROBATIVE VALUE.

Harry asserts that admitting his text messages at trial will be prejudicial, because the text messages will be subject to great speculation and interpretation without Wauneka's outgoing correspondence.   See Motion to Suppress at 2-3.   Harry asserts that admitting his "one-sided text messages" and not precluding "any testimony concerning the content" is likely to create an unfair trial, because the messages are unduly prejudicial.   Motion to Suppress at 4-5.   The United States asserts that Wauneka's outgoing text messages "would not have the power to exonerate the defendant, and it is entirely possible for the defendant to receive a fair trial without the text messages, and with the admission of the evidence of text messages offered by the United States." Response at 8.   Harry asserts that, because the text messages from him contain an apology, to admit those messages without Wauneka's outgoing messages would confuse or mislead the jury. See Reply at 2.

"In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."   Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d at 1274.   The maximum reasonable probative force of the text messages from Harry would be insight into Harry's state of mind shortly after the alleged assault. The Court has in another case denied a motion in limine under rule 403, because the probative value of defendants' previous litigation was helpful to prove their state of mind in the matter before the Court and outweighed the alleged prejudicial effect -- that the evidence would cause the

jury to dislike the defendants.   See Guidance Endodontics, L.L.C., v. Densply Int'l, Inc., 705 F.

Supp. 2d 1265, 1272 (D.N.M. 2010)(Browning, J.)("The prejudice or confusion about which the

Defendants are concerned is that the jury will . . . dislike them.   While that is a valid concern, it is

not one against which the Rules of Evidence will protect the Defendants in this case.").   Harry

makes a similar argument here -- that admitting one-side of the text messages from him would

cause the jury read its own negative experiences into Harry's alleged conduct.   See Tr. at

111:22-112:7 (Samore)("The jury's going to[] hear . . . about sexual activity between these kids.

That invites people projecting when they had been in their own experience and . . . it's difficult to

ro[ot] out the power of those subtle inferences we all have . . . . ").   The Court does not believe that

the jury's potential bias based on their individual, unknown, negative experiences is so prejudicial

to Harry as to outweigh the probative value the messages provide regarding his state of mind.

Harry argued several times at the hearing that the evidence is not reliable, because it invites

conjecture and speculation, and because of Wauneka and Harry's drunken state at the time the

messages were exchanged.   See Tr. at 11:12-16; id. at 117:5-23 (Samore).   These arguments,

however, go to the weight of the messages from Harry and not to their admissibility.   See United

States v. Martinez, 744 F.2d at 80 (holding that a defendant's argument regarding the materiality

of tests which were not performed, the exculpatory value of which could thus not be determined,

"goes to weight and sufficiency of the government's case").   Harry may very well at trial

undermine the reliability of the messages by bringing forward evidence of his level of intoxication

at the time, either through taking the stand himself, or through the testimony of other witnesses

from the party.   Indeed, Harry has ample ground to cross-examine the United States' witnesses,

given that many guests were intoxicated or recovering therefrom when the assault allegedly

occurred.   Harry is also capable of developing other elements of his defense which may appeal to the jury in his favor.   Although rule 106 might have allowed Harry to introduce Wauneka's outgoing text messages at trial, Harry is not left without a remedy.   See Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.").   He may be able to testify himself as to, or elicit from the testimony of other witnesses, a description of Wauneka's outgoing messages.   See United States v. Burch, 153 F.3d 1140, 1144 (10th Cir. 1998)("Cross examination may embrace any matter germane to the direct examination, qualifying or destroying, or tending to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness.").   Further, the best evidence rule does not bar testimony from Wauneka or Johnson regarding the contents of Wauneka's outgoing messages.   Rule 1002 of the Federal Rules of Evidence provides: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."   Fed. R. Evid. 1002.   An original is not necessary to prove the content of a writing, however, if "all originals are lost or destroyed, and not by the proponent acting in bad faith."   Fed. R. Evid. 1004.   The Court has determined that Wauneka's outgoing text messages were not destroyed or lost in bad faith, and, therefore, "other evidence of the content" of the messages may be used to prove their content at trial.   Fed. R. Evid. 1004.

As the Tenth Circuit has explained, the "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d at 787.   Harry's text messages will not be of such prejudice as to outweigh their probative value for the United States' case, and the Court will thus

deny the Motion to Suppress on the basis of rule 403.

