# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                     No. CR 10-1915 JB

MYRON JIM HARRY,

        Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

You can't hide your lyin' eyes
And your smile is a thin disguise
I thought by now you'd realize
There ain't no way to hide your lyin' eyes

The Eagles, Lyin' Eyes (1975 Cass County Music & Red Cloud Music).

**THIS MATTER** comes before the Court on: (i) Defendant Myron Harry's Motion in Limine to Exclude Testimony of Sane Nurse and Supporting Memorandum, filed January 24, 2013 (Doc. 108)("SANE MIL"); and (ii) the United States' Motion to Exclude Expert Testimony of Samuel Roll, filed March 26, 2013 (Doc. 129)("Roll MIL"). The Court held hearings on March 29, 2013, and April 10, 2013. The primary issues are: (i) whether the Court should exclude the testimony of Julie Kysar, R.N., a Sexual Assault Nurse Examiner ("SANE nurse") in Farmington, New Mexico, because it is irrelevant, unfairly prejudicial, will include opinion testimony that lacks a reliable basis in scientific or medical knowledge, or will include hearsay that is not within

---

[1] In its Sealed Memorandum Opinion and Order, filed August 13, 2013 (Doc. 197)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

an exception; and (ii) whether the Court should exclude Dr. Samuel Roll from testifying at trial because his proffered expert opinion lacks a reliable basis in psychological knowledge or is irrelevant.   The Court will deny the SANE MIL and grant the Roll MIL.   The Court concludes that Kysar's factual testimony is relevant to the charges against Harry, any hearsay within her testimony falls within rule 803(4)'s exception to hearsay for statements made to a medical provider, and Kysar has a basis in reliable medical knowledge to provide her opinion regarding Jane Doe's injuries, an opinion that is relevant to the jury's determination whether Doe and Harry engaged in consensual intercourse.   The Court will not allow Dr. Roll to testify, because he has not provided the Court with an article, resource, or other basis of knowledge in the field of psychology that supports his proffered testimony.

## FACTUAL BACKGROUND

The United States accuses Harry of sexually assaulting Doe during a party the night of May 5-6, 2010, in Shiprock, New Mexico.   See Indictment at 1, filed June 24, 2010 (Doc. 14).   The Court previously made findings of fact for Harry's Motion to Suppress Evidence Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75).   See Memorandum Opinion and Order at 2-16, filed February 19, 2013 (Doc. 114).   The Court incorporates those findings of fact by reference herein.

The morning after the incident, Doe asserted that Harry sexually assaulted her at the party. See SANE MIL at 1.   Doe visited Kysar for an examination.   SANE MIL at 1.   During the SANE examination, Kysar noted that Doe's demeanor was tearful, calm/cooperative, and she made poor eye contact.   See Sexual Assault Exam at 1, 3, filed March 26, 2013 (Doc. 128-5).

Harry initially denied having sexual contact with Doe.   DNA evidence revealed Harry's

DNA on vaginal swabs taken from Doe.   See Response to Motion in Limine to Exclude Expert Testimony ¶ 1, at 1, filed January 31, 2013 (Doc. 112)("SANE Response").

## PROCEDURAL BACKGROUND

On June 24, 2010, a grand jury indicted Harry for having knowingly engaged in a sexual act with Doe, who was physically incapable of declining participation and could not communicate her unwillingness to engage in the sexual act, in violation of 18 U.S.C. §§ 1153, 2242(2), and 2246(A).   See Indictment at 1.   Trial in this matter is set for May 6, 2013, at 9:00 a.m.   See Agreed Order to Vacate and Reset Trial and Extend the Time for the Filing of Pre-Trial Motions at 4, filed February 28, 2013 (Doc. 12).   On September 28, 2012, Plaintiff United States of America informed the parties that it intends to call Kysar, a "certified Sexual Assault Nurse Examiner with the Sexual Assault Services of Northwest New Mexico" to testify regarding the conclusions in Doe's SANE examination report.   Sealed Notice of Intention to Offer Expert Testimony ¶ 3, at 2, filed September 28, 2012 (Doc. 95)("SANE Notice").   The United States asserts that Kysar's testimony will be mostly factual, and not "expert" in nature, but notifies the Court that it has, "out of an abundance of caution," listed her as a potential expert witness, because "she may include her expert opinions or specialized knowledge regarding this matter and derived from her education, training, and professional experience as a sexual assault nurse examiner."   SANE Notice ¶ 3, at 2. On January 24, 2013, the United States notified the Court and Harry that it intends to call Kysar as an expert at trial.   See Sealed First Amended Notice of Intention to Offer Expert Testimony ¶ 3, at 2, filed March 26, 2013 (Doc. 128)("Second SANE Notice").   The United States intends to call Kysar to testify regarding the "contents of her report and examination of Jane Doe," the medical questions she asked Doe, and Doe's responses to Kysar's questions.   Second SANE Notice ¶ 3, at

2.   Additionally, the United States intends for Kysar to testify regarding the SANE examination, the tools and instruments Kysar used during the examination, "what the examination entailed," and which areas of Doe's body Kysar examined.   Second SANE Notice ¶ 3, at 2.   The United States intends for Kysar to testify that she took swabs from Doe's genitalia and anus for serology and DNA examination, and that Kysar identified injuries and tearing on Doe's genitalia.   The United States states that Kysar "may testify that she cannot conclude that the injuries and tearing are indicative of non-consensual or consensual intercourse."   Second SANE Notice ¶ 3, at 2-3.   The United States states that Kysar may testify that Doe's injuries are "consistent with injury by blunt force trauma, which could have been caused by a penis during attempted penetration of the vagina."   Second SANE Notice ¶ 3, at 3.   The United States maintains that Kysar's testimony will be "largely factual but does contain some opinion testimony."   Second SANE Notice ¶ 3, at 3.

Harry intends to call Dr. Roll, a "psychologist of forty (40) years' experience . . . an associate psychology professor at University of New Mexico, widely-published and recognized as a speaker," as an expert at trial.   Second Amendment to Rule 702, 703, 705 Notice of Intent to Call Expert Witness at 1, filed March 15, 2013 (Doc. 122)("Roll Notice").   Harry states that he may call Dr. Roll to testify

> that no known treatise or empirical findings support the existence of any constellation of psychological symptoms or behavior that are observable or measurable which might indicate to a greater or lesser certainty that a person who claims to be a victim of non-consensual intercourse has or has not been such a victim.

Roll Notice at 1.   Harry further informs the parties that Dr. Roll will "address to what extent and whether any of the subjective observations by a SANE nurse have empirical support or scientific

basis, known in any reliable, verified research, that may be reproduced or verified through scientific or empirical means."   Third Amendment to Rule 702, 703, 705 Notice of Intent to Call Expert Witness at 1, filed March 25, 2013 (Doc. 127)("Second Roll Notice").

1.    **The SANE MIL.**

Harry asserts that a SANE examination is "not for law enforcement purposes," and, rather, state law requires that individuals alleging that they have been sexually assaulted receive a SANE examination.   SANE MIL at 2.   Harry asserts that his counsel interviewed Kysar and that Kysar informed Harry's counsel: "I'm not able to differentiate between nonconsensual and consensual injury caused by nonconsensual or consensual sex.   I'm not able to differentiate those."   SANE MIL at 2.   Harry contends that neither his identity nor Doe's capacity to consent are at issue, and, therefore, Kysar need not testify regarding her findings on those matters.   Harry asserts that Kysar will have no expert opinion or specialized knowledge to offer to this matter, and that her testimony may be irrelevant and touch on impermissible character evidence.   See SANE MIL at 2.   Harry asserts that Kysar found "no admissible evidence of injury, representation of no injury, no evidence of forceable [sic] penetration," and that he will not contest that a rape kit was used to obtain samples from Doe which the United States then tested.   SANE MIL at 4.   Harry contends that Kysar cannot offer an opinion whether her findings indicate consensual or nonconsensual intercourse occurred.   Harry contends, therefore, that Kysar's testimony lacks any probative value under rule 403.   He asserts that "[t]o even permit the SANE nurse to take the stand as a fact witness would be reversible error for several reasons," including that her testimony would serve no medical purpose and only bolster the testimony of the United States' other witnesses.   SANE MIL at 5.   Harry argues that Kysar's testimony does not fall within any exception for medical

testimony.   See SANE MIL at 5.   Harry requests that the Court, therefore, preclude Kysar from testifying.   See SANE MIL at 6.

The United States requests the Court to admit both Kysar's factual and expert testimony "regarding the victim's statements provided to Ms. Kysar during the victim's sexual assault exam."   SANE Response at 1.   The United States asserts that the SANE MIL is without merit. See SANE Response ¶ 3, at 2.   The United States first asserts that rule 803(4) of the Federal Rules of Evidence's exception to the hearsay prohibition allows the Court to admit the SANE nurse's testimony regarding Doe's statements, because her statements were "'made for the purposes of medical diagnosis or treatment.'"   SANE Response ¶ 4, at 2-3 (quoting Fed. R. Evid. 803(4)). The United States contends that, in United States v. Tome, 61 F.3d 1446 (10th Cir. 1995), the United States Court of Appeals for the Tenth Circuit held that "statements made in preparation for an examination in response to questions designed to build rapport, and statements that noted the extent of touching without identification of the perpetrator made during a secondary examination to determine whether abuse had occurred were all admissible under Fed. R. Evid. 803(4)."   SANE Response ¶ 5, at 3.

The United States asserts that rule 803(4) covers Doe's statements, because the SANE examination was conducted for Doe's "health and well-being."   SANE Response ¶ 6, at 3 (citing United States v. Joe, 8 F.3d 1488, 1493 (10th Cir. 1993)).   The United States asserts that the SANE examination was conducted for medical purposes and not to further a criminal investigation.   See SANE Response ¶ 6, at 4.

The United States also asserts that, contrary to Harry's contention, "it is common practice for treating practitioners to take the stand as fact witnesses."   SANE Response ¶ 7, at 4.   The

United States points out that, in United States v. Chaco, 801 F. Supp. 2d 1200, 1203 (D.N.M. 2011)(Browning, J.), the Court determined that statements made during a SANE examination "fall within rule 803(4)'s hearsay exceptions."   SANE Response ¶ 7, at 4 (citing United States v. Frost, 684 F.3d 963, 976 (10th Cir. 2012)).

The United States "concedes that the SANE nurse is not able to differentiate between nonconsensual and consensual injury caused by nonconsensual or consensual sex."   SANE Response ¶ 8, at 5.   The United States asserts, however, that the SANE examination revealed vaginal tearing and other injuries.   See SANE Response ¶ 8, at 5.   The United States asserts that the Tenth Circuit has allowed a doctor to testify about the results of a physical examination, and "whether or not the results were consistent with the victim's allegations of sexual abuse."   SANE Response ¶ 8, at 5 (citing United States v. Charley, 189 F.3d 1251, 1264 (10th Cir. 1999)).   The United States states that it intends to call Kysar "to testify to her opinion as to whether or not Jane Doe's injuries are consistent with the method of injury."   SANE Response ¶ 8, at 5.   The United States last asserts that excluding Kysar would be an "extreme remedy . . . that is not supported in case law or the Federal Rules of Evidence."   SANE Response ¶ 9, at 6.

Harry responds that United States v. Tome's broad admission of testimony from alleged sexual assault victims is applicable in cases of child sexual assault and, thus, not applicable here. See Reply to Response to Motion in Limine to Exclude Expert Testimony at 1, filed February 19, 2013 (Doc. 115)("SANE Reply").   Harry contends that "there exists no recognized galaxy of behaviors or demeanors or appearances that are observable and can distinguish between consensual or nonconsensual sexual relations," and, thus, Kysar cannot testify regarding her perception of Doe after the incident.   See SANE Reply at 1-2.   Harry contends that Kysar's

testimony is not relevant to any issue in the case and that its prejudicial effect far outweighs its probative value.   See SANE Reply at 2.   Harry contends that Kysar cannot testify whether Doe and Harry engaged in consensual or nonconsensual intercourse, because Kysar admits that she cannot differentiate between the two.   See SANE Reply at 2-3.   Harry asserts that Doe's alleged injuries are consistent with consensual intercourse.   See SANE Reply at 3.

Harry also asserts that the testimony of Kysar, as a lay witness, has no probative value.   He argues that Kysar's testimony might confuse or divide the jury, or cause the jury to make its decision on improper beliefs which the evidence does not support.   See SANE Reply at 3.   Harry contends that Kysar's testimony may only be relevant if Harry denied that Doe had a SANE examination, which he does not deny.   See SANE Reply at 3-4.

### 2.    The Roll MIL.

The United States moves the Court to exclude testimony from Harry's witness, Dr. Roll. See Roll MIL at 1.   The United States asserts that it has not received an expert report from Dr. Roll.   See Roll MIL at 2.   The United States asserts that neither it nor the Court can evaluate Dr. Roll's expert testimony without a report.   See Roll MIL at 3.   The United States asserts that, based on the limited information in the Roll Notice and Second Roll Notice, Dr. Roll's testimony is "irrelevant and improper under rule 702 and Daubert and the Court should exclude Roll from testifying."   Roll MIL at 4.   The United States contends that the Roll Notice and Second Roll Notice are "wholly inadequate to meet Rule 702's requirements."   Roll MIL at 4.   The United States further asserts that Dr. Roll's testimony would infringe on the "jury's province to determine the facts and to assess credibility."   Roll MIL at 4.   The United States contends that, in United States v. Adams, 271 F.3d 1236 (10th Cir. 2001), the Tenth Circuit held that the "'credibility of

witnesses is generally not an appropriate subject for expert testimony,'" although the United States notes that the Tenth Circuit did not proscribe a "'blanket exclusion' of evidence regarding the circumstances of a confession."   Roll MIL at 5 (quoting 271 F.3d at 1244-45).   The United States asserts that the Tenth Circuit in United States v. Adams explained that expert testimony that only vouches for witness credibility encroaches on the jury's "'vital and exclusive function to make credibility determinations,'" and can exceed the scope of an expert's specialized knowledge, causing a jury to reach a verdict on an improper basis.   Roll MIL at 5 (quoting 271 F.3d at 1245). The United States contends that Harry seeks to use Dr. Roll for a similar purpose and that such testimony would violate the Tenth Circuit's rulings.   See Roll MIL at 6.   The United States contends that, if the Court does not preclude Dr. Roll from testifying under United States v. Adams, the Court should preclude Dr. Roll from testifying, because the prejudicial effect of Dr. Roll's testimony will outweigh its probative value.   See Roll MIL at 6-7.

### 3.   **The March 29, 2013 Hearing**.

The Court held a hearing on the SANE MIL on March 29, 2013.   See Transcript of Hearing (taken March 29, 2013)("Mar. 29 Tr.").[2]   The Court informed the parties that it had previously discussed similar issues regarding SANE nurse testimony in United States v. Chaco. See Mar. 29 Tr. at 13:5-11 (Court).   The Court stated that the issues in this case cannot be easily distinguished from those in United States v. Chaco, in which the Court admitted a victim's statements through a physician.   See Mar. 29 Tr. at 13:12-25 (Court).   The Court noted that it made a similar ruling in United States v. Jim, No. CR 10-2653 JB, 2012 WL 2053683 (D.N.M.