## III.   **RULE 404 DOES NOT BAR HARRY'S TEXT MESSAGES.**[24]

Harry argues that admitting his messages would violate rule 404 of the Federal Rules of Evidence.   See Motion to Suppress at 3; Reply at 2 ("What is also significant herein, is that to introduce only side of the conversation [sic] also violates Fed. R. Evid. 403 and 404."); Tr. at 112:6-7 (Samore)("It is not reliable enough under 403, 404, and perhaps other rules of evidence, for it even to come before the jury.").   While Harry is correct that character evidence is generally inadmissible to show conformity therewith, the United States seeks to introduce Harry's text messages to demonstrate Harry's state of mind and not to prove that he acted in conformity with his character.   See Tr. at 121:21-22 (Nayback)(describing the text messages from Harry as "highly probative of the defendant's state of mind immediately after the allegations made against him").   Demonstrating Harry's state of mind after the alleged assault through the text messages would not violate rule 404.

Rule 404 provides: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a).   The United States has not indicated that it intends to prove that Harry acted in conformity with any particular character trait set forth in the text messages.   The Court may only hypothesize as to the character trait the United States would attempt to tease out of the text

---

[24] Harry does not contest that, if the messages came from him, they would be admissible as non-hearsay.   See Tr. at 13:19-21 (Nayback)("We would intent to introduce the text into evidence under 801(d)(2), 803(1), 803(2) . . . ."); id. at 125:23-126:8 (the Court inquiring whether Harry agreed that there is not a hearsay problem with the text messages and Harry responding "Yes"). Rule 801(d)(2)(a) provides that statements are not hearsay if: "the statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity."   Fed. R. Evid. 801(d)(2)(a).

messages, as Harry does not admit that he has previously sexually assaulted other females in the messages.   The text messages, thus, are not "[e]vidence of other crimes, wrongs, or acts."   Fed. R. Evid. 404(b).   To a certain degree, all evidence reveals some character, but if it has another purpose, the evidence is not excluded because it also shows character; a limiting instruction can cure any misuse of the evidence.   "Almost all evidence has some tendency to show propensity; the question is whether that is the evidence's sole purpose."   United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3894147, at *3 (D.N.M. July 31, 2010)(Browning, J).   To the extent the text messages demonstrate Harry's character, the general character trait presented is an apologetic tone, which does not inculpate Harry.   Even if the messages are character evidence, the United States is permitted to introduce the messages to demonstrate Harry's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Fed. R. Evid. 404(b).   The United States' use of the text messages to demonstrate Harry's state of mind immediately after the alleged assault is a "permissible purpose for which such evidence is offered," and the inferences to be drawn from the messages should be limited to that purpose. United States v. Youts, 229 F.3d at 1317.   Using the text messages to demonstrate Harry's state of mind is a proper purpose, relevant to whether Harry acted with the requisite state of mind, the prejudicial effect of which does not outweigh its probative value.   Harry may request a jury instruction indicating the limit of the text message's evidentiary value should the United States introduce those messages at trial.   Evidence which is admissible under rule 404(b) must

> be offered for a proper purpose; . . . be relevant; . . . the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed its potential for unfair prejudice; and . . . upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d at 762.

The Court will deny the Motion to Suppress.   Wauneka's outgoing text messages are not in the United States' possession, and the evidence does not demonstrate that outgoing text messages were patently exculpatory to Joe, and thus the failure to preserve the outgoing text messages does not violate Harry's due-process rights.   Additionally, even if Wauneka's outgoing text messages were potentially useful, there is no evidence that the United States failed to preserve them in bad faith.   Proceeding to trial without the outgoing text messages will not preclude Harry from receiving a fair trial, given that the outgoing text messages were not likely to have established Harry's innocence.   Further, admitting the text messages from Harry will not be overly prejudicial to him.   Although the text messages are prejudicial, Harry may undermine at trial the weight of the messages through other evidence, such as that of his intoxication.   Harry's text messages are highly probative regarding Harry's state of mind immediately after the alleged assault and, and the ability to probe Harry's state of mind outweighs the text messages' prejudicial effect.   Lastly, although Harry's the text messages are not facially impermissible character evidence, even if the text messages demonstrate Harry's character, United States may still use the text messages as evidence of Harry's state of mind.   The Court, thus, has no sound basis to suppress Harry's text messages.

**IT IS ORDERED** that the Motion to Suppress Evidence Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Kyle T. Nayback
David Adams
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

     *Attorney for the Defendant*