---

[2] The Court's citations to the transcripts of the hearings and trial refer to the court reporter's original, unedited versions.   Any final transcripts may contain slightly different page and/or line numbers.

Jan. 7, 2012)(Browning, J.).  See Mar. 29 Tr. at 14:3-12 (Court).  The Court stated, therefore, that, "unless there's something unusual about the SANE nurse then probably the statements that are . . .  made by the victim to the SANE nurse about the identity and her condition are going to probably come in."  Mar. 29 Tr. at 14:12-17 (Court).  The Court stated that it will not allow Kysar to speculate regarding whether vaginal tears are consistent with sexual assault.  See Mar. 29 Tr. at 14:18-22 (Court).

Harry moved into evidence the SANE nurse report from May 6, 2011 -- Defense Exhibit A -- the interview transcript of a December 28, 2012 interview of Kysar -- Defense Exhibit B -- and Dr. Hariton's report, dated March 14, 2012 -- Defense Exhibit C.  See Mar. 29 Tr. at 15:15-23 (Samore); id. at 71:8-72:11 (Samore, Court, Nayback).  Harry first asserted that his case is distinguishable from United States v. Chaco, because the victim in this case is not a child.  See Mar. 29 Tr. at 15:24-16:2 (Samore).  The Court countered that the Tenth Circuit finds the identity of the assailant relevant in any sexual assault case, regardless of the victim's age.  See Mar. 29 Tr. at 16:3-18 (Court)(citing United States v. Joe).

The Court inquired of Harry what the problem is with Kysar testifying as a fact, and not an expert, witness.  See Mar. 29 Tr. at 17:6-7 (Court).  Harry contended that Kysar is "not a treating physician," and that a SANE nurse's primary purpose is to give sympathy and support, unlike the treatment Doe would receive in an emergency room.  Mar. 29 Tr. at 17:12-20 (Samore).  The Court contrasted a SANE nurse with a Federal Bureau of Investigation ("FBI") agents and investigators, who are often called as witnesses, notwithstanding that FBI agents are "not neutral, they're going to try to turn every case into a criminal case."  Mar. 29 Tr. at 18:10-17 (Court).  Harry countered that statements from medical providers are relevant to prove an assailant's

identity, which is not at issue in this case.   See Mar. 29 Tr. at 19:1-5 (Samore).   Harry contended

that Kysar admitted in her interview that she cannot differentiate, based on her findings, between

consensual and nonconsensual intercourse.   See Mar. 29 Tr. at 19:8-17 (Samore)(citing Defense

Exhibit A at 39).   The Court asked Harry how Kysar's testimony could be problematic if she

states that she cannot so differentiate when she testifies, and Harry asserted that the United States

wants to introduce more evidence, besides Kysar's physical findings, through Kysar's testimony.

See Mar. 29 Tr. at 19:23-20:1 (Samore).   Harry asserted that the United States wants to introduce

evidence of Doe's demeanor through Kysar, and Harry asserted that Dr. Roll will testify that "there

is not one word of empirical support for putting on a witness from the SANE office" to

demonstrate that "demeanor makes . . . it more or less likely that the person was a victim of sexual

assault."   Mar. 29 Tr. at 20:1-12 (Samore).   The Court countered that the SANE nurse cannot

testify that, based on Doe's demeanor, she believes it was sexual assault, and the Court stated that

Kysar therefore appears to be only a fact witness, and not an expert witness.   See Mar. 29 Tr. at

20:13-19 (Court, Samore).   The Court noted that a treating physician is not usually considered an

expert when the physician comments on an examination which the physician administered.   See

Mar. 29 Tr. at 21:1-5 (Court).   Harry countered that Kysar's testimony is not relevant, even as a

fact witness, because "the prosecution can't make a threshold showing of authority, not just with

presumptions . . . to say the demeanor has one . . . millimeter, milligram of support . . . ."   Mar. 29

Tr. at 21:6-11 (Samore).   The Court inquired how a "woman's demeanor after having consensual

sex or having a sexual assault [could] not be relevant[.]"   Mar. 29 Tr. at 21:12-14 (Court).   Harry

countered that whether demeanor is relevant varies with each woman, and the Court noted that he

may make that argument to the jury.   See Mar. 29 Tr. at 21:15-18 (Samore, Court).   The Court

noted that, if a woman "ran out of the room . . . naked and screaming I've [been] raped . . . I think that would be fac[tually] relevant." Mar. 29 Tr. at 22:3-7 (Court). The Court stated that it would allow the jury to decide "whether they thought somebody had been raped or . . . sexually assaulted." Mar. 29 Tr. at 22:9-11 (Court).

Harry noted that Kysar appears to be a "decent lady," and he does not believe that she will "stretch and . . . project [her] opinions." Mar. 29 Tr. at 22:20-22 (Samore). The Court noted that its concern with SANE nurses is that they often become advocates for victims. See Mar. 29 Tr. at 22:23-25 (Court). Harry stated that Kysar admits that "she is an advocate for this lady." Mar. 29 Tr. at 23:3-4 (Samore). Harry asserted, nonetheless, that Kysar's testimony that Doe's injuries are consistent with the account she provided to the United States cannot be relevant, unless Harry argues that Doe is changing her story, which he does not plan to argue. See Mar. 29 Tr. at 23:15-21 (Samore). The Court stated that it would not allow Kysar to testify that "based upon her demeanor . . . she was sexually assaulted and this was not consensual," but expressed that the jury can use common sense to determine what weight to give Kysar's description of Doe's demeanor. Mar. 29 Tr. at 24:13-23 (Court). Harry asserted that jurors bring "their prejudice" to a rape case, and he asserted that he is trying to "keep the prejudice out." Mar. 29 Tr. at 25:2-11 (Samore). The Court stated that a SANE nurse is not allowed to "assess" Doe's demeanor, and, rather, Kysar can only describe Doe's demeanor. Mar. 29 Tr. at 25:15-21 (Court). Harry asserted that Dr. Roll's testimony will discuss whether Doe's demeanor has relevance to the charges against Harry. See Mar. 29 Tr. at 25:22-26:4 (Samore). Harry asserted, further, that Kysar's testimony describing Doe's account of the events is not relevant, because it is repetitive and only serves to bolster the United States' case. See Mar. 29 Tr. at 26:5-10 (Samore). The Court responded that

repeating Doe's story is not necessarily irrelevant, because, that Doe repeats the same story multiple time to different individuals tends to show that the story is more reliable.   See Mar. 29 Tr. at 26:11-18 (Court).   Harry responded that he would not think repeating the same story gives any more weight to a victim's story.   See Mar. 29 Tr. at 26:19-20 (Samore).   Harry asserted, rather, that repeating the same story multiple times would tend to show that a victim is lying, and not that a victim is telling the truth.   See Mar. 29 Tr. at 27:22-23 (Samore).   Harry stated that he wants to call Dr. Roll to testify regarding the relevance of Kysar's testimony.   See Mar. 29 Tr. at 27:13-18 (Samore).

The United States objected to testimony from Mr. Roll.   See Mar. 29 Tr. at 27:22 (Nayback).   Regarding Kysar's testimony, the United States stated that she will not assess Doe's demeanor or asses Doe's credibility based upon her demeanor.   See Mar. 29 Tr. at 28:9-11 (Nayback).   The United States agreed that Kysar may not testify that Doe's demeanor indicates that she was sexually assaulted.   See Mar. 29 Tr. at 28:12-19 (Court, Nayback).   The Court asked whether Kysar would testify that, in most cases, "consensual sex and sexual assault are going to have the same sort of physical characteristics [in the] overwhelming number of cases?"   Mar. 29 Tr. at 28:20-23 (Court).   The United States agreed.   See Mar. 29 Tr. at 28:24 (Nayback).   The United States stated that it agrees with the Court's restrictions on Kysar's testimony, that it noticed Kysar as an expert only "out of an [abundance of] caution," and that Kysar is "a fact witness." Mar. 29 Tr. at 29:2-6 (Court, Nayback).

The United States stated that Kysar "might opine . . . based on training and experience . . . that [Doe's] injuries [are] consistent" with Doe's account of the events.   Mar. 29 Tr. at 29:18-21 (Nayback).   The United States explained that, according to Doe, Harry came into the bedroom

- 13 -

where Doe was sleeping, pulled her panties down, and had sexual relations with her, and that Kysar might opine that the vaginal tears found on Doe are consistent with that version of the incident.   See Mar. 29 Tr. at 29:23-30:2 (Nayback).   The United States stated that the extent of Kysar's expert testimony would be that Doe's vaginal tearing indicates that she was "in no way cooperating[,] she's not tilting her pelvic area and so she would expect to find the tearing where it was."   Mar. 29 Tr. at 30:2-6 (Nayback).   The Court inquired whether Kysar will concede that consensual intercourse and nonconsensual intercourse can cause the same vaginal tears, and the United States responded that it understands that SANE nurses can "never differentiate really." Mar. 29 Tr. at 30:11-14 (Court, Nayback).   The United States noted that Kysar will inform the jury that aggressive consensual intercourse can cause severe tearing, while a rape victim may have very minimal tearing.   See Mar. 29 Tr. at 30:14-19 (Court, Nayback).   The United States stated that Kysar's testimony is relevant, because Harry initially denied touching Doe, and took issue with Harry's contention that SANE nurses provide sympathy to victims, and argued that Kysar's testimony is relevant regarding Doe's vaginal tearing and her account of events.   Mar. 29 Tr. at 30:21-25 (Nayback).   The United States contended that identity is an issue, because Harry denied touching Doe, but a DNA test found his fluids inside of her.   See Mar. 29 Tr. at 31:1-10 (Nayback).

The United States suggested that Dr. Roll not testify at the March 29, 2013 hearing, because Dr. Roll had not yet filed an expert report, and, therefore, the United States had no basis for questioning Dr. Roll.   See Mar. 29 Tr. at 31:19-32:8 (Nayback).   The Court responded that it could hear the United States' objections to Dr. Roll's expert testimony at a later hearing, but that, at the March 29, 2013, hearing, Harry's purpose for Dr. Roll's testimony is to bolster the SANE

MIL.   See Mar. 29 Tr. at 32:9-17 (Court).   The Court stated that it would allow Harry to examine

Dr. Roll, but may let the United States cross-examine Dr. Roll after he has produced an expert

report.   See Mar. 29 Tr. at 33:23-34:2 (Court).   The Court inquired of Harry whether he is using

Dr. Roll at the March 29, 2013 hearing for the limited purpose of bolstering his SANE MIL, and

Harry responded that bolstering the SANE MIL is his purpose for Dr. Roll's testimony.   See Mar.

29 Tr. at 34:3-12 (Court, Harry).   Harry stated that, if the Court allows Kysar to testify about

demeanor, he would want Dr. Roll to testify that demeanor does not indicate anything.   See Mar.

29 Tr. at 34:3-6 (Court, Samore).

Harry then called Dr. Roll to testify.   See Mar. 29 Tr. at 39:27-21 (Court, Samore,

Witness).   The United States waived an inquiry regarding Dr. Roll's qualification as an expert in

the field of psychology, because Dr. Roll has previously testified before the Court as an expert.

See Mar. 29 Tr. at 40:2-9 (Samore, Roll, Court, Nayback).   Harry asked Dr. Roll whether there is

"any constellation or observable behaviors of people who claim to be a victim of sexual abuse that

is recognizable or . . . makes it more likely or less likely that they're telling the truth?"   Mar. 29

Tr. at 40:16-21 (Samore).   Dr. Roll replied: "There is not."   Mar. 29 Tr. at 40:22 (Roll).   Dr. Roll

explained that "it is the absence of what is in the record" that supports his opinion.   Mar. 29 Tr. at

40:23-41:1 (Samore, Roll).   Dr. Roll stated that he has "followed the research on sexual abuse

[and] asexual assaults since at least 40 years ago . . .   and none of them . . . . indicat[e] that [a]

constellation of physical presentation can either confirm or inform the hypothesis that abuse was

consensual or not."   Mar. 29 Tr. at 41:1-8 (Roll).   Dr. Roll stated that he had not reviewed

particular documents before testifying at the March 29, 2013, hearing, and, rather, the history of

his work and review of journals of normal psychology and personality assessment over the years

- 15 -

informs his opinion.   See Mar. 29 Tr. at 41:13-18 (Roll).   Dr. Roll stated that, in his thirty-three

years of teaching psychology, he has not found a psychology textbook which states that a person's

demeanor or a constellation of features is reliable, and he stated that a person's demeanor and

features are "highly unreliable."   Mar. 29 Tr. at 41:19-24 (Roll).   Dr. Roll stated that whether a

person is calm or tearful is not indicative whether that person was sexually abused or assaulted.

See Mar. 29 Tr. at 42:1-7 (Roll).

　　　　Harry inquired whether Dr. Roll notes patients' demeanor when he examines patients, and

Dr. Roll stated that he does.   See Mar. 29 Tr. at 42:14-17 (Samore, Roll).   Dr. Roll stated that a

person's demeanor is relevant contextually and may indicate that a certain topic triggers a response

in an individual.   See Mar. 29 Tr. at 42:23-43:43:4 (Samore, Roll).   Dr. Roll stated that he cannot

assess, from a person's behavior, whether they were sexually assaulted.   See Mar. 29 Tr. at

43:10-17 (Roll).   Dr. Roll stated that a person's responses can "go every which way [f]or every

which behavior," and, therefore, a person's demeanor is not a reliable method of determining

whether an individual was sexually assaulted.   Mar. 29 Tr. at 43:19-24 (Roll).   In response to

Harry's question whether a person's behavior can determine that person's credibility in court, Dr.

Roll responded that an individual's behavior is "just too [un]reliable from the psychological

perspective" to be indicative of credibility.   Mar. 29 Tr. at 43:25-44:23 (Samore, Roll).   In

response to Harry's question whether Dr. Roll perceives problems with a nurse testifying about an

alleged victim's statements, Dr. Roll stated that a person's behavior cannot indicate whether that

person is telling an account truthfully.   See Mar. 29 Tr. at 44:15-46:12 (Samore, Roll).   Dr. Roll

stated that he is testifying only that there is not a "constellation of behaviors and emotion[s] [that]

can be used reliably to tell whether or not sex was consen[sual or] not."   Mar. 29 Tr. at 46:17-22

(Roll).

The United States stated that it prefers to cross-examine Dr. Roll at a later hearing, after Dr. Roll produces an expert report.  See Mar. 29 Tr. at 47:8-14 (Court, Nayback).   The Court asked Dr. Roll whether he is familiar with Malcolm Gladwell's book Blink: The Power of Thinking Without Thinking (Back Bay Books, 2007), and Dr. Roll responded that he is familiar with the book.  See Mar. 29 Tr. at 47:15-23 (Court, Roll).   The Court asked Dr. Roll what his opinion is of the section in Blink where Gladwell describes psychologists' study of individuals' faces for the purpose of determining the individuals' underlying emotions.[3]  See Mar. 29 Tr. at 47:24-48:3 (Court).   Dr. Roll responded that, "if that were true, it would be the most startling finding in the history of psychology and . . . you would be out of a job and so would I."   Mar. 29 Tr. at 48:11-15 (Roll).   Dr. Roll stated that there is "no way . . . that these kinds of actions even the subtle ones that you measure with a . . . lie detect[or] or polygraph test can[] be relied on . . . ."   Mar. 29 Tr. at 48:17-23 (Roll).   Regarding Gladwell's description of the psychologists' catalog of faces indicating emotions, Dr. Roll stated that young theatre actors are able to create "every kind of [emotion] you can imagine and [] are . . . believable," and that, if Gladwell's hypothesis is correct, "it would be much more startling than any of [F]r[e]ud's discoveries."   Mar. 29 Tr. at 49:5-16 (Court, Roll).

### 4. Harry's Response to the Roll MIL.

Harry asserts that Kysar's testimony is "unnecessary, irrelevant, entirely unsupported by empirical evidence supporting its reliability."   Response to Government's Motion to Exclude

---

[3] In Chapter 1 of Blink, Gladwell discusses the psychologist studies of Dr. John Gottman. Dr. Gottman studies the emotions are displayed on subjects' faces for brief instances of time, and uses those indications of unconscious emotions to determine his subjects' underlying -- and perhaps unexpressed -- emotions.   See Gladwell, supra, at 18-47.

Expert Testimony of Samuel Roll at 2, filed April 9, 2013 (Doc. 132)("Roll Response").   Harry contends that any objections which the United States had to Dr. Roll's testimony have been cured from the time the United States filed the Roll MIL.   See Roll Response at 1.

Harry contends that Dr. Roll's testimony is "absolutely essential to achieve a fair trial." Roll Response at 2.   Harry asserts that the United States conceded at the March 29, 2013, hearing that any testimony from Kysar "regarding a possible, positional explanation of physical findings and, secondarily, the demeanor of the Porsecutrix has no evidentiary value . . . whether the alleged relations were consensual or nonconsensual."   Roll Response at 2.   Harry contends that, if Kysar is allowed to testify in support of Doe's allegations of sexual assault, Kysar's testimony would "suggest to an otherwise uninformed jury that it has value."   Roll Response at 3.   Harry asserts that the United States is seeking to "offer unproven, entirely unreliable evidence to confuse the jury and suggest that it is something with merit to support the Government's case."   Roll Response at 3.   Harry contends that "to permit the SANE witness to testify regarding [] the Government's admitted purposes and to deny the Defense opportunity to provide substantive response is Constitutionally prejudicial and selectively denies fair trial."   Roll Response at 3.

5.   **The April 10, 2013 Hearing.**

The Court held a hearing on April 10, 2013, at which the United States cross-examined Dr. Roll.   See Transcript of Hearing at 39:6-12 (taken April 10, 2013)(Court, Witness)("Apr. 10 Tr.").   Dr. Roll stated that Harry first contacted him about the case approximately three weeks before the hearing, he has spent approximately fourteen hours preparing for his testimony, and he has reviewed the Court's proceedings, motions, Kysar's notes, and some psychological research. See Apr. 10 Tr. at 40:12-41:2 (Nayback, Roll).   Dr. Roll stated that he has not conducted a

psychological examination of, or had personal contact with, any of the witnesses.   See Apr. 10 Tr. at 42:9-14 (Nayback, Roll).   In response to the United States' question how Dr. Roll's testimony would be relevant, Dr. Roll responded that, if asked, he will testify that there are no constellation of behaviors found in scientific evidence that indicate that an individual had consensual intercourse.   See Apr. 10 Tr. at 43:8-21 (Nayback, Roll).   Dr. Roll asserted that there is not a certain behavior that consistently indicates a particular aspect of an individual's past.   See Apr. 10 Tr. at 46:17-47:6 (Nayback, Roll).   Dr. Roll stated that regardless whether an individual is a victim of domestic violence or won the lottery, an individual's demeanor is not indicative of their experience.   See Apr. 10 Tr. at 47:12-22 (Nayback, Roll).   Dr. Roll stated that an individual yelling that "they w[on] the lottery doesn't mean they're not telling the truth.   It's not about truth telling."   Apr. 10 Tr. at 48:2-6 (Roll).   Dr. Roll stated that he will not testify that, because an individual is crying during a SANE examination, she is telling the truth, but, rather, his testimony is that "behavioral constellations are not a good guideline based on psychological [research]." Apr. 10 Tr. at 48:15-25 (Nayback, Roll).   Dr. Roll stated that the literature "really doesn't discuss this . . . that demean[or] is a reliable indicator of [whether] . . . [a] person's sexual experiences are consensual or non[consensual]."   Apr. 10 Tr. at 49:14-19 (Roll).   The United States inquired whether Dr. Roll is, therefore, testifying to a negative, and Dr. Roll admitted that he is "somewhat testifying to the negative."   Apr. 10 Tr. at 49:19-21 (Nayback, Roll).   Dr. Roll asserted that psychological reports cataloging reliable psychological indicators do not include demeanor as a reliable indicator.   See Apr. 10 Tr. at 50:2-12 (Roll).   Dr. Roll asserted that the general discrediting of polygraph tests in the psychological community is evidence that psychologists do not find behavior indicators to be reliable.   See Apr. 10 Tr. at 51:13-21 (Roll).

- 19 -

The United States inquired whether Dr. Roll's opinion may be tested, and Dr. Roll replied: "Of course."   Apr. 10 Tr. at 53:4-5 (Nayback, Roll).   Dr. Roll asserted that the National Academy of Sciences has found that behavioral manifestations are unreliable.   See Apr. 10 Tr. at 53:7-10 (Roll).   The United States inquired how Dr. Roll's testimony that there is not a connection between psychological behaviors and sexual experience may be tested, and Dr. Roll stated that his opinion may be tested with the methods described in the articles attached to his expert report.   See Apr. 10 Tr. at 53:11-19 (Nayback, Roll).   Dr. Roll admitted that his expert opinion has not been peer reviewed.   See Apr. 10 Tr. at 53:20-24 (Nayback, Roll).   Dr. Roll asserted that his opinion is accepted in the scientific community and is in accordance with relevant academic psychological standards.   See Apr. 10 Tr. at 54:13-55:8 (Nayback, Roll).   In response to the United States' question, Dr. Roll stated that he "may have" noted demeanor in previous forensic evaluations, but that he does not normally note an individual's demeanor "because some of the material that I have reviewed here indicates that is the least useful part of the evaluation and . . . it's distracting."   Apr. 10 Tr. at 55:19-24 (Nayback, Roll).   The United States inquired whether Dr. Roll's testimony is relevant if the Court instructs the jury that the jurors are the "sole judges of credibility and believability."   Apr. 10 Tr. at 56:17-19 (Nayback).   Dr. Roll replied that, in his opinion, his testimony is not rendered irrelevant by such an instruction.   See Apr. 10 Tr. at 56:20-21 (Roll).   The United States inquired whether Dr. Roll believes that the jury can judge the value of an individual's demeanor for assessing the individual's past experiences, and Dr. Roll stated that the ability of a jury to judge credibility is "not my call."   Apr. 10 Tr. at 58:13-21 (Nayback, Roll).   In response to the United States' question, Dr. Roll stated that he is not being called to testify regarding the credibility of any particular witness in this case.   See Apr.

10 Tr. at 60:14-18 (Nayback, Roll).   Dr. Roll agreed that the credibility of witnesses is not an appropriate subject for expert testimony.   See Apr. 10 Tr. at 62:21-25 (Nayback, Roll).

On re-direct, Dr. Roll stated that not every authorized study in psychological science is published.   See Apr. 10 Tr. at 65:3-9 (Samore, Roll).   Dr. Roll also stated that he would not, at trial, assess the import of any witnesses' testimony, although he recognized that his testimony may "touch on" witnesses' credibility when testifying.   Apr. 10 Tr. at 66:20-67:4 (Samore, Roll).

The Court noted that it will likely allow Kysar to testify regarding Doe's demeanor, without allowing her to assess Doe's demeanor.   See Apr. 10 Tr. at 67:19-68:2 (Court).   The Court further stated that Dr. Roll's testimony may be relevant to the jury, because many jurors likely believe that demeanor has a significant value.   See Apr. 10 Tr. at 68:3-5 (Court); id. at 68:7-69:4 (Court).   The United States contended that Dr. Roll has not provided an article that supports his opinion testimony regarding demeanor.   See Apr. 10 Tr. at 69:6-11 (Nayback).   The Court agreed that the absence of scientific support is a problem with admitting Dr. Roll's testimony.   See Apr. 10 Tr. at 69:12-17 (Court).   The Court countered, nonetheless, that Dr. Roll's testimony seems to be similar to that of an expert testifying that eye-witness testimony is not infallible.   See Apr. 10 Tr. at 69:21-70:14 (Court).   The United States responded that it has never seen nor heard of an expert who testifies regarding the fallibility of eye-witness testimony and that any such expert testimony is distinguishable from Dr. Roll's testimony.   See Apr. 10 Tr. at 70:15-24 (Court).   The United States asserted that Dr. Roll's testimony is relevant only to assess the credibility of witnesses, which is a precluded purpose for expert testimony in the Tenth Circuit.   See Apr. 10 Tr. at 71:3-11 (Nayback).   The United States further asserted that Dr. Roll has provided insufficient scientific basis for his expert opinion and that Dr. Roll's testimony is not

proven reliable within his scientific field.  See Apr. 10 Tr. at 71:11-24 (Nayback).  The United

States asserted that credibility is for the jury to judge, and that, if Dr. Roll testifies, his testimony

will have no parameters.  See Apr. 10 Tr. at 72:1-11 (Nayback).  The Court noted that, although

the jury is the sole judge of credibility, lawyers are allowed to impeach witnesses.  See Apr. 10 Tr.

at 72:12-17 (Court, Nayback).  The Court stated that, at least with respect to relevance, the Court

is allowing evidence of Doe's demeanor to be admitted and that, if Dr. Roll testifies regarding the

value of Doe's emotional state, that testimony would be relevant.  See Apr. 10 Tr. at 75:18-24

(Court).  The United States asserted that Dr. Roll's testimony would go too far because he would

testify whether Doe and Harry engaged in consensual intercourse, but the Court countered that Dr.

Roll never stated that his testimony would encompass whether there was consensual intercourse.

See Apr. 10 Tr. at 75:15-21 (Nayback, Court).  The United States asserted, therefore, that Dr.

Roll's testimony does not have a factual connection necessary to be relevant to the case, but the

Court stated that it does not want Dr. Roll to testify about the credibility of particular witnesses in

the case.  See Apr. 10 Tr. at 75:22-76:8 (Nayback, Court).  The United States asserted that Dr.

Roll's testimony would still be tied to the facts of the case and that Dr. Roll's testimony cannot

meet the standards necessary for expert testimony.  See Apr. 10 Tr. at 76:20-77:13 (Nayback).

Harry asserted that he is not making demeanor an issue in this case.  See Apr. 10 Tr. at

77:20-21 (Samore).  Harry asserted that the United States has not produced any evidence

indicating the relevance of demeanor to sexual assault victims and that Dr. Roll has brought

forward five studies which demonstrate that demeanor is not relevant to assessing a person's

background.  See Apr. 10 Tr. at 78:3-15 (Samore).  Harry contended that, if Dr. Roll does not

testify, the jury will give undue weight to Kysar's testimony regarding Doe's demeanor.  See Apr.

10 Tr. at 79:25-80:6 (Samore).   Harry asserted that the absence of Tenth Circuit case law regarding testimony such as Dr. Roll's is evidence of a prosecutorial bias in the appellate process. See Apr. 10 Tr. at 79:10-24 (Samore).   Harry asserted that the Court has an opportunity to fashion a fair remedy for his case.   See Apr. 10 Tr. at 80:21-81:3 (Samore).   Harry contended that the importance of demeanor is not a "hot topic" in psychology, and, rather, it is settled that it is not relevant to indicate an individual's psychological history.   Apr. 10 Tr. at 82:18-24 (Samore). Harry asserted that, if evidence of Doe's demeanor is admitted, the Court should allow Dr. Roll to testify.   See Apr. 10 Tr. at 83:9-16 (Samore).

The Court inquired whether Dr. Roll's testimony has any relevance beyond attacking the credibility of Doe's demeanor.   See Apr. 10 Tr. at 84:1-10 (Court).   Harry stated that Dr. Roll will not testify about Doe's credibility and, rather, that Dr. Roll will testify that the juror cannot "determine the validity, the reliability of what they're describing to you" through demeanor.   Apr. 10 Tr. at 84:11-19 (Samore).   The Court stated that it is concerned that Dr. Roll will testify that an individual's emotional response is not a "reliable indication that a person's sexual experiences were consensual or nonconsensual."   Apr. 10 Tr. at 85:5-9 (Court).   The Court stated that such a testimony is close to commenting on the credibility of witnesses.   See Apr. 10 Tr. at 84:11-16 (Court).   Harry responded that Dr. Roll could not testify about the witnesses' credibility in the case because Dr. Roll will not comment on a particular emotional response.   See Apr. 10 Tr. at 85:17-19 (Samore).   The Court asked Harry, therefore, what the relevance of Dr. Roll's testimony would be.   See Apr. 10 Tr. at 85:20-21 (Court).   The Court stated that Dr. Roll must be able to provide at least two or three articles in support of his opinion that "demeanor doesn't tell anybody about the . . . emotions" of an individual.   Apr. 10 Tr. at 86:2-12 (Court).   Harry responded that

the subject of Dr. Roll's testimony is not Doe's particular emotional response, but, rather, that the there is no evidence to link her emotional response to a particular sexual incident.   See Apr. 10 Tr. at 86:15-24 (Samore).   The Court responded that it seems as though somebody in the realm of psychology should have been able to comment heretofore on the disconnect between demeanor and emotional response if the disconnect exists to the extent Dr. Roll testifies it does.   See Apr. 10 Tr. at 87:7-11 (Court).   The Court stated that Dr. Roll should be able to cite to an article that indicates that Gladwell's theories are "a bunch of garbage" if Dr. Roll's opinion is accurate.   Apr. 10 Tr. at 87:14-020 (Court).   Harry asserted that ample evidence exists in the field of psychology that demeanor is not reliable evidence.   See Apr. 10 Tr. at 87:21-88:15 (Samore).   The Court responded that the Federal Rules of Evidence seem to allow demeanor and, therefore, recognize that demeanor is a valuable tool of assessment for the jury.   See Apr. 10 Tr. at 88:16-21 (Court). The Court stated that the exception for a declarant's mental, emotional, and physical state indicates that demeanor is admissible evidence.   See Apr. 10 Tr. at 89:1-4 (Court).   Harry contended that Dr. Roll's testimony would preclude the jury from making "that erroneous unsupported inference" that Doe's demeanor has relevance to her credibility.   Apr. 10 Tr. at 89:9-17 (Samore).

The Court inquired whether Harry can characterize Dr. Roll's testimony in any other fashion than testimony regarding an individual's emotions or the validity of an individual's statements.   See Apr. 10 Tr. at 90:24-91:6 (Court).   Harry stated that Dr. Roll will testify that an individual's demeanor is not indicative whether that individual was sexually assaulted or had other sexual experiences, or of the validity of that individual's statements.   See Apr. 10 Tr. at 91:7-19 (Samore).   Harry conceded that, when he says "validity," he is referring to the truthfulness of an individual's statement.   Apr. 10 Tr. at 91:20-24 (Court, Samore).   The Court stated that it will

- 24 -

likely exclude Dr. Roll's testimony if its subject matter is reliability or validity of an individual's statements.  See Apr. 10 Tr. at 92:3-9 (Court, Samore).  Harry asserted that emotions are not at issue in this case, and, rather, that the United States is seeking to introduce Doe's demeanor to support the validity of her statements.  See Apr. 10 Tr. at 92:18-93:1 (Samore).  Harry asserted that he has a right to respond to the United States' evidence regarding the validity of Doe's statements.  See Apr. 10 Tr. at 93:2-15 (Samore).

The Court inquired whether the United States would agree to Dr. Roll's testimony if he broadened the scope of his opinion to state that demeanor is not an indicator of psychological phenomenon, which would omit any mention of sexual experience.  See Apr. 10 Tr. at 94:8-13 (Court).  The United States responded that it would not likely be comfortable with Dr. Roll's testimony even if it were so broadened.  See Apr. 10 Tr. at 94:14-16 (Nayback).  The United States also asserted that Dr. Roll's testimony is not relevant to a material issue in the case, because Kysar will not assess Doe's demeanor.  See Apr. 10 Tr. at 95:12-24 (Nayback).  The United States asserted that Dr. Roll's expert report does not meet the standards necessary for him to testify as an expert.  See Apr. 10 Tr. at 96:14-20 (Nayback).

The Court inquired of Harry whether he would still want Dr. Roll to testify if the Court did not allow Kysar to testify regarding Doe's demeanor.  See Apr. 10 Tr. at 97:2-6 (Court).  Harry responded that he would.  See Apr. 10 Tr. at 97:7 (Samore).

The Court stated that it is inclined to allow Kysar to testify about Doe's demeanor, as "most people . . . do think demeanor is probably something that [factors] in determining credibility."  Apr. 10 Tr. at 98:22-25 (Court).  The Court stated that it would take the Roll MIL under advisement and would consider whether Dr. Roll's testimony may be limited so that "he

provides some basic information without in any way commenting on this case."   Apr. 10 Tr. at

99:2-15 (Court).   The Court also stated that Dr. Roll's testimony may not meet the standards

necessary for admission of expert testimony.   See Apr. 10 Tr. at 99:15-17 (Court).   The Court

stated that Dr. Roll must provide the Court with "no more than ten pages of at least three articles

that are highlighted that supports what he says," and, that if he cannot, then the Court will likely

exclude Dr. Roll's testimony under Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993).

Apr. 10 Tr. at 100:1-6 (Court).   The Court stated that it is inclined to "find some ground to allow

some testimony, but try to keep it as far away from him commenting on the incident in this case as

much as possible."   Apr. 10 Tr. at 101:1-4 (Court).   The Court noted that it excluded Dr. Roll's

testimony entirely in United States v. Sanchez, No. CR 02-2283 (Doc. 101).   See Apr. 10 Tr. at

101:5-9 (Court).

> **6.      Dr. Roll's Supporting References.**

Harry provided the Court with Supporting Reference for Opinions for Samuel Roll and

Background Scientific Basis, on April 16, 2013.   See Doc. 136 ("Roll Report").   Dr. Roll's first

point is that the absence of references to demeanor and manifest behavior as a reliable tools of

psychological assessment demonstrates the negative -- that is, demonstrates that demeanor and

behavior are not reliable tools of psychological assessment.   See Roll Report at 1 (citing Gary B.

Melton, John Petrila, Norman G. Poythress, & Christopher Slobogin, Psychological Evaluations

for the Courts: A Handbook for Mental and Health Professionals and Lawyers 43-68 (3d ed.

2007); 1 Robert R. Holt, Methods in Clinical Psychology xi, xii-iv (1978).[4]   Dr. Roll also notes

---

[4] Although Dr. Roll's citation in the Roll Report to the Methods in Clinical Psychology
cites to the second volume of the work, the pages that Dr. Roll provided to the Court are from the
first volume.   Compare Roll Report at 1 (providing a citation of: "1 Holt, R.R., Methods in

- 26 -

that in a "famous Sherlock Holmes story, the fact that a dog did not bark helped Holmes solve the mystery."   Roll Report at 1.   Dr. Roll analogizes this Sherlock Holmes to his statement that "the following references are ones in which one would expect to list demeanor and manifest behavior as measures if they were considered reliable in psychological assessment."   Roll Report at 1 (citing Melton, Petrila, Poythress & Slobogin, supra, at 43-68; Holt, supra, at xi, xii-iv.   In the Psychological Evaluations for the Courts: A Handbook for Mental and Health Professionals and Lawyers, the authors state that "a variety of tools are available for the purposes of assessing the client's functions and impairments, diagnosing mental disorders, and planning treatment" in a therapeutic context, including interviewing, testing, and retrieval of archival or third-party information, the "most important" of which "is the clinical interview."   Melton, Petrila, Poythress & Slobogin, supra, at 43-44.   The authors relate that the same tools are useful for forensic evaluations.   See Melton, Petrila, Poythress & Slobogin, supra, at 44.   The authors contrast a therapeutic setting, in which a client's perspective is of utmost importance, with a forensic setting, in which accuracy is of the utmost importance, and, therefore, places a greater emphasis on perspectives attained from multiple sources.   See Petrila, Poythress & Slobogin, supra, at 44. The authors note that clinical assessment instruments which are often useful in the therapeutic context -- "because they assess general psychological constructs (e.g., intelligence, depression, academic abilities, anxiety level)" -- are the "least likely" to be helpful in forensic evaluations because the psychological constructs assessed are "far removed from the specific psychological issues of interests to the legal decisionmaker (e.g., competence to stand trial, best interests of the

---

Clinical Psychology.   Tables of Contents.   Pages xi and xii-xiv in Volume II [sic]"), with Roll Report at 31-33 (excerpts from Methods in Clinical Psychology's table of contents which reads "Contents of Volume 1").

- 27 -

child, capacity to manage one's personal and financial affairs)." Melton, Petrila, Poythress & Slobogin, supra, at 48. The authors note that forensically relevant instruments, which are used to assess clinical constructs, are more helpful that clinical assessment instruments, because forensically relevant instruments assess constructs "most relevant to evaluation of persons who are involved in the legal system in some way (e.g., psychopathy, response style, violence risk)." Melton, Petrila, Poythress & Slobogin, supra, at 48. The authors note that a final category of psychological assessment tools, forensic assessment instruments, which assess "psycholegal capacities, abilities, or knowledge, such a criminal defendant's competence to stand trial" are often used to supplement or replace traditional therapeutic assessment procedures. Melton, Petrila, Poythress & Slobogin, supra, at 48. The authors later state that "most psychological tests have neither been developed nor validated specifically to inform judgments about legally relevant behavior." Melton, Petrila, Poythress & Slobogin, supra, at 50. The authors also discuss certain situations in which hypnosis may be helpful for a forensic assessment, such as when an individual reports memory problems. See Melton, Petrila, Poythress & Slobogin, supra, at 55.

Melton, Petrila, Poythress and Slobogin also warn forensic examiners about the dangers of relying on "clinical impressions or psychological testing," to describe an examinee's response style. Melton, Petrila, Poythress & Slobogin, supra, at 56. The authors note that a response style may be characterized as "honest/candid," "exaggerated/fabricated," "denying/minimizing," "irrelevant," and a combination of these styles. Melton, Petrila, Poythress & Slobogin, supra, at 57. They warn that, unlike patients and clients in a clinical setting, individuals being psychologically examined for forensic purposes often have "much to gain from a particular finding or formulation about the case." Melton, Petrila, Poythress & Slobogin, supra, at 56.

Accordingly, the authors encourage forensic psychological examiners to develop a "low threshold for suspecting dissimulation" and a "conservative stance with respect to reaching conclusions" that an examinee has not responded candidly during an examination.   Melton, Petrila, Poythress & Slobogin, supra, at 57.   The authors discuss few methodologies for assessing whether an individual is overstating his or her symptoms in the hopes of securing a particular result in litigation, and the authors' discussion of these methodologies focuses on assessing an individual's report of her or her symptoms, and not an individual's demeanor during an interview.   See Melton, Petrila, Poythress & Slobogin, supra, at 59-60.   Melton, Petrila, Poythress and Slobogin also explain that there is little, if any, useful research that may aid an examiner in identifying feigned denial, guardedness, and minimization.   See Melton, Petrila, Poythress & Slobogin, supra, at 61-62.

Also in support of Dr. Roll's theory that the absences of references to demeanor and behavior as reliable psychological assessment tools, Dr. Roll provides an excerpt from Methods in Clinical Psychology's table of contents.   See Roll Report at 1, 30-33.   The table of contents denote relevant chapters on the topic of "Individuality and Generalization in the Psychology of Personality: A Theoretical Rationale for Personality Assessment and Research."   Holt, supra, at xiii.   The headings for the following chapters relate to "The Thematic Apperception Test," "The Rorschach," and "Other Methods," including "the Szondi Test," "Self-Evaluations," and "Analyzing Defense of Self-Esteem."   Holt, supra, at xii-iv.   The materials included in the Roll Report do not define these psychological assessment tools.

Dr. Roll also provides the Court with materials that, he states, directly "reference . . . the lack of reliability of behavior observation in assessment of personality."   Roll Report at 1 (citing

James N. Butcher, Clinical Personality Approaches 225 (Oxford 1995); H.M. Knoff, The Personality Assessment Report and the Feedback and Planning Conference 552 (Guilford Press 1986)).   The excerpt from Clinical Personality Approaches reads:

> "For 'Behavior Observations' to play an effective role in test reports, a rationale is required that involved greater specificity than the view that all behavior is important and that recognizes that these accounts have a legitimate and even indispensable role to play in the report."

Roll Report at 1 (quoting Butcher, supra, at 225).   The excerpt from The Personality Assessment Report and the Feedback and Planning Conference reads: "To date there is no empirically sound observational system available for completion by the practitioner during or immediately after the individual assessment session; nor are there procedures to control the potential bias when data (observed or recalled) are generalized into diagnostic hypothesis."   Roll Report at 2 (quoting Knoff, supra, at 552).

Lastly, Dr. Roll draws on the psychological community's general discrediting of the polygraph test to support his theory that demeanor and behavior are not linked to reliability or credibility.   See Roll Report at 3 (citing American Psychological Association, The Polygraph in Doubt, APA Monitor 71 (2004); W. Iacono, Forensic "Lie Detection": Procedures Without Scientific Basis, 1 Psychology Practice 75-86 (2001)).   Dr. Roll prefaces the resources he attaches with the statement: "There is now consensus within the scientific community that the polygraph as a way of systematically collecting behavioral data is no more useful or reliable than the simple recording of the patients' obvious demeanor and behavior."   Roll Report at 3.   The American Psychological Association's discussion of polygraph tests explains that "[p]sychologists have repeatedly told U.S. courts that polygraph tests . . . are theoretically unsound and not valid in assessing honesty."   American Psychological Association, supra, at 1.   The American

Psychological Association further states that a recent National Research Council panel "found no evidence of polygraph validity."   American Psychological Association, supra, at 1.   The American Psychological Association quotes a psychologist, Dr. Leonard Saxe, a polygraph researcher at Brandeis University, as saying, "'There is no unique physiological reaction to deception.'"   American Psychological Association, supra, at 1.

The abstract from Iacono's article states that the polygraph test "is based on an implausible set of assumptions that makes it biased against innocent individuals and easy for guilty persons to defeat using countermeasures."   Iacono, supra, at 75.   Iacono contrasts the polygraph test, which he refers to as the "control question test" or "CQT," with the "relevant/irrelevant test (RIT)."   Iacono, supra, at 76-77.   When administering a RIT, examiners would ask a suspect irrelevant questions "dealing with unimportant facts known to both examiner and suspect ( . . . "Are you sitting down? . . .)," and the examiners would conclude that a suspect's strong response to a relevant question (the answer to which was presumably unknown to the examiner), indicates a suspect's guilt.   Iacono, supra, at 76.   Iacono states that the RIT "has been found wanting even by proponents of polygraph because the irrelevant items do not provide an adequate control for the emotional impact of simply being presented with the accusatory relevant question."   Iacono, supra, at 76.   The CQT, on the other hand, uses "control" questions to elicit lies from suspects by asking questions such as: "Have you ever hurt someone to get revenge," or "Have you ever lied to a person in a position of authority?"   Iacono, supra, at 77.   The theory behind this test is that most people have committed acts about which the control questions probe, and the assumption is that most people will have an urge to lie about these misdeeds.   Iacono explains that the CQT requires two assumptions to be true for its results to be valid: (i) that innocent individuals are more

- 31 -

responsive to control than relevant questions; and (ii) that guilty persons respond more intensely to relevant than control questions.   The basis of Iacono's article is that both of these assumptions are "easily challenged."   Iacono, supra, at 77.   Iacono states that the CQT suffers from the same flaw as the RIT, in that neither test adequately control for the "emotional impact of being asked the accusatory relevant question."   Iacono, supra, at 77.   Iacono also attacks the assumption that guilty persons will respond more strongly than innocent persons to relevant questions, as he asserts that "simple countermeasures such as curling the toes, lightly biting the tongue, or performing mental arithmetic when control questions are asked" can artificially augment a response to control question.   Iacono, supra, at 78.   Iacono discusses the difficulties facing researches attempting to "accurately estimate the validity of the CQT."   Iacono, supra, at 79.   See Iacono, supra, at 79-82. Lastly, Iacono discusses his own survey of members of the Society for Psychophysiological Research and the Fellows of the American Psychological Association's Division of General Psychology, and he states that "the great majority" of respondents "held that the CQT could be defeated by countermeasures that were easily learned and they expressed substantial skepticism in the validity of friendly CQTs and in the accuracy claims of polygraph proponents."   Iacono, supra, at 83-84.   In conclusion, Iacono states that "[a]lthough the CQT may be useful as an investigative aid and tool to induce confessions, it does not pass muster as a scientifically credible test."   Iacono, supra, at 84.

**7.      Dr. Roll's Proffer at Trial.**

On May 8, 2013, before the jury was called into trial, Harry requested permission to present more evidence from Dr. Roll regarding excerpts from psychological journals that Dr. Roll submitted to the Court.   See Transcript of Trial at 2:9-17 (taken May 8, 2013)(Samore)("May 8

Tr.").   Harry requested the Court to consider the March 29, 2013 and April 10, 2013 hearings, in addition to Dr. Roll's testimony on May 8, 2013, in deciding whether to allow Dr. Roll to testify at trial.   See May 8 Tr. at 14:21-15:5 (Samore).   The United States objected to the Court considering Dr. Roll's previous testimony, and stated that Dr. Roll's testimony "has already been laid out sufficiently on direct examination," and in his report.   May 8 Tr. at 15:8-14 (Nayback). The United States objected to Dr. Roll testifying again, and asserted that it has no notice regarding what Dr. Roll will say and is not prepared to cross-examine him at trial.   See May 8 Tr. at 15:15-22 (Nayback).

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.   As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible. See Fed. R. Evid. 402.   The standard for relevance is liberal.   See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).   The evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   Fed. R. Evid. 401.   See United States v. Leonard, 439 F.3d at 651.   "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only need to have "any tendency" to do so.   United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).   See United States v. Leonard, 439 F.3d at 651; United States v. McVeigh, 153 F.3d at 1190.   Although the threshold burden is low, the rules do "not

sanction the carte blanche admission of whatever evidence a defendant would like.  The trial

judge is the gatekeeper under the Rules of Evidence."  United States v. Jordan, 485 F.3d at 1218.

### LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered

evidence's probative value against its potential for unfair prejudice.  See United States v. Record,

873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing

probative value, which permits exclusion of relevant matter [under rule 403]."  United States v.

Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563

(10th Cir. 1991)).  The Tenth Circuit has reminded district courts that they should be "mindful"

that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an

extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787

(10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's

discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's

discretion to balance possible unfair prejudice against probative value is broad, see United States

v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88

(4th Cir. 1980).  As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its
> greater experience in evidentiary matters, courts of appeals afford broad discretion
> to a district court's evidentiary rulings . . . . This is particularly true with respect to
> Rule 403 since it requires an "on-the-spot balancing of probative value and

prejudice, potentially to exclude as unduly prejudicial some evidence that already
has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan

Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See

United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered

evidence], and weighing any factors counseling against admissibility is a matter first for the

district court's sound judgment under Rules 401 and 403 . . . .").

    Evidence may be unfairly prejudicial if it would likely provoke an emotional response

from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular

matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not

unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 543

F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003);

United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly

prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at

1301 (quoting Fed. R. Evid. 403 advisory committee note).

## LAW REGARDING EXPERT TESTIMONY

    "Since the Supreme Court of the United States decided Daubert v. Merrell Dow

Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered

experts will assist the jury in understanding the evidence and in determining the factual issues it

must decide."  United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M.

2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to

testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is

the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at

1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered

expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro,

805 F. Supp. 2d at 1224.

### 1.   Rule 702.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to the facts of
> the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land

values."). An expert is "required to possess such skill, experience or knowledge in that

particular field as to make it appear that his opinion would rest on substantial foundation and

would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank,

374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of

establishing by a preponderance of the evidence that the pertinent admissibility requirements are

met.   See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning,

J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).   Once the trial court has

determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an

expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be

required to satisfy an overly narrow test of his own qualifications."   Gardner v. Gen. Motors

Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).   Courts should,

under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez,

67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court

has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v.

Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will

not be overturned "unless it is manifestly erroneous or an abuse of discretion").

###      2.      The Standard in *Daubert v. Merrell Dow Pharm., Inc.*

In its gatekeeper role, a court must assess the reasoning and methodology underlying an

expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of

the case, i.e., whether it is helpful to the trier of fact.   See Daubert v. Merrell Dow Pharm., Inc.,

509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2

(D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir.

2003)).   The Supreme Court articulated a non-exclusive list of factors that weigh into a district

court's first-step reliability determination, including: (i) whether the method has been tested;

(ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the

existence of standards and whether the witness applied them in the present case; and (v) whether

the witness' method is generally accepted as reliable in the relevant medical and scientific

community.   See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.   The court is also to

consider whether the witness' conclusion represents an "unfounded extrapolation" from the data;

whether the witness has adequately accounted for alternative explanations for the effect at issue;

whether the opinion was reached for the purposes of litigation or as the result of independent

studies; or whether it unduly relies on anecdotal evidence.   See Witherspoon v. Navajo Ref. Co.,

LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).   The

Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."   [Bitler v. A.O. Smith Corp., 391
> F.3d 1114, 1120 (10th Cir. 2004)] (quoting Daubert, 509 U.S. at 589 . . .).   This
> obligation involves a two-part inquiry.   Id.   "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"   Id. (quoting Daubert, 509
> U.S. at 592 . . . .).   In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."   Id. (quoting Daubert, 509 U.S. at 592-93 . . .).   Second, the district
> court must further inquire into whether proposed testimony is sufficiently "relevant
> to the task at hand."   Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted).   "The second inquiry is related to the first.   Under the

relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony

logically advances a material aspect of the case. . . .   The evidence must have a valid scientific

connection to the disputed facts in the case."   Norris v. Baxter Healthcare Corp., 397 F.3d at 884

n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand

from the Supreme Court), and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)).   If the

expert's proffered testimony fails on the first prong, the court does not reach the second prong.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.   In Kumho Tire Co. v. Carmichael, 526

U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm.,

Inc., to non-scientific expert testimony.   See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").   The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.   Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.   And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665 JB/DJS, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).   "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.   See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.   As the Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing

> reliability under Daubert, and because, in light of that discretion, there is not an
> extensive body of appellate case law defining the criteria for assessing scientific
> reliability, we are limited to determining whether the district court's application of
> the Daubert manifests a clear error of judgment or exceeds the bounds of
> permissible choice in the circumstances. . . . Thus, when coupled with this
> deferential standard of review, Daubert's effort to safeguard the reliability of
> science in the courtroom may produce a counter-intuitive effect: different courts
> relying on the essentially the same science may reach different results.

289 F.3d at 1206.   As the United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington N. R.R. Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method.   Certainly, scientists may form initial tentative
> hypotheses. However, scientists whose conviction about the ultimate conclusion of
> their research is so firm that they are willing to aver under oath that it is correct
> prior to performing the necessary validating tests could properly be viewed by the
> district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503.

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of fact.
> In making that determination, the court should consider, among other factors, the
> testimony's relevance, the jurors' common knowledge and experience, and
> whether the expert's testimony may usurp the jury's primary role as the evaluator
> of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623 JB/WPL, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective

tissue disease is an untested hypothesis.   At worst, the link has been tested and found to be

untenable.   Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested

- 40 -

hypothesis cannot be a scientifically reliable basis for an opinion on causation.").   A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.   The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."   Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).   See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").   Courts have excluded experts' opinions when the experts depart from their own established standards.   See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.    Necessity of Evaluating an Issue Under *Daubert v. Merrell Dow Pharm., Inc.*

The restrictions in Daubert v. Merrell Dow Pharm., Inc. apply to both "novel" expert testimony and "well-established propositions."   509 U.S. at 593 n.11 ("Although the Frye[1] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").   "Of course, well-established propositions are less likely to be challenged than those that are novel, and

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."   293 F. at 1014.

they are more handily defended."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"Indeed, theories that are so firmly established as to have attained the status of scientific law, such

as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of

Evidence 201."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need

not take issue under Daubert . . . ."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769,

780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a

district court may require further indications of reliability."  Attorney Gen. of Okla. v. Tyson

Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's

opinion is a relevant consideration in determining whether expert testimony is reliable.  See

Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the

courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their

acceptance of it.").

## DR. ROLL IN THE DISTRICT OF NEW MEXICO

Dr. Roll frequently appears in court in the District of New Mexico.  In United States v.

Lopez-Hodgson, 333 F. App'x 347 (10th Cir. May 28, 2009)(unpublished), the Honorable

William J. Holloway, Jr., United States Circuit Judge for the United States Court of Appeals for

the Tenth Circuit, wrote an opinion for a unanimous panel including the Honorable Paul J. Kelly,

Jr., United States Circuit Judge for the Tenth Circuit, and the Honorable Mary Beck Briscoe, Chief

United States Circuit Judge for the Tenth Circuit, determining that the Honorable C. Leroy

Hansen, Senior United States District Judge for the District of New Mexico, did not err in finding

a defendant competent to stand trial over Dr. Roll's recommendation.  See 333 F. App'x at

354-55.   Although Dr. Roll stated that the defendant suffered from mild mental retardation, and was therefore incompetent, Judge Hansen relied on the findings of another expert forensic psychologist who was "very confident" that the defendant was competent to stand trial.   333 F. App'x at 354-55.   The other expert noted in support of his confidence that the defendant could memorize portions of the sentencing guidelines.   See 333 F. App'x at 354-55.   Judge Holloway stated that Dr. Roll's finding that the defendant's mild mental retardation and "blending of schizophrenic thought disorders with paranoid aspects," rendered him unable to assist in his own defense, 333 F. App'x at 349, "provided, at best, questionable support for [his] conclusion that Mr. Lopez-Hodgson was incompetent."   333 F. App'x at 355.

In United States v. McQuade Q., 403 F.3d 717 (10th Cir. 2005), the Honorable Bobby R. Baldock, Senior United States Circuit Judge for the Tenth Circuit, wrote for a unanimous panel affirming the Honorable James Aubrey Parker, Senior United States District Judge for the District of New Mexico's reliance on Dr. Roll's testimony that a juvenile defendant suffered from an "extreme anti-social personality disorder" supported, with other factors, the juvenile's transfer to adult status.   403 F.3d at 721.   Judge Baldock noted that Dr. Roll's testimony that the defendant would need treatment one to three times a week by a licensed psychologist for his personality disorder warranted the juvenile's transfer to adult status so that he could benefit from the increased resources in the adult criminal system.   See 403 F.3d at 721.

Additionally, in 1986, the Tenth Circuit relied on Dr. Roll's testimony, in part, in reversing the Honorable Santiago E. Campos, former United States District Judge for the District of New Mexico's directed verdict in a civil case in favor of a defendant on a claim of negligently inflicting psychological injury.   See Whalley v. Sakura, 804 F.2d 580, 584-86 (10th Cir. 1986).   Writing

for a majority, Judge Holloway, noted that Dr. Roll testified that the plaintiff's mental distress was related to the breast reconstruction that the defendant performed on the plaintiff and its aftermath -- which involved infections, a re-opening of the incision, and the plaintiff's flesh falling out.   See 804 F.2d at 584.   Judge Holloway also stated that the district court could have properly relied on Dr. Roll's testimony, even though he is a clinical psychologist and not a psychiatrist.

> [D]efendant points to no New Mexico law requiring expert medical testimony by psychiatrists in cases involving the negligent infliction of mental distress.
>
>  . . . .
>
> Although psychologists like Dr. Roll are not licensed to practice medicine, see N.M. Stat. Ann. § 61-9-17 (1985 supp.) (repeal effective July 1, 1992), they typically undergo extensive training in the diagnosis and treatment of mental disease.   Jenkins v. United States, 307 F.2d 637, 644-45 (D.C. Cir. 1962) (en banc). New Mexico's Professional Psychologist Act requires substantial training and experience for certification as a clinical psychologist.   See N.M. Stat. Ann. §§ 61-9-9, 61-9-10, 61-9-11 (1978) (repeal effective July 1, 1992).   Dr. Roll was more than qualified under this statutory scheme. See V R. 552.   He received a doctorate degree in clinical psychology from Pennsylvania State University, served as an intern at the University of Pittsburgh, and completed two years of supervised work at the Yale Psychiatric Institute.   V R. 552-54.   At the time of trial, he was serving as a professor of psychology and psychiatry at the University of New Mexico.   V R. 554.   He had published a number of scholarly articles on psychology and received several national honors.   V R. 553-55. . . .
>
> The New Mexico courts have relied on credentials like Dr. Roll's in allowing psychologists to testify on a criminal defendant's sanity, State v. Padilla, 66 N.M. 289, 347 P.2d 312, 318 (1959), and on "cause of any change in [a] plaintiff's mental ability," Winder v. Martinez, 88 N.M. 622, 545 P.2d 88, 92 (Ct.App.1975), cert. denied, 89 N.M. 6, 546 P.2d 71 (1976); see Higgins v. Hermes, 89 N.M. 379, 552 P.2d 1227, 1229 (Ct. App.) (upholding admission of a psychologist's testimony on the extent of plaintiff's mental anguish), cert. denied, 90 N.M. 8, 558 P.2d 620 (1976). See also, Hooper v. Industrial Commission, 126 Ariz. 586, 617 P.2d 538, 540 (Ct. App. 1980) (allowing psychologist to testify that an industrial accident caused plaintiff's mental disability); Kravinsky v. Glover, 263 Pa. Super. 8, 396 A.2d 1349, 1355 (1979) (allowing psychologist to give expert opinion on the cause of plaintiff's "driving phobia"); Landreth v. Reed, 570 S.W.2d 486, 488-89 (Tex. Ct. Civ. App. 1978) (allowing psychologist to testify regarding the physical manifestations of plaintiff's emotional shock); Durflinger v. Artiles,

727 F.2d 888, 890-91 (10th Cir. 1984) (applying Kansas law) (holding that a clinical psychologist can testify regarding a physician's standard of care in making a discharge decision).

Whalley v. Sakura, 804 F.2d at 585.   Judge Holloway held, accordingly, that Dr. Roll's testimony regarding the cause of the plaintiffs' emotional distress, in conjunction with the other testimony presented at trial, was sufficient "to present a claim for submission to the jury of negligent infliction of psychological injury with emotional distress and physical manifestations."   804 F.2d at 585-86.

In United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769 (D.N.M. June 5, 2012)(Browning, J.), the Court used Dr. Roll's psychological evaluation of a defendant, Ira Lewis Lewellen, in the Court's analysis whether to depart downwards in Lewellen's sentence under U.S.S.G. § 5K2.20(b) on the basis of aberrant behavior.   The Court noted that Dr. Roll's psychological evaluation of Lewellen indicated that Lewellen did not have "personality characteristics that suggest he is a person likely to commit crimes or that he will commit more crimes in the future."   2012 WL 2175769, at *9.   In United States v. Ganadonegro, 805 F. Supp. 2d 1188 (D.N.M 2011)(Browning, J.), the Court allowed Dr. Roll to testify on some, but not all, of the Defendant Kalvest Ganadonegro's proffered topics.   The Court found that, in light of Dr. Roll's credentials and that the tests he used to evaluate Ganadonegro were subject to peer review, Dr. Roll's testimony that Ganadonegro's language skills, cultural background, and personality created a likelihood that he gave false admissions was reliable.   See 805 F. Supp. 2d at 1201-03. On the other hand, the Court determined that testimony from Dr. Roll that some defendants give false testimonies, was irrelevant.   The Court concluded that such testimony would relate to the credibility of Ganadonegro's statements, which is "'not an appropriate subject for expert

testimony.'"  United States v. Ganadonegro, 805 F. Supp. 2d at 1213 (quoting United States v. Adams, 271 F.3d at 1244-45).  The Court concluded that the Tenth Circuit's opinions "strongly suggest[] that Dr. Roll's testimony that there are a host of language factors, cultural factors, and personality factors that would have increased the probability of Ganadonegro making false admissions does little more than vouch for the credibility of Ganadonegro's statement."  805 F. Supp. 2d at 1213.  On the other hand, the Court allowed Dr. Roll to offer testimony that went to the voluntariness of Ganadonegro's statements, drawing a distinction between testimony regarding credibility and regarding voluntariness by prohibiting Dr. Roll from testifying "generally about the phenomenon of false confessions and that Ganadonegro fits the profile of someone who would give a false confession," but allowing Dr. Roll to testify that Ganadonegro's test results indicate "the existence of identifiable medical disorders in the form of mental defects," which may have made him susceptible to suggestion.  805 F. Supp. 2d at 1216.

In  United States v. Sorto, No. CR 07-0158 JB, 2008 WL 4104121 (D.N.M. May 5, 2008)(Browning, J.), the Court did not depart downward based on a defendant's alleged exposure to extreme violence as a child from his experience with war in El Salvador, despite a report from Dr. Roll purporting to link the defendant's childhood experiences with his criminal history, offense conduct, and drug abuse.  See 2008 WL 4104121, at **2, 5.  In United States v. Jones, 411 F. Supp. 2d 1262 (D.N.M. 2005)(Browning, J.), the Court determined that Dion Lamy, a defendant, voluntarily made incriminating statements to FBI agents, notwithstanding Dr. Roll's testimony that Lamy had a low level of mental functioning and suffered from an "acquiescent set" -- a "purported tendency to defer to those in authority."  411 F. Supp. 2d at 1270.  The Court noted that Dr. Roll's testimony, which demonstrated that Lamy's intelligence was below average,

did not establish that Lamy had difficulty understanding his rights, especially in light of Lamy's previous encounters with the criminal justice system.   See 411 F. Supp. 2d at 1269. Additionally, the Court determined that, although Lamy may "generally wish to please authority," his ability to defy authority, as evidenced by his initial statement "that he had nothing to do with the alleged rape," indicated that his statements were not involuntarily made because of a propensity for suggestibility.   411 F. Supp. 2d at 1270.

Last, in United States v. Waylon Sanchez, No. CR 02-2283 JB (D.N.M. filed Oct. 7, 2003)(Browning, J.), the Court excluded Dr. Roll's testimony that a defendant, Waylon Sanchez, possessed "a number of personality features that are inconsistent with the crimes with which he is charged," and that Sanchez' personality features "are consistent with giving a false confession in an effort to help a loved one, namely his girlfriend, Paula Padilla."   Slip op. at 2.   Relying on United States v. Adams, 271 F.3d 1236 (2001), in which Judge Kelly excluded testimony from a psychologist that a defendant's "neurocognitive impairment and dependent personality structure" supported the possibility that the defendant gave false incriminating statements to the police, the Court reasoned that Dr. Roll's testimony, similar to the proffered expert testimony in United States v. Adams, was not relevant and had little probative value, because whether Sanchez' confession and subsequent retraction thereof is consistent with his personality trait did not aid the jury in determining whether Sanchez committed the alleged crime.   United States v. Waylon Sanchez, Slip op. at 4, 6-7 (citing United States v. Adams, 271 F.3d at 1241-42, 1245-46) Additionally, the Court found that, although Dr. Roll's testing methods were based on peer-reviewed techniques, the conclusions which Dr. Roll reached from those methods had not been subjected to peer review. The Court determined, thus, that it could not assess whether Dr. Roll's testimony was reliable.

- 47 -

See Slip op. at 8-10.   The Court, therefore, did not allow Dr. Roll to testify at Sanchez' trial.   See

Slip op. at 10-11.

## LAW REGARDING RULE 803(4)

Hearsay testimony is generally inadmissible.   See Fed. R. Evid. 802.   The Federal Rules

of Evidence contain a number of exceptions, however, to the hearsay prohibition.   See Fed. R.

Evid. 803, 804.   One of these exceptions, rule 803(4), excepts from the general bar on hearsay

"[s]tatements made for purposes of medical diagnosis or treatment and describing medical history,

or past or present symptoms, pain, or sensations, or the inception or general character of the cause

or external source thereof insofar as reasonably pertinent to diagnosis or treatment."   Fed. R.

Evid. 803(4).

### 1.      Rationale for the 803(4) Exception.

This exception is premised on the rationale that a patient's statements to his or her

physician are likely to be particularly reliable because the patient has a self-interested motive to be

truthful.   The patient knows that the efficacy of his or her medical treatment depends upon the

accuracy of the information that he or she provides to the doctor.   See United States v. Joe, 8 F.3d

at 1493.   Stated differently, "a statement made in the course of procuring medical services, where

the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special

guarantees of credibility."   White v. Illinois, 502 U.S. 346, 356 (1992).

The selfish-interest/treatment rationale, therefore, supports the exception.   In United

States v. Joe, the Tenth Circuit stated:

> The Rule 803(4) exception to the hearsay rule is founded on a theory of reliability
> that emanates from the patient's own selfish motive -- her understanding "that the
> effectiveness of the treatment received will depend upon the accuracy of the
> information provided to the physician."   2 McCormick on Evidence § 277, at

246-47 (John W. Strong ed., 4th ed. 1992).

United States v. Joe, 8 F.3d at 1493-94.   It is the patient's self-interest in furnishing accurate information that provides the guarantee of trustworthiness which justifies exempting these out-of-court statements from the general hearsay prohibition.   See White v. Illinois, 502 U.S. at 356 ("[A] statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony.").

In United States v. Joe, the Tenth Circuit observed that the United States Courts of Appeals for the Fourth and Eighth Circuits have applied a two-part test to determine a statement's admissibility under rule 803(4).   See 8 F.3d at 1494 n.5 (citing United States v. Renville, 779 F.2d 430, 436 (8th Cir. 1985)).   Under the first half of the test, "the declarant's motive in making the statement must be consistent with the purposes of promoting treatment."   8 F.3d at 1494 n.5. Second, "the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis."   8 F.3d at 1494 n.5.

In United States v. White, 11 F.3d 1446 (8th Cir. 1993), the defendant was convicted of sexually abusing his wife's two grandsons, R.H. and L.H., who were nine and seven years old, respectively, at the time of the defendant's trial.   On appeal, the defendant argued that statements which R.H. made to a social worker were not admissible under rule 803(4).   The Eighth Circuit noted that, for the statements to be admissible under rule 803(4), the government "must show that R.H. understood that he was speaking to a trained professional for the purposes of obtaining diagnosis of, or providing treatment for, emotional or psychological injuries."   11 F.3d at 1449. The Eighth Circuit concluded: "There is nothing in the record to suggest that R.H. appreciated that

it was in his best interests to tell the truth and was therefore unlikely to lie." 11 F.3d at 1450.

"How [the social worker] explained her role and purpose to R.H., how she asked him questions, and how and where she conducted the interview are matters that can provide evidence 'that the child understood the physician's [or therapist's] role in order to trigger the motivation to provide truthful information.'" 11 F.3d at 1450 (quoting United States v. Barrett, 8 F.3d 1296, 1300 (8th Cir. 1993)).

The Eighth Circuit in United States v. White also relied on Ring v. Erickson, 983 F.2d 818 (8th Cir. 1992), a habeas case which held that the admission at trial, under rule 803(4) of Minnesota's Rules of Evidence, of out-of-court statements that a three-year-old child, C.R., to a physician, violated the petitioner's confrontation rights. Minnesota's rule 803(4) was identical to federal rule 803(4). In so holding, the Eighth Circuit said:

> C.R.'s mother, not C.R., sought the "medical treatment," and there was no evidence suggesting that at the time of the interview C.R. even knew Dr. Levitt was a doctor. C.R. was three years old at the time. The principal reason why 803(4) is a traditional hearsay exception automatically carrying the indicia-of-reliability label is because of the selfish-motive doctrine. This exception is based on the belief that a person seeking medical treatment is unlikely to lie to a doctor she wants to treat her, since it is in her best interest to tell the truth. White [v. Illinois], [502] U.S. at [354]-[58] . . . .

983 F.2d at 820. See People of Territory of Guam v. Ignacio, 10 F.3d 608, 613 n.3 (9th Cir. 1993) ("[W]hether a statement is admissible under the medical treatment exception does not depend solely on the intent of the questions, but also on whether the respondent understands herself to be providing information for purposes of medical treatment.").

In Morgan v. Foretich, 846 F.2d 941 (4th Cir. 1988), retired Associate Justice Lewis F. Powell Jr., sitting by designation on the United States Court of Appeals for the Fourth Circuit, concurred in part and dissented in part, stating:

> [T]here is no evidence in the record that [the girl's] frame of mind was comparable
> to a patient seeking treatment. . . . [T]here is no evidence that Dr. Harrison ever
> explained to [the child] that his questions and relationship with her arose, at least in
> part, from a desire to treat her. . . .   Absent a finding that [the child] made her
> statements believing they would be used by Dr. Harrison to help her, I am reluctant
> to rest my decision on the cases relied on by the court.

846 F.2d at 951-52.   See Oldsen v. People, 732 P.2d 1132, 1135-36 (Colo. 1986)(holding

statements inadmissible under Colo. R. Evid. 803(4) -- which was identical to the federal rule --

because there was no evidence that the five-year-old child "was capable of recognizing, at the time

the challenged statements were made, the need to provide accurate information for purposes of

medical diagnosis or treatment within the meaning of Fed. R. Evid. 803(4)").   The Supreme Court

of Colorado in Oldsen v. People held that the prosecution, as proponent of the hearsay statements,

had the burden of establishing the foundation for admitting them under an exception to the hearsay

rule.   See 732 P.2d at 1135 n.7.   The court in Oldsen v. People upheld the conviction, however,

because the challenged testimony was admitted properly on an alternative ground.   See 732 P.2d

at 1137.   But see United States v. George, 960 F.2d 97, 100 (9th Cir. 1992)("As a general matter,

the age of the child and her other personal characteristics go to the weight of the hearsay

statements rather than their admissibility.").   In State v. Robinson, 153 Ariz. 191, 735 P.2d 801

(1987), the Supreme Court of Arizona upheld the admission of statements under rule 803(4) of the

Arizona Rules of Evidence -- which also was identical to the federal rule -- concluding:

> The record is not clear regarding [the child's] motive in making the challenged
> statements.   The record does indicate, however, that [the] statements were elicited
> in the course of treatment.   And nothing in the record indicates that [the child
> victim's] motive in making these statements was other than as a patient seeking [or
> at least needing] treatment.

State v. Robinson, 153 Ariz. at 199, 735 P.2d at 809 (internal quotation marks and citations

omitted).

2.    __The Tenth Circuit's Test for Admissibility Under Rule 803(4)__.

"[T]he test for admissibility under rule 803(4) is whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment."   United States v. Tome, 61 F.3d at 1451.   Accordingly, the Tenth Circuit has rejected the two-part test that the Fourth and the Eighth Circuits have used to evaluate evidence proffered under rule 803(4), stating:

> The Fourth and Eighth Circuits . . . have employed the following two-part test to determine a statement's admissibility under Rule 803(4): "first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." Renville, 779 F.2d at 436; Morgan, 846 F.2d at 949 (quoting Renville).   This two-part test is not contemplated by the rule and is not necessary to ensure that the rule's purpose is carried out.

United States v. Joe, 8 F.3d at 1494 n.5.   As the Tenth Circuit explained in United States v. Joe: "[T]he plain language of Rule 803(4) should guide us in determining the admissibility of statements made for purposes of medical diagnosis or treatment."   8 F.3d at 1494 n.5.   Moreover, because it follows the plain language of rule 803(4), the Tenth Circuit has rejected any presumptions against admission of hearsay evidence under the exception in the case of children. See United States v. Edward J., 224 F.3d 1216, 1219 (10th Cir. 2000)("Edward encourages us to . . . establish a presumption that Rule 803(4) does not apply to statements given by young children to their doctors identifying their abusers unless the physician first explains to the child such information is important for their treatment.   We decline to do so.").

For a hearsay statement to be admissible under rule 803(4), the declarant need not have necessarily made the statement to a physician.   As the advisory committee's note to the rule explains, "[s]tatements to hospital attendants, ambulance drivers, or even members of the family might be included."   Fed. R. Evid. 803(4) advisory committee's note.

3.      **Identification of the Assailant in Sexual-Abuse Cases**.

A declarant's statement to a physician that identifies the person responsible for the declarant's injuries is ordinarily inadmissible under rule 803(4), because the assailant's identity is usually unnecessary either for accurate diagnosis or effective treatment.   See United States v. Joe, 8 F.3d at 1494.   The Tenth Circuit held in United States v. Joe, however, that a hearsay statement revealing the identity of a sexual abuser who is a member of the victim's family or household "is admissible under rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment."   8 F.3d at 1495.   In so holding, the Tenth Circuit reasoned:

> All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser.   The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household.   In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere.

8 F.3d at 1494-95 (footnote omitted).   Although the victim in United States v. Joe was an adult, the Tenth Circuit stated that "the identity of the abuser is reasonably pertinent in virtually every domestic sexual assault case," including "statements made by a child to a physician which identify the sexual abuser as a member of the family or household."   8 F.3d at 1494.   Thus, when a victim of domestic sexual abuse identifies her assailant to her physician, the physician's recounting of the identification is admissible under rule 803(4) when it is "reasonably pertinent" to the victim's treatment or diagnosis.   United States v. Joe, 8 F.3d at 1495.   See 2 John William Strong, McCormick on Evidence § 277, at 248 (4th ed. 1992).

In United States v. Tome, the defendant was convicted in the United States District Court

- 53 -

for the District Court of New Mexico of sexual abuse of a child.  The Tenth Circuit originally affirmed the admission of testimony from six witnesses relaying the child's statements as non-hearsay under rule 801(d)(1)(B), <u>see</u> 3 F.3d 342, 344 (10th Cir. 1993), and the defendant appealed.  The Supreme Court reversed and remanded to the Tenth Circuit, because the statements were not "made before the charged recent fabrication or improper influence or motive." 513 U.S. 150, 167 (1995).  On remand, the Tenth Circuit "determine[d] whether the challenged evidence could have been admitted under another rule of evidence."   <u>United States v. Tome</u>, 61 F.3d at 1449.

The Tenth Circuit first addressed the testimony of three pediatricians who examined the child.  In their trial testimony, the three doctors relayed statements that the child made either before or during the doctors' physical examinations.  The Tenth Circuit held that all of the testimony was admissible under rule 803(4).

1. Testimony of Karen Kuper

Kae Ecklebarger of Child Protection Services referred A.T. to Dr. Karen Kuper, a board certified pediatrician, for a physical examination.  Kuper testified that she examined A.T. on two occasions, in September and October 1990.  Prior to the first examination, Kuper interviewed A.T.  Kuper testified that the purpose of the interview was "to ascertain exactly what injuries had occurred."   In response to Kuper's questions, A.T. told Kuper about the sexual abuse, at times pointing to the appropriate areas of dolls to answer Kuper's questions.  A.T. also identified defendant as her abuser.  After the interview, Kuper performed a complete physical examination of A.T.

We find it clear that A.T.'s statement to Kuper was reasonably pertinent to Kuper's proper diagnosis and treatment of A.T.  The information contained in the statement was important to Kuper's determination of A.T.'s condition.  This statement was therefore admissible under Rule 803(4).

2. Testimony of Laura Reich

A.T. saw Dr. Laura Reich on September 21, 1990, for treatment of a skin

rash in the vaginal area that was unrelated to any sexual abuse.  At the time of Reich's examination of A.T., Reich was aware of the allegations of sexual abuse. Reich testified that, prior to conducting the physical examination, she asked A.T. several personal questions.  One of these questions was whether "anybody had ever touched her in her private area."  According to Reich's testimony, A.T. replied "that her father had put his thing in her."  The remainder of Reich's testimony concerned her findings and conclusions from the physical examination.

Reich testified that the reason she had conducted a preexamination interview with A.T. was "that the child needs to be comfortable with me before I examine her."  Because the adequacy of Reich's examination in part depended on the child's comfort with her, we find that A.T.'s statement was reasonably pertinent to Reich's diagnosis or treatment. It consequently was admissible under Rule 803(4).

3. Testimony of Jean Spiegel

Dr. Jean Spiegel, an assistant professor of pediatrics at the University of New Mexico, testified that she examined A.T. for the purpose of offering a second opinion as to whether the child had been sexually abused.  Spiegel had extensive training in the area of child sexual abuse, and teaches other doctors how to examine children to detect molestation.  Most of Spiegel's testimony focused on the technical aspects of her examination of A.T. and her conclusion that A.T. had experienced chronic vaginal penetration.

On redirect examination, Spiegel testified that A.T. told her where on her body she had been touched during the abuse.  Spiegel did not ask, nor did A.T. volunteer, who had touched her.  Clearly, A.T.'s statement regarding where she had been touched was pertinent to Spiegel's diagnosis of A.T.  The district court therefore properly admitted the statement under Rule 803(4).

61 F.3d at 1450-51.

The Tenth Circuit also held that the victim's statements to a caseworker and babysitter were not admissible under rule 803(4).  The relevant portions of the Tenth Circuit's decision on remand involve the testimony of Kae Ecklebarger of Colorado Springs Child Protection Services. Ecklebarger, a caseworker, interviewed A.T. on August 29, 1990.  Ecklebarger testified that, during the interview, A.T. gave Ecklebarger a detailed account of the alleged abuse, at times using anatomically correct dolls to demonstrate what had occurred.  See 61 F.3d at 1451.  Ecklebarger

also testified that A.T. alleged she had told her grandmother and aunt of the abuse.   The United States argued that Ecklebarger's testimony was admissible under either rule 803(4) and then-rule 803(24), the residual exception.   See 61 F.3d at 1451-52.   The United States argued that A.T.'s statement to Ecklebarger was admissible, because the job of a Child Protection Services caseworker "was equivalent to that of a doctor under Fed. R. Evid. 803(4)" and because A.T. understood that Ecklebarger's role was to "help kids."   61 F.3d at 1451.   The Tenth Circuit rejected the United States' proffer, noting:

> Ecklebarger neither diagnosed nor treated A.T.   She described her role as "the initial short-term investigat[or]."   Ecklebarger spoke to A.T. two times, after which "[t]he case was sent on to an ongoing protection worker."   Clearly, Ecklebarger did not treat A.T. in any way.
>
>     Nor did Ecklebarger diagnose A.T.   Indeed, Ecklebarger referred the child to Dr. Kuper for a medical opinion regarding the allegations of abuse.   Moreover, Ecklebarger testified that she interviewed A.T. only to the extent necessary to make a decision whether a protective order was appropriate.   Because Ecklebarger did not diagnose or treat A.T., the child's statement to Ecklebarger could not have been for the "purpose[ ] of medical diagnosis or treatment," and thus was not properly admitted under Rule 803(4).

61 F.3d at 1451 (alterations in original).

Ecklebarger testified that she interviewed A.T. only to the extent necessary to make a decision whether a protective order was appropriate.   See 61 F.3d at 1451.   The Tenth Circuit stated that, because Ecklebarger did not diagnose or treat A.T., the child's statement to Ecklebarger could not have been for the "purpose[] of medical diagnosis or treatment," and thus was not properly admitted under rule 803(4).   61 F.3d at 1451.

Applying these principles, the Court, in United States v. Chaco, allowed the Plaintiff United States of America to introduce a victim's statements made during a SANE examination to a treating doctor.   See 801 F. Supp. 2d at 1210-1213.   The Court noted that the purpose of the

SANE examination was to assess the victim's "physical and psychological condition," and to determine whether the victim was "in a safe environment or remained at risk of further abuse." 801 F. Supp. 2d at 1213.   The Court found that the victim's statements regarding the alleged abuse were relevant to the doctor's determination of "where signs of abuse may be found and deciding for where to test for sexually transmitted diseases."   801 F. Supp. 2d at 1213.   The Court also found that the victim's statements about who abused her and when she was abused were relevant in determining the identity of the abuser, and whether the victim was in a safe environment.   Based on these findings, the Court held that the victim's statements "about who touched her, where he touched her, and when he touched her were reasonably pertinent to . . . [a] proper diagnosis and treatment of [the victim], and are therefore admissible pursuant to rule 803(4)."   801 F. Supp. 2d at 1213.   Similarly, in United States v. Jim, the Court allowed the United States to introduce statements a victim made to a SANE nurse during the victim's SANE examination.   See 2012 WL 205683, at *1.   The defendant in United States v. Jim did not object to the introduction of the SANE nurse's statements.   See 2012 WL 205683, at *1.

## ANALYSIS

The Court will deny the SANE MIL and grant the Roll MIL.   The Court concludes that Kysar may testify regarding her SANE examination of Doe, the questions Kysar asked Doe and Doe's responses, that Kysar cannot determine whether Doe's injuries are indicative of consensual or non-consensual intercourse, and that Doe's injuries are consistent with her version of events, although the Court will not allow Kysar to identify Harry as Doe's assailant.   The Court determines that Kysar's testimony regarding the SANE examination is relevant to Doe's injuries and to help the jury understand that Harry's DNA was found inside Doe's vagina, and the

probative value of such evidence is sufficient to outweigh any prejudicial effect that Kysar's testimony in this regard will have to Harry.   Kysar's testimony regarding the questions she asked Doe and Doe's responses fall with rule 803(4)'s exception to hearsay, and, is relevant to the jury's understanding of the nature of Doe's injuries.   The Court will allow Kysar to testify to Doe's demeanor during the SANE examination, as Doe's demeanor is neither hearsay, nor unfairly prejudicial to Harry's case, as Harry may attack any weight that the jury may give to Doe's demeanor on cross-examination.   Kysar may not assess the value of Doe's demeanor.   Kysar may testify that she cannot conclude whether Doe engaged in consensual sexual intercourse, and that Doe's injuries are consistent with her version of events, because Kysar's testimony in this regard has a reliable basis in the science of her discipline, is relevant whether Harry assaulted Doe, and, further, is not unfairly prejudicial, as Kysar admits she cannot discern from her findings whether the sexual intercourse was nonconsensual.   Kysar may not identify Harry as the abuser, as this is neither a case of alleged domestic sexual abuse, in which the identity an abuser is relevant to Doe's diagnosis and treatment, nor has the United States proffered that Kysar has knowledge, whether lay or expert, that Harry abused Doe.

On the other hand, the Court will not allow Dr. Roll to testify.   First of all, the Court is not convinced that Dr. Roll's testimony is relevant to any issue in this case, as Kysar will not assess the weight of Doe's demeanor after the incident.   Additionally, the Court is not convinced that the absence of any scientific evidence linking demeanor to an individuals' past experiences or the veracity of their statements demonstrates that Dr. Roll's testimony has a reliable basis in psychology.   Rather, Dr. Roll's testimony appears similar to an untested hypothesis and, therefore, fails the first prong of the Court's inquiry under Daubert v. Merrell Dow Pharm, Inc.,

and the Court will, thus, not allow Dr. Roll to testify at trial.

I.     **THE COURT WILL ALLOW KYSAR TO TESTIFY ON THE UNITED STATES' PROFFERED TOPICS**.

The United States intends to introduce testimony from Kysar: (i) regarding her SANE examination of Doe; (ii) regarding the questions she asked Doe and Doe's responses; (iii) that "she cannot conclude that the injuries and tearing are indicative of non-consensual or consensual intercourse;" and (iv) that Doe's injuries are consistent with an injury caused by "blunt force trauma, which could have been caused by a penis during attempted penetration of the vagina." Second SANE Notice ¶ 3, at 2-3, filed March 26, 2013 (Doc. 128).   Harry asserts that Kysar's testimony is not relevant, because identity is not an issue in this case and he does not dispute that Doe received a SANE examination.   See SANE MIL at 2-3.   Harry further asserts that Kysar's testimony would be impermissible character evidence and that Kysar is not qualified to testify regarding her opinion.   See SANE MIL at 2, 4-5.   Harry contends that Kysar's testimony does not fall within rule 803(4)'s exception to the hearsay prohibition for testimony given to medical providers and that her testimony will be unfairly prejudicial.   See SANE MIL at 4-5.

A.     **THE COURT WILL ALLOW KYSAR TO TESTIFY REGARDING DOE'S SANE EXAMINATION.**

Kysar may testify regarding the SANE examination of Doe, Kysar's findings from the SANE examination, Kysar's questions to Doe during the examination, and Doe's responses to Kysar's questions.   First, Kysar, as the administering SANE nurse, has personal knowledge to testify regarding the SANE examination.   See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").   Second, Kysar's findings from the SANE examination are relevant

to the case.   The United States intends for Kysar to testify that she obtained swabs from Doe's genitalia, and will offer further testimony that those swabs reveal that Harry's DNA was inside Doe after the incident.   See Second SANE Notice ¶ 3, at 2.   Although Harry asserts that Kysar's testimony is "unnecessary, irrelevant, entirely unsupported by empirical evidence supporting its reliability," Roll Response at 2, the Court finds that Kysar's testimony about the SANE examination is relevant, as her testimony helps the jury understand what Doe experienced the night of the incident, see SANE Response ¶ 1, at 1.   Harry initially denied ever touching Doe, but, that Doe sustained injuries allows the United States to refute any possibility that Doe fabricated her story in its entirety.   The Court does not believe that any prejudicial effect of Kysar's testimony regarding the SANE examination would be unfairly prejudicial to Harry, as the probative value of medical evidence linking Harry to Doe's injuries is high, and the Court does not see how this testimony causes Harry undue prejudice.   Cf. United States v. Caraway, 453 F.3d at 1301 ("To be unfairly prejudicial, the evidence must have an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (internal quotations omitted)).

Additionally, Kysar may testify regarding the questions she asked Doe during the SANE examination, Doe's responses to those questions, and Doe's demeanor during the examination. "[T]he test for admissibility under rule 803(4) is whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment."   United States v. Tome, 61 F.3d at 1451. Kysar's questions during the SANE examination and Doe's responses fall within rule 803(4)'s exception to the general prohibition on hearsay evidence.   The Court has previously determined that statements made to a medical provider, such as Kysar, a trained SANE nurse, are admissible under rule 803(4), and the Court determines that the proffered testimony from Kysar is, likewise,

admissible here.   See United States v. Chaco, 801 F. Supp. 2d at 1210-1213.   In United States v.

Chaco, the Court determined that statements made to a doctor during a SANE examination were

"reasonably pertinent to diagnosis or treatment, and therefore admissible," and were relevant to

understanding the "nature and scope of the abuse and also pertinent to deciding what treatment and

counseling may be necessary."   801 F. Supp. 2d at 1203.   The Court notes that the United States

has not proffered the specific questions and responses exchanged between Kysar and Doe during

the SANE examination.   The Court will not preemptively preclude the United States from

offering Kysar's testimony entirely at trial, because, just as the Court determined that statements

made during a SANE examination are reasonably pertinent to diagnosis or treatment, the Court can

conclude that Kysar's questions during the SANE examination were pertinent to determine what

treatment and counseling Doe may need to recover from the incident.   The Tenth Circuit has held

an alleged sexual-assault victim's statements regarding "the sexual abuse," including those

necessary for identifying the nature of the injuries suffered and building rapport between a medical

provider and a victim, are admissible under rule 803(4).   United States v. Tome, 61 F.3d at

1449-50.   On the other hand, this case does not involve allegations of domestic sexual abuse such

that whether Doe was in a safe environment would be relevant to her medical diagnosis and

treatment, and, therefore, unlike statements regarding the identity of the alleged assailant in United

States v. Tome, Kysar may not testify regarding the identity of who had sex with Doe around May

6, 2010.   Cf. United States v. Joe, 8 F.3d at 1494 (finding that victim of domestic sexual abuse's

statements to a treating physician "which identify the sexual abuser as a member of the family or

household" are relevant to the victim's medical diagnosis and treatment); United States v. Chaco,

801 F. Supp. 2d at 1213 (allowing statements made during a SANE examination, under rule 803(4)

from a victim of alleged domestic sexual abuse, regarding the abuser's identity).   Harry is free to object, at trial, if the United States attempts to introduce questions and responses exchanged between Doe and Kysar that probe topics beyond those the Tenth Circuit has determined necessary for Doe's diagnosis, treatment, and possible need for counseling.

The Court will also allow Kysar to testify regarding Doe's demeanor during the SANE examination.   First, Doe's demeanor is not hearsay.   Doe's demeanor is not a "nonverbal act," subject to the preclusion on hearsay, as it does not appear that Doe's poor eye contact and tearful nature was intended to make a statement to Kysar without using words.   Fed. R. Evid. 801(a). See Sexual Assault Exam at 3 (describing Doe's demeanor as tearful and calm/cooperative, and that she made poor eye contact).   Neither has the United States proffered that it will introduce Doe's demeanor for the truth of any matter that her lack of eye contact or tearful appearance may assert.   Moreover, even if the Court construes Doe's demeanor as a form of hearsay, her demeanor may properly be admitted under rule 803(4).   The Tenth Circuit has recognized, in the context of domestic sexual abuse, that "[a]ll victims of domestic sexual abuse suffer emotional and psychological injuries," and Doe's demeanor is indicative whether the incident had an emotion or psychological impact upon her.   United States v. Joe, 8 F.3d at 1494-95.   Therefore, Kysar's notation of Doe's demeanor is reasonably pertinent to determining whether, and to what extent, Doe is in need of further treatment and/or counseling.   Doe's demeanor is relevant for the jury to asses her emotional state after the incident, which the jury may use to give more or less weight to Doe's version of events.   See United States v. Jordan, 485 F.3d at 1218 (stating that "a fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only need to

have "any tendency" to do so).   The Court will not allow Kysar to assess any weight that she believes the jury should attach to Doe's demeanor.   Any such testimony would be opinion, not based personal knowledge, and the United States has not proffered that Kysar has specialized knowledge that would allow her to give her opinion regarding the import of Doe's demeanor during the SANE examination.   Additionally, the Court notes that testimony regarding Doe's demeanor is not unfairly prejudicial to Harry.   Harry may attack Doe's demeanor on cross-examination, if he chooses, and, moreover, the jury is capable of weighing whether and to what extent Doe's demeanor affects the United States' case.   See United States v. Pettigrew, 468 F.3d at 638 ("[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403].").

### B.      KYSAR MAY OFFER HER OPINION REGARDING DOE'S INJURIES.

Harry asserts that Kysar has no "expert opinion or specialized knowledge regarding" Doe's injuries, and, therefore, she is not qualified to testify as an expert.   SANE MIL at 2.   Harry makes this allegation, because Kysar admits that she cannot "differentiate between nonconsensual and consensual injury caused by nonconsensual or consensual sex."   SANE MIL at 2.   The United States has notified the Court that the only area in which Kysar may offer expert testimony is regarding Doe's vaginal injuries, about which Kysar may testify that "she cannot conclude that the injuries and tearing are indicative of non-consensual or consensual intercourse," but that "the location of the tearing is consistent with the version of events that were provided by Jane Doe," and that Doe's injuries "could have been caused by a penis during attempted penetration of the vagina."   Second SANE Notice ¶ 3, at 3.   The Court determines that Kysar has specialized knowledge regarding Doe's injuries that will assist the jury in understanding whether Doe's

version of events is accurate, a fact at issue in this trial.  See Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .").

Before admitting expert testimony, the Court must determine whether "the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline'"; and, second, whether the proffered testimony "is sufficiently 'relevant to the task at hand.'" Norris v. Baxter Healthcare Corp., 297 F.3d at 883-84 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 597, 589).  The United States has provided the Court with Kysar's curriculum vitae, which indicates that she is a clinical registered nurse, and has three years of experience providing care in the hospital setting.  See Julie Kysar RN Curriculum Vitae at 1, filed March 26, 2013 (Doc. 128-6)("Kysar CV").  Kysar has served as a SANE nurse from June, 2009, and has completed the SANE Competency Examination.  Kysar's duties as a SANE nurse include assessing patients' needs and determining whether patients are in need of immediate medical referral or an intervention.  The SANE examination includes an examination of patients' genitalia.  See Kysar CV at 1.  Kysar has an associate's degree in nursing.  See Kysar CV at 2. This information indicates to the Court that Kysar's testimony regarding Doe's injuries has a reliable basis in the knowledge and experience of her discipline.  Kysar is trained in examining genitalia and determining whether a patient's injuries require further medical attention.  Kysar's training as a registered nurse likely includes training in certain standards of medical treatment, and the United States may bring forward, at trial, that Kysar applied those standards when examining Doe.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95 (listing the existence of

standards and whether the witness applied them in the present case as a factor for the Court to apply when assessing the reliability of an expert's testimony).   It also appears to the Court that Kysar's training is generally accepted in the medical community, as SANE nurses are commonly found at hospitals, and their examination is often used in sexual assault trials.   See, e.g., United States v. Chaco, 801 F. Supp. 2d at 1213 (permitting a doctor to testify regarding his sexual assault examination of an alleged victim of sexual abuse); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95 (listing whether the witness' method is generally accepted as reliable in the relevant medical and scientific community as a factor for the Court to apply when assessing the reliability of an expert's testimony).

Additionally, Kysar's testimony that Doe's injuries are consistent with her version of events is relevant to an issue in this case, as Kysar's testimony corroborates Doe's version of events.   The credibility of Doe's account of the incident is at the forefront of the United States' case.   The Court also notes that Kysar's testimony will not be unfairly prejudicial to Harry; although Kysar's expert testimony will be damaging to Harry's case -- he will not be able to argue credibly that he had no sex with Doe -- Harry must demonstrate a more prejudicial effect for the Court to preclude Kysar's expert testimony under rule 403.   See United States v. Caraway, 543 F.3d at 1301 (stating that evidence is not unfairly prejudicial merely because it damages a party's case).   As Kysar has admitted, she cannot determine, from her findings, whether Harry and Doe engaged in consensual or nonconsensual intercourse.   Moreover, the Court will not allow Kysar to discuss the identity of Doe's alleged abuser.   The United States has not proffered that Kysar has expert knowledge allowing her to identify Doe's alleged abuser, and, moreover, any information that Doe provided to Kysar regarding the identity of her alleged abuser is not relevant to Doe's

medical diagnosis and treatment, because this is not a domestic sexual abuse case wherein whether a victim is returning to a safe environment is part of a physician's examination.   Harry may, therefore, attack any weight that the jury attaches to Kysar's opinion testimony by pointing out that Kysar's findings do not preclude the possibility of consensual intercourse.   The Court determines, therefore, that Kysar's testimony regarding Doe's injuries has a reliable basis in the medical field and is relevant to the task at hand, and, thus, the Court will permit Kysar to offer opinion testimony on this limited issue.

## II.      **THE COURT WILL NOT ALLOW DR. ROLL TO TESTIFY.**

Harry seeks to introduce testimony from Dr. Roll that evidence of a witness' demeanor is an unreliable method for determining the veracity and credibility of that witness, and is unreliable for determining whether that witness experienced a sexual assault.   See Roll Notice at 1.   Harry further intends to use Dr. Roll's testimony to undermine the value of Kysar's "subjective observations" of Doe during the SANE examination.   Second Roll Notice at 1.   The United States contends that Dr. Roll's testimony is irrelevant, see Roll MIL at 4, and that Dr. Roll's opinion testimony lacks a reliable basis in the field of psychology, see Apr. 10 Tr. at 69:6-11 (Nayback).   The Court agrees with the United States on both stances.

In the Roll Report, Dr. Roll's first point is that the absence of references to demeanor as a reliable tool of psychological assessment demonstrates a negative, that demeanor is not a reliable tool of psychological assessment.   See Roll Report at 1 (citing Melton, Petrila, Poythress, & Slobogin, supra, at 43-68; Holt, supra, at xi, xii-iv.   Indeed, Dr. Roll's main point at the April 10, 2013, hearing was that the absence of evidence that demeanor is reliable is the psychological research that supports his proffered expert opinion.   See Apr. 10 Tr. at 57:17-22 (Roll).   Melton,

Petrila, Poythress and Slobogin do discuss, to some extent, the relevance and usefulness of an individual's response style during a psychological interview to a forensic assessment of that individual.   See Melton, Petrila, Poythress & Slobogin, supra, at 56-62.   This discussion is not helpful to Dr. Roll's hypothesis.   Even if the Court were to conclude that a response style -- which may include annotation of an individual's honesty, exaggeration of symptoms, and denial of symptoms -- included an evaluation of the individual's demeanor -- which the authors do not include as a response style -- Melton, Petrila, Poythress and Slobogin's discussion thereof would indicate that demeanor is a valuable tool for psychological assessment.   Indeed, the authors discuss how an examiner may, in certain circumstances, use response style to determine whether an individual is feigning certain psychological symptoms.   See Melton, Petrila, Poythress & Slobogin, supra, at 59-62.   This discussion signals to the Court that, if the Court extrapolated that demeanor was part of an individual's response style, demeanor would be a helpful tool for psychological assessment, either as indicative of the presence of a psychological condition, or that an individual was feigning a psychological assessment.

That these resources do not list demeanor as a reliable psychological indicator supports a conclusion that Dr. Roll's testimony is more akin to an untested hypothesis than an opinion based upon reliable scientific methodology.   Cf. In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").   If the Court were to conclude that the absence of scientific evidence in support of a theory proves that the theory's converse is true, any number of illogical and irrational expert opinions could be presented to a jury.   For example, the absence of scientific evidence that victims exaggerate stories of sexual assault would not be a reliable scientific basis upon which an expert could base his or her opinion

that victims of sexual assault never exaggerate their version of events. The absence of psychological research controverting Dr. Roll's proffered testimony does not allow the Court to permit Dr. Roll to testify that the lack of evidence means that demeanor is not a reliable psychological indicator. Moreover, the sources upon which Dr. Roll bases his theory that the absence of evidence giving demeanor psychological significance proves that demeanor is not of psychological import supports the Court's decision. The Court will not permit Kysar to asses Doe's demeanor.

Dr. Roll's second category of scientific information also fails to support his opinion. Dr. Roll cites to two resources as "[d]irect reference to the lack of reliability of behavior observation in assessment of personality." Roll Report at 1-2. Dr. Roll includes two excerpts from resources describing behavioral and personality assessments. Initially, the Court has trouble weighing the value of one excerpted sentence from presumably a much longer book. Additionally, the first excerpt, from Clinical Personality Approaches, indicates that behavior may play an "even indispensable role" in a psychological report, not that behavior is an unreliable indicator of a psychological factor. Roll Report at 1. That behavioral observations require "greater specificity" in psychological assessment does not signal to the Court that behavior is inherently unreliable; if anything, this phrase indicates that behavior may have value for psychological assessment, albeit a limited value. Roll Report at 1. The Court has similar understanding what weight Dr. Roll attaches to the second excerpt, from The Personality Assessment Report and the Feedback Planning Conference, because, like the first excerpt, this single paragraph is excerpted from a larger report. Moreover, this excerpt does not mention a disassociation between behavior and emotion, behavior and credibility, or behavior and sexual assault. This excerpt falls woefully

short of stating that a person's demeanor is an inherently unreliable psychological indicator.

Last, Dr. Roll points the Court to two resources which support his statement: "There is now consensus within the scientific community that the polygraph as a way of systematically collecting behavioral data is no more useful or reliable than the simple recording of the patients' obvious demeanor and behavior."   Roll Report at 2 (citing American Psychological Association, The Polygraph in Doubt, APA Monitor 71 (2004); Iacono, supra, at 75-86.   Although these resources would support an expert opinion that a polygraph is an unreliable method of determining a witness' truthfulness, these resources do not prove the testimony which Dr. Roll would provide -- that behavior and/or demeanor is unrelated to truthfulness, credibility, or a sexual experience. Indeed, Iacono's report indicates that physical reaction can be linked to an underlying psychological or emotional sentiment, as one of Iacono's critiques of the polygraph test is that it does "not provide an adequate control for the emotional impact of simply being presented with the accusatory relevant question."   Iacono, supra, at 76.   Thus, Iacono's critique of the polygraph test is premised on the observation that the stress associated with a particular line of questioning will create a physical response in those taking the polygraph test.   This critique indicates that physical and emotional responses are associated.   Although Iacono critiques the polygraph test because of its unreliability, largely because a test taker can curl his or her toes or bite his or her tongue to mess up the test of physical reactions to questions, that a polygraph cannot produce a reliable measure of truthfulness does not prove Dr. Roll's theory that a physical appearance or response is completely divorced from a person's underlying emotions or previous sexual experience.   Indeed, Iacono seems to suggest, to a little extent, the opposite -- that there are physical responses to questions, but they cannot be accurately tested in such a manner that allows examiners to develop uniform

conclusions.   Similarly, the American Psychological Association's report, which notes that "[t]here is no unique physiological reaction to deception," does not prove that a physiological reaction is inherently disconnected from a subject's emotional or psychological underpinnings. American Psychological Association, supra, at 1.   In sum, Dr. Roll's proffered support for his expert opinion does not demonstrate that his opinion has a reliable basis in the knowledge and experience of psychology.   The Court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.   The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."   Gen. Elec. Co. v. Joiner, 522 U.S. at 146 .   The Court, therefore, will exclude Dr. Roll's testimony.

Regarding the second prong of Daubert v. Merrell Dow Pharm., Inc., the Court is not convinced that Dr. Roll's testimony is relevant to any "task at hand."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 597.   The Court will not permit Kysar to assess Doe's demeanor during the SANE examination.   Dr. Roll's testimony that Doe's demeanor is an unreliable indicator whether she was sexually assaulted, or whether her version of the events is accurate, therefore, attacks theories that the United States will not raise at trial.   Additionally, to the extent that Dr. Roll's testimony is relevant to impeach Doe's statements the Tenth Circuit has ruled that "the credibility of witnesses is generally not an appropriate subject for expert testimony."   United States v. Adams, 271 F.3d at 1244-45.   Harry has not, therefore, notified the Court of any basis upon which Dr. Roll's testimony may be relevant to a task at hand at trial.

After reading Blink, the Court was intrigued with Dr. Roll's opinion that demeanor had no probative value in determining whether a person is telling the truth, and particularly, whether a person is telling the truth about a sexual assault or whether the person had intercourse but it was

consensual.   Dr. Roll may be right that Gladwell's subjects are wrong that they can read the facial features as accurately as Gladwell suggest, but Dr. Roll is at the other end of the spectrum -- demeanor has no value.   Gladwell's experts do not upset the norm and turn what is done in courts on its head -- a lot of our judicial system is premised on the fact that juries should see witnesses' demeanor under cross examination.   Dr. Roll's hypothesis, on the other hand, suggests that all that effect the courts make to put everyone in the same room staring at each other is largely irrelevant to the test of determining credibility out of the testimony -- what happened.   If Dr. Roll is going to offer such testing that runs so much against the grain of our entire judicial system, he bears the burden of proving that his profession agrees with him.   Despite repeated opportunities to prove that his profession agrees with him, he has failed to meet his burden.   Instead, he largely says, look, no one says demeanor is reliable, so that shows everyone obviously agrees with him. That resort to a negative is not enough to meet his burden.   See Elkins v. United States, 364 U.S. 206, 218 (1960)("[A]s a practical matter it is never easy to prove a negative."); United States v. Wilgus, 638 F.3d 1274, 1288-89 (10th Cir. 2011)(stating that, "[i]n the abstract," a negative "can never be proven conclusively; the ingenuity of the human mind, especially if freed from the practical constraints of policymaking and politics, is infinite.").   If Dr. Roll's point is so obvious, he should write an article and have it peer reviewed.   If Gladwell is so terribly wrong, it looks like an article saying so would be of some interest.

If Dr. Roll's point is more simple -- that demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people.   Men and women, from Presidents to priests, lie about sex.   The jury will not be helped by Dr. Roll telling it that

sometimes people lie when they cry, and it cannot focus just on crying to determine whether someone is telling the truth.   Dr. Roll's testimony in the end gets too close to somebody saying, as an expert, that the Court should ignore Doe's crying and lack of eye contact when it decides whether she was/is telling the truth.

In conclusion, the Court determines that Kysar's testimony regarding the SANE examination of Doe and Kysar's testimony regarding her questions and Doe's responses during the examination is relevant to the jury's determination of what transpired between Harry and Doe on the night of May 5-6, 2010.   Kysar may testify regarding her findings from the SANE examination, because she has personal knowledge of the examination, and the probative value of the examination, as linking Harry to the incident, outweighs any prejudicial effect Kysar's testimony may have to Harry.   Additionally, Kysar may testify regarding Doe's demeanor during the SANE examination, as Doe's demeanor is not hearsay, and Doe's demeanor is useful for the jury in assessing Doe's statements and Doe's version of events.   Kysar may testify that Doe's injuries are consistent with her version of events, but that Kysar cannot determine whether consensual or nonconsensual intercourse caused Doe's injuries, as the Court is satisfied that Kysar has a reliable basis for opining on this limited aspect of Doe's injuries, and this testimony is helpful for determining whether Harry and Doe engaged in consensual intercourse.   The Court will not allow Dr. Roll to testify regarding the import of demeanor for determining whether a victim suffered sexual abuse, or regarding the reliability of Kysar's observations of Doe's demeanor. Dr. Roll has failed to provide the Court with a scientific resource that supports his proffered expert testimony, and, therefore, the Court determines that his testimony lacks a reliable basis in the field of psychology.

**IT IS ORDERED** that: (i) the Defendant Myron Harry's Motion in Limine to Exclude Testimony of Sane Nurse and Supporting Memorandum, filed January 24, 2013 (Doc. 108), is denied; and (ii) the United States' Motion to Exclude Expert Testimony of Samuel Roll, filed March 26, 2013 (Doc. 129), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Kyle T. Nayback
   Assistant United States Attorney
David Adams
   Special Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

     *Attorney for the Defendant*