# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. CR 10-1915 JB

MYRON JIM HARRY,

   Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Motion to Reconsider Court's Ruling of February 19 on Suppression of Evidence, filed April 26, 2013 (Doc. 138)("Motion to Reconsider"); and (ii) Amendment to Motion to Reconsider Court's Ruling of February 19 on Suppression of Evidence, filed April 30, 2013 (Doc. 145)("Amendment"). The Court held a hearing on May 2, 2013. The primary issues are: (i) whether the Court should reconsider its decision to deny the Defendant's Motion to Suppress Evidence Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75)("Motion to Suppress"), which it made in the Memorandum Opinion and Order, filed February 19, 2013 (Doc. 114)("Motion to Suppress MOO");[1] and (ii) whether the Court should suppress the text messages that Defendant Myron

---

[1]The Court filed the Amended Memorandum Opinion and Order, filed May 13, 2013 (Doc. 183)("Amended MOO"), correcting one sentence from the Motion to Suppress MOO:

> In the Memorandum Opinion and Order, filed February 19, 2013 (Doc. 114), the Court incorrectly stated: "The Court agrees with Harry that the evidence does demonstrate that the United States violated his constitutional rights by failing to preserve Wauneka's outgoing text messages." Memorandum Opinion and Order at 50. This sentence is changed to explain that the Court "agrees with Harry that the evidence does not demonstrate that the United States violated his constitutional rights . . . ." Amended Memorandum Opinion and Order at 50 (emphasis added).

Harry sent to Dimitri Wauneka on May 6, 2011, because Plaintiff United States of America failed to preserve Wauneka's outgoing text messages to Harry.  The Court will reconsider its prior ruling in the Motion to Suppress MOO, but will continue to deny the Motion to Suppress, because the new evidence that Harry has presented does not alter the Court's conclusion that the outgoing text messages had, at best, a marginally and/or only potentially useful value, and that the United States did not fail to preserve the text messages in bad faith.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Garcia, 324 F. App'x 705, 708

---

Amended MOO at 1 n.1.

(10th Cir. 2009)(unpublished)[2] ("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[3] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"), cert. denied, 130 S. Ct. 223 (2009); United States v. Merritt, 695 F.2d at 1269; United States v. Christy, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

   The Court previously made findings of fact in the Motion to Suppress MOO; because Harry has introduced additional evidence, the Court will amend some of its findings.   The Court will also update its references to the transcript of the hearing; in the Motion to Suppress MOO, the

---

[2] United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court finds that United States v. Archuleta has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

[3] Crawford v. Washington decided that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.   See 541 U.S. at 53-54.

Court referenced the draft transcript from the September 19, 2012, evidentiary hearing, but will now refer to the final version of the transcript, which has slightly different page and/or line numbers.   See Transcript of Hearing, taken September 19, 2012, filed May 9, 2013 (Doc. 179)("Sept. 19, 2012 Tr.").

1.      On May 5, 2010, a group of young people, including Jane Doe and Harry, attended a birthday party at the home of Stephanie Johnson and Wauneka in Shiprock, New Mexico.   See Sept. 19, 2012 Tr. at 25:3-25:12 (Adams, Joe)(Navajo Nation Criminal Investigator Jefferson Joe testifying that Jane Doe informed him that, on the evening of May 5, 2010, Harry attended a birthday party for Jane Doe at the home of Johnson and Wauneka in Shiprock, and that the party lasted into the morning of May 6, 2010).

2.      There were between nine and twelve guests at the party.   See Sept. 19, 2012 Tr. at 71:10-71:11 (Nayback, Wauneka)(Wauneka stating that there were "about" nine guests at the party); id. at 97:13-97:14 (Adams, Johnson)(Johnson stating that she believes there were twelve guests at the party).[4]

---

[4]Johnson's and Wauneka's testimony is inconsistent regarding the total number of guests at the party.   Joe's report from his interview with Johnson on May 6, 2010, provides a list of the guests Johnson recalls were present at the party: she lists eleven individuals, including herself, Wauneka, and their child.   See Navajo Nation Report of Interview with Stephanie Johnson at 1, dated May 6, 2010 (Government Ex. S7).   Thus, Johnson's and Wauneka's testimonies are closer to consistent if Wauneka did not include Johnson and their child in his count, and if Johnson did. The Court concludes that it need not parse the testimonies to determine an exact number of guests at the apartment on May 5-6, 2010, because the parties do not assert that this fact is a material one, and because Johnson and Wauneka testified to approximately the same number of guests. Further, as guests frequently will come and go over the course of a party, at one point in the night Wauneka's count may have been accurate, while Johnson's may have been accurate at another point in the night.

3.      All guests at the party were close friends of Wauneka's; Harry was one of Wauneka's "best friends" at the time.    Sept. 19, 2012 Tr. at 71:10-71:20 (Nayback, Wauneka)(Nayback: Q: "How did you know [Harry] at the time?"   A: "He was one of my friends, best friends.").

4.      All the guests at the party, except for Johnson, consumed a large amount of alcohol. See Sept. 19, 2012 Tr. at 88:10-88:11 (Samore, Wauneka)(Q: "Pretty large amounts of alcohol consumed by everyone except Stephanie, right?" A: "Yes.").

5.      Wauneka was very drunk at the party.  See Sept. 19, 2012 Tr. at 88:10-88:11 (Wauneka).

6.      The attendees at the party decided, between 1:00 a.m. and 2:00 a.m. on May 6, 2010, that the remaining female guests would sleep in one of the two bedrooms of the home, an apartment, and the remaining male guests would sleep in the living room.   See Sept. 19, 2012 Tr. at 72:15-73:2 (Nayback, Wauneka); id. at 99:13-99:18 (Adams, Johnson).

7.      Johnson awoke around 5:00 a.m. and found Harry awake.  See Sept. 19, 2012 Tr. at 98:15-98:16 (Adams, Johnson)(Q: "Did you wake up at any point in the evening?" A: "Yes. I believe it was around 5:00."); id. at 100:11-100:23 (Johnson)("I was walking straight to my room . . . .   I turned the light back on, and that's when Myron was standing there.").

8.      Other female guests at the party were also awake and were accusing Harry of assaulting Jane Doe.  See Sept. 19, 2012 Tr. at 101:24-102:5 (Johnson)("So Jo[sephine] had Myron's keys, and when he came back in, that's when, you know, everybody was accusing . . . Myron of taking advantage of [Jane Doe].").

9.      Harry left quickly thereafter.   See Sept. 19, 2012 Tr. at 100:11-101:13 (Johnson); id. at 101:24-102:5 (Johnson).

10.     Wauneka awoke to yelling.   See Sept. 19, 2012 Tr. at 77:9-77:12 (Nayback, Wauneka)(Q: "[Y]ou woke up to screaming, yelling, and fighting; is that right?"   A: "Yes.").

11.     Other guests at the house told Wauneka that Harry assaulted Jane Doe.   See Sept. 19, 2012 Tr. at 78:2-78:14 (Nayback, Wauneka).

12.     Wauneka texted Harry between 5:00 a.m. and 7:00 a.m. on May 6, 2010 regarding the incident.   See Sept. 19, 2012 Tr. at 78:16-78:17 (Nayback, Wauneka)(A: "I texted Myron and asked him what happened."); Printed Results of Forensic Download of Dimitri Wauneka's Cellular Telephone (Government Ex. S10)(indicating that he exchanged text messages with Harry between 5:00 a.m. and 7:00 a.m. on May 6, 2010); Government's Exhibit List for Hearing on Defendant's Motion to Suppress Evidence Based on Spoliation or Incompleteness at 2, filed Sept. 18, 2012 (Doc. 91)("Exhibit List").

13.     Wauneka asked about the alleged assault on Jane Doe.   See Sept. 19, 2012 Tr. at 103:19-104:9 (Johnson, Adams); id. at 104:21-104:23 (Johnson)(Johnson testifying that she could see some of Wauneka's outgoing text messages to Harry and that messages were asking Harry about the alleged assault on Jane Doe).

14.     Wauneka may have sent less than eight text messages to Harry on the morning of May 6, 2010.   See Sept. 19, 2012 Tr. at 83:14-83:21 (Nayback, Wauneka)(Q: "[D]o you know if you sent one text for every text you received?   There were eight text messages that you received." A: "I don't really remember.   I think it might have been less, maybe."   Q: "Might have been less?"   A: "Yes, less.").

15.     Wauneka and Harry did not correspond via text messaging regarding anything except the alleged assault on the morning of May 6, 2010.  See Sept. 19, 2012 Tr. at 82:2-82:9 (Nayback, Wauneka)(Q: "[Y]ou were asking him about what happened, correct?" A: "Yes." Q: "Were there any texts that you had that morning with Myron that were about some other subject matter?"  A: "No.")

16.     Johnson saw Wauneka texting Harry and had the opportunity to look at Wauneka's cellular telephone's screen while Wauneka was texting Harry.  See Sept. 19, 2012 Tr. at 84:19-85:11 (Nayback, Wauneka)(Wauneka responding to the United States' question whether Johnson had the "opportunity to look at your cell phone screen" while he texted Harry: "Yes.   She wanted to know what was going on, also").

17.     Wauneka showed Johnson every text message which he sent to Harry that morning. See Sept. 19, 2012 Tr. at 84:19-85:11 (Nayback, Wauneka); id. at 90:9-90:17 (Samore, Wauneka)(Q: "And are you telling this court you were also showing her each of the things you were sending to him?" A: "Yes."   Q: "Every single one?"   A: "Yes.").

18.     Johnson read one of Harry's text messages to Wauneka, in which Harry stated that he would accept charges for what he had done, but Johnson did not see the exact wording of any other text messages exchanged between Wauneka and Harry.  See Sept. 19, 2012 Tr. at 107:20-108:10 (Johnson, Samore)(A: "I did see the one where it says 'I will take the charges.'" Q: "And that's the only one you saw?"   A: "Yes."   Q: "And you didn't see any of the exact wording of what Dimitri was sending to my client, did you?"   A: "Well, no, I don't --"   Q: "Other than what you've said?"   A: "Yes.").

19.[5]   Joe began working alongside the United States by communicating with and receiving advice from United States prosecutors on May 12, 2010.   See Investigation Notes at 1-2

_____

[5]The Court amends this fact and facts 20 to 22 to reflect the evidence that Harry presents as part of his Motion to Reconsider.   The Court's previous fact found:

> 12.      Neither Joe, nor Louis St. Germaine, a criminal investigator for the Navajo Nation, were working alongside the United States, either with Federal Bureau of Investigation ("FBI") agents, or with United States prosecutors, before, at the earliest, May 24, 2010.   See [Sept. 19, 2012 Tr. at 23:8-23:11] (Adams, Joe)(A: "I'm a Navajo Nation criminal investigator."   Q: How long have you been employed with the Navajo Nation?"   A: "Approximately 22 years."); id. at [30:15-31:23] (Adams, Joe); id. at [38:15-23] (Samore, Joe)(Q: "To whom did [Wauneka] give the cell phone, sir?" A: "To another investigator by the name of Louis St. Germaine."); Government Exhibit S6 (report from Joe and St. Germaine's interview with Wauneka, indicating that St. Germaine and Joe are criminal investigators with the Navajo Nation); Complaint, filed May 24, 2010, at 1, 7 (Joe signed the Complaint and affidavit filed therewith in support.).

Motion to Suppress MOO at 7 (footnotes omitted).   In a footnote to this fact, the Court explained that Joe and St. Germaine are "criminal investigators for the Navajo Nation."   MOO at 7 n.8 (citing Sept. 19, 2012 Tr. at 23:8-23:9 (Adams, Joe)(Joe testifying that he is a "Navajo Nation criminal investigator"); id. at 38:19-38:23 (Samore, Joe)(Joe testifying that Wauneka gave his cellular telephone to St. Germaine, "another investigator"); Navajo Nation Report of Interview of Dimitri Wauneka, dated May 21, 2010 (Government Ex. S6)(identifying Joe and St. Germaine as investigators with the Shiprock Police Department)).   The Court noted that, because Joe first contacted the Farmington Police Department for help retrieving Wauneka's outgoing messages, and only contacted a FBI forensic examiner after the Indictment was filed, it concluded that "Joe was not working alongside the United States when he interviewed Wauneka and attempted to retrieve Wauneka's outgoing text messages from the Farmington Police Department and Wauneka's telephone company."   Motion to Suppress MOO at 8 n.8.   The Court also noted that "[t]here is no evidence that St. Germaine is now, or ever was, working alongside the United States or on its behalf."   Motion to Suppress MOO at 8 n.8.   Finally, the Court concluded that, "[r]egardless, there is no evidence that the United States was involved in the case before May 24, 2010, and thus, neither Joe nor St. Germaine working on behalf of the United States until, at the earliest, May 24, 2010."   Motion to Suppress MOO at 8 n.8.

With Harry's new evidence, the Court concludes that Joe was working alongside and behalf of the United States by May 12, 2010.   The notes are less clear regarding St. Germaine, because the first reference to St. Germaine are illegible.   See Investigation Notes at 2 ("5-21-10: Interviewed Zia W Dimitri Wauneka.   Pics taken of cell phone - text messages from S rec'd.   Got new information from W Stephanie Johnson -- per instructions from AUSA Carson McNabb.

("5-12-10: Called AUSA Barth -- advised will get female perspective AUSA Glynett C-McNabb on matter - need search warrant for DNA comparison"; "5-13-10: Called USA ofc -- talked to AUSA Glynett C-McNabb[,] told her of case -- affidavit rush drafts[.]   Faxed her affidavits 4/ review"; "5-20-10: Went to Albuq -- presented case to AUSA Glynett C-McNabb . . .   AUSA gave new instructions.").

20.     Louis St. Germaine, a criminal investigator for the Navajo Nation, was working on the case by at least May 21, 2010.  See Investigation Notes at 2 ("5-21-10: Interviewed Zia W Dimitri Wauneka.   Pics taken of cell phone - text messages from S rec'd.   Got new information from W Stephanie Johnson -- per instructions from AUSA Carson McNabb.   Took W Wauneka's phone as evidence -- [illegible] L. St. Germain.").

21.     United States prosecution teams include "federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant."   Department of Justice Memorandum Regarding Guidance on the Use, Preservation, and Disclosure of Electronic Communications in Federal Criminal Cases at 1 n.2, dated March 30, 2011 ("DOJ Memo.").

22.     United States' prosecutors are "encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes."   Department of Justice Memorandum Regarding Guidance for Prosecutors Regarding Criminal Discovery from David W. Ogden, Deputy Attorney General, at 1, dated January 4, 2010 ("Ogden Memo.").

---

Took W Wauneka's phone as evidence -- [illegible] L. St. Germain.").   The Court concludes, however, that, because Joe was working on behalf of the United States, and Joe was working with St. Germaine, that St. Germaine was also working alongside and behalf of the United States by May 21, 2010.

23.      Joe interviewed Harry on May 12, 2010.   See Navajo Nation Report of Interview of Myron Harry, dated May 12, 2010 (Government Ex. S3)(indicating that Joe interviewed Harry on May 12, 2010).

24.      Harry informed Joe that he texted with Wauneka on May 6, 2010, regarding the incident at Wauneka's home.   See Sept. 19, 2012 Tr. at 48:14-48:15 (Adams, Joe)(A: "So when did you first learn about the text messages?"   A: "When I interviewed Myron Harry."); Sept. 19, 2012 Tr. at 48:19-49:11 (Adams, Joe); Transcript of Myron Harry Statement at 14:11-15:13, taken May 12, 2010 (Government Ex. S2)(Harry stating that, after leaving Wauneka's apartment, he and Wauneka were texting regarding the alleged assault on Jane Doe).

25.      Joe did not make an effort to obtain text messages from Harry's cellular telephone. See Sept. 19, 2012 Tr. at 50:2-50:8 (Court, Joe).

26.      Joe interviewed Wauneka on May 21, 2010, regarding the incident.   See Sept. 19, 2012 Tr. at 26:20-27:2 (Adams, Joe)(Q: "Do you recall the date when you interviewed Dimitri?" A: "I believe it was the 21st of May, . . . 2010."   Q: "And you mentioned that you asked [Wauneka] about some text messages?"   A: "Yes.")

27.      Joe's specific purpose for contacting Wauneka was to discuss the text messages that he exchanged with Harry on May 6, 2010.   See Sept. 19, 2012 Tr. at 50:9-50:15 (Court, Joe)(Q: "[W]hen you had the conversation with Mr. Wauneka . . . did you go to him specifically to talk to him about these text messages?"   A: "Yes, sir."   Q: "All right.   So that was the purpose of that meeting?"   A: "Yes.").

28.      Wauneka allowed Joe to look at his cellular telephone on May 21, 2010.   See Sept. 19, 2012 Tr. at 27:7-27:11 (Adams, Joe).

29.     Joe took photographs of the following messages from Wauneka's cellular telephone on May 21, 2010:

"From: Myron   Whats going on?  Im lost.  Ilmygirls :] [sic] CB:505-486-0099 May 6, 5:36 am Stored: May 6, 6:00 am."  Photo of May 6 text from Myron Harry (Government Ex. S13).

"From: Myron   Ok. I know u dnt. Ill guess I have 2 accept the charges.   I still love u guys though. [sic]  CB: 505-486-0099 May 6, 6:05 am."  Photo of May 6 text message from Myron Harry (Government Ex. S14).

"From: Myron   Im sorry 4 what I did.   I didn't want 2 disrespect u in ur home. That's all I can say. Im sorry. Ilmygirls :-] [sic] CB:505-486-0099 May 6, 5:53 am."  Photo of May 6 text message from Myron Harry (Government Ex. S15).

"From: Myron   Ok. Im sorry. Ilmygirls :] [sic] CB: 505-586-0099 May 6, 6:15 am."  Photo of May 6 text message from Myron Harry (Government Ex. S16).

"From: Myron   I knw. She was all over me the whole nite.  I remember that. Ilmygirls :] [sic] CB: 505-486-0099 May 6, 6:29 am."  Photo of May 6 text message from Myron Harry (Government Ex. S18).

"From: Myron   Well tell bean that Im sorry n That I am an idiot n a stupid mafucker.  Im sorry.  I wasn't in my right mind 2 do that 2 her.  Im stupid.   [sic] That's all I can say.  CB: 505-486-0099."  Photo of May 6 text message from Myron Harry (Government Ex. S19).

"From: Myron   I know. It was me.  I messed up.  I should have known better. Im sorry.   Ilmygirls :] [sic] CB 505-486-0099 May 6, 6:41 am."  Photo of May 6 text message from Myron Harry (Government Ex. S20).

Sept. 19, 2012 Tr. at 26:16-29:20 (Adams, Joe).

30.     "Bean" is a nickname for Jane Doe.   Sept. 19, 2012 Tr. at 29:7-29:14 (Adams, Joe); id. at 70:23-71:3 (Nayback, Wauneka).

31.     The "CB" telephone number on the text messages in Wauneka's cellular telephone labeled as "From: Myron" matches the telephone number which Harry provided to Joe as that of

his cellular telephone.   Photos of May 6 text messages from Myron Harry (Government Exs. S13-S20).   See Sept. 19, 2012 Tr. at 33:16-33:20 (Adams, Joe).[6]

32.     When Joe interviewed Wauneka, Wauneka's outgoing text messages were still on his cellular telephone.   See Sept. 19, 2012 Tr. at 79:23-80:3 (Nayback, Wauneka)(Q: "At that point did you realize that, hey, my texts that I sent . . . Harry, they're not here?"   A: "No.   It was all there."   Q: "It was all there?"   A: "Yes.").

33.     Wauneka showed his outgoing text messages to Joe, and the two looked at both sides of the text conversation during the interview.   See Sept. 19, 2012 Tr. at 94:7-94:22 (Court, Wauneka)(Q: "When Mr. Joe came and talk to you for the first time, that's when you gave him your telephone, correct?"   A: "Yes."  . . .   Q: "[Y]ou're pretty certain that when you gave him the phone it had the text messages from Mr. Harry as well as your . . . text messages to him?"   A: "Yes."   Q: "And so you recall that day looking at the phone and looking at your messages, as well?"   A: "Yes.");[7]   Navajo Nation Report of Interview of Dimitri Wauneka at 1, dated May 21,

---

[6]The parties did not define the meaning of "CB" displayed on the pictures of the text messages on Wauneka's cellular telephone.   The "CB" appears to refer to the originating number for the text messages.   Sept. 19, 2012 Tr. at 33:17-33:23 (Adams, Joe)(Adams: "[C]ould you read the phone number for the Court's record?"   Joe:   "I asked him for his cell phone number. [Harry] gave me 505-486-0099."   Adams: "Was that the same cell phone number that you saw in Dimitri's phone, as well?"   Joe: "Yes.").

[7]Joe's testimony contradicts Wauneka's on this point.   See Sept. 19, 2012 Tr. at 29:21-30:11 (Adams, Joe)(A: "Did you have an opportunity to review any messages that were sent to Myron . . . from Dimitri?"   A: "There was nothing that I could see that he could pull up that there was any outgoing.").   The Court concludes that Wauneka's testimony is accurate.   It is most likely that Joe does not remember looking at Wauneka's outgoing text messages: Harry's messages were the focus of his inquiry, demonstrated by Joe taking pictures only of Harry's messages.   Wauneka may have only shown the outgoing messages to Joe for a few seconds, as Wauneka moved between Harry's messages.   Additionally, the United States asserted at the hearing that Joe is "spread thin" in his investigative duties, which further causes the Court to

2010 (Government Ex. S6)(Joe's report from his interview of Wauneka states: "Dmitri showed the investigators his cellular telephone that still had the text communications between him and Myron.").

34.     Joe's fellow investigator, St. Germaine, took custody of Wauneka's cellular telephone at the interview.  See Sept. 19, 2012 Tr. at 27:9-27:10 (Adams, Joe)(Q: "And you received Mr. Wauneka's permission to obtain his phone?" A: "Yes."); id. at 37:1-37:10 (Samore, Joe)(Joe stating, regarding his May 21, 2010 interview with Wauneka, that on that date Wauneka gave his telephone to another Navajo National criminal investigator, St. Germaine); Navajo Nation Report of Interview of Dimitri Wauneka, dated May 21, 2010 (Government Ex. S6)(report that Joe prepared regarding his interview with Wauneka, stating, in reference to Harry's text messages, that "Dimitri's cell phone was placed in evidence to preserve the above text messages. Pictures of the text messages were taken as well.").

35.     Wauneka's outgoing messages were on his cellular telephone when he gave it to St. Germaine, but when Joe tried to retrieve the outgoing messages at a later date, he was unable to do so.  See Sept. 19, 2012 Tr. at 79:23-80:3 (Nayback, Wauneka)(Q: "At that point did you realize that, hey, my texts that I sent . . . Harry, they're not here?" A: "No.   It was all there."   Q: "It was all there?" A: "Yes."); id. at 94:7-94:22 (Court, Wauneka)(Q: "When Mr. Joe came and talked to you for the first time, that's when you gave him your telephone, correct?" A: "Yes.   Q: "[Y]ou're pretty certain that when you gave him the phone it had the text messages from Mr. Harry as well as

---

believe that Joe had the opportunity to see Wauneka's outgoing text messages on May 21, 2012, and he does not remember accurately this detail from the interview.  Sept. 19, 2012 Tr. at 122:17-122:22 (Nayback).

your . . . text messages to him?" A: "Yes."); Navajo Nation Report of Interview of Dimitri

Wauneka, dated May 21, 2010 (Government Ex. S6)(report that Joe prepared regarding his

interview with Wauneka, stating, in reference to Harry's text messages, that "Dimitri's cell phone

was placed in evidence to preserve the above text messages.   Pictures of the text messages were

taken as well.").[8]

---

[8]The Court amends this footnote to reflect Harry's arguments in the Motion to Reconsider,
although most of the footnote remains the same.   The Court will delete the following sentence:

> Harry has admitted that outgoing text messages may only be retrievable for a
> certain period of time, between fifteen and thirty days, and this information is
> supported by the United States' forensic investigator.   Motion to Suppress
> Evidence Based on Spoliation or Incompleteness at 2 n.1, filed June 26, 2012
> (Doc. 75)("Based on information, texts are not recoverable by the cell companies
> after thirty (30) days.").

In its place, the Court notes that the following is the amended footnote:

> The Court concludes that Wauneka's outgoing text messages were still on his cellular
> telephone when he gave it to Joe, even though Joe states that "[t]here was nothing I could see that
> he could pull up that there was any outgoing."  Sept. 19, 2012 Tr. at 29:25-30:1 (Joe).  Joe's
> statement is not necessarily contradictory with Wauneka's statement regarding the presence of the
> outgoing text messages on the cellular telephone.  Joe may not have looked for Wauneka's
> outgoing messages immediately, because his focus appears to have been on retrieving Harry's
> messages.  See Photos of May 6 Text Message from Myron Harry (Government Exs. S13-S20);
> Navajo Nation Report of Interview of Dimitri Wauneka dated 21, 2010 (Government Ex.
> S6)(recording Harry's messages but not Wauneka's).   Outgoing text messages may be retrievable
> only for a certain period of time, between 15 and 30 days, and the United States' forensic
> investigator supports this information. See Sept. 19, 2012 Tr. at 30:15-30:18 (Joe)("[B]y calling
> the . . . [telephone] company to see if that was feasible or possible, I was told that within a
> two-week range their policy was they couldn't save or retrieve what was sent out from a particular
> . . . phone."); Sept. 19, 2012 Tr. at 59:15-59:18 (Guilmette)("Certain phones, what they'll do is --
> Like I say, the phone has a memory that will only hold 50 messages.   If another message comes
> in, it then has to delete one of the 50 messages that it has in order to make room for that new one.").
> The Court concludes that, at the time Joe took possession of Wauneka's cellular phone, the cellular
> telephone contained Wauneka's outgoing messages, but that, when Joe attempted to retrieve
> Wauneka's outgoing messages at some later date, the messages were no longer retrievable.

36.     The exculpatory value of Wauneka's outgoing text message was not immediately apparent to Joe when he saw them at his May 21, 2010, interview.   See Transcript of Myron Harry Statement at 14:11-15:13 (Harry), taken May 12, 2010 (Government's Ex. S2)("Dimitri was texting me, and telling me, 'How could you do this?   I was your friend.   How could you do this to me?' . . . .   I was like, 'What did I do, Dimitri?' . . . '[S]omebody said you raped [Jane Doe].'"); Sept. 19, 2012 Tr. at 78:15-78:17 (Nayback, Wauneka)(Wauneka testifying that he was asking Harry about "what happened?"); id. at 82:2-82:9 (Nayback, Wauneka)(same); id. at 103:19-104:9 (Johnson testifying that Wauneka was asking Harry about "what happened"); id. at 104:21-104:25 (Johnson, Adams)(same).[9]

---

[9]The Court cannot hypothesize anything that Wauneka could have written to Harry that would exculpate him, to which Harry responded: "Ill guess I have 2 accept the charges [sic]," Photo of May 6 Text Message from Myron Harry (Government Ex. S14), "tel bean that Im sorry," Photo of May 6 Text Message from Myron Harry (Government Ex. S19), and "I know. . . .   I messed up.   I should have known better," Photo of May 6 Text Message from Myron Harry (Government Ex. S20).   Nor have the parties presented any theories as to how Wauneka's outgoing text messages could exculpate Harry.   Even though the Court concludes that Joe saw Wauneka's text messages when he interviewed Wauneka on May 21, 2010, there is nothing to indicate that Wauneka's questions to Harry about the alleged assault on Jane Doe was evidence "that might be expected to play a significant role in the suspect's defense."   California v. Trombetta, 467 U.S. 479, 488-89 (1984).   Joe's testimony indicates that, to his knowledge, Wauneka's text messages were limited to inquiring about the alleged assault; this line of questioning does not have an apparent exculpatory value.   The only possible exculpatory information which could be produced from Wauneka's outgoing text messages could perhaps be that he and Harry were not discussing Jane Doe's alleged assault, contrary to Wauneka's, Harry's, and Joe's testimonies at the hearing.   See United States v. Parker, 72 F.3d 1444, 1452 (10th Cir. 1995)("[T]he only way the erased video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as Trooper Bushell related, that is, that he was lying about the events . . . essentially a question of credibility for the district court.").   Any assertion that Wauneka's text messages would be exculpatory to Harry is "based purely on speculation and conjecture," which does not meet the standard of apparent exculpatory value that California v. Trombetta requires.   United States v. Martinez, 744 F.2d 76, 80 (10th Cir. 1984)(holding that a defendant's argument that evidence "might have contained exculpatory information" goes to the "weight and sufficiency of the government's case," but does not demonstrate that the failure to

- 15 -

37.[10]     Cellular telephone companies can recover text messages only for a certain period of time.  See Motion to Suppress at 2 n.1 ("Based on information, texts are not recoverable by the cell companies after thirty (30) days."); Sept. 19, 2012 Tr. at 30:15-30:18 (Joe)("Through experience also, and by calling the [] [telephone] company . . . , I was told that [] in a two-week range their policy was they couldn't save or retrieve what was sent out from a particular [] phone.").

38.     Sometime after May 21, 2010, and before June 24, 2010, Joe requested the assistance of the Farmington, New Mexico Police Department in retrieving Wauneka's side of the text conversation.  See Sept. 19, 2012 Tr. at 45:16-46:8 (Samore, Joe)(Q: "When did you check

---

preserve the evidence was a constitutional violation under California v. Trombetta).  The Court thus concludes that, factually, Wauneka's outgoing text messages to Harry were not apparently exculpatory to Joe when he viewed them while interviewing Wauneka on May 21, 2010.  The Court will also conclude, legally, that the messages were not apparently exculpatory.

[10]The Court amends this fact, based on Harry's additional evidence at the May 2, 2013, hearing, during which the Court heard William Elliott's testimony that he does not know the specific make, model, and carrier of Wauneka's telephone, which are necessary in determining the period of time that text messages are stored on a particular cellular telephone.  Sept. 19 2012 Tr. at 31:9-32:21 (Nayback, Elliott).  The original fact stated:

> Outgoing text messages are only recoverable from Wauneka's cellular telephone for a certain period of time.  See Motion to Suppress at 2 n.1 ("Based on information, texts are not recoverable by the cell companies after thirty (30) days."); [Sept. 19, 2012 Tr. at 30:15-30:18] (Joe)("Through experience also, and by calling the [] [telephone] company . . . , I was told that [] in a two-week range their policy was they couldn't save or retrieve what was sent out from a particular [] phone."); id. at [59:15-59:18] (Guilmette)(explaining that "[c]ertain phones, what they'll do is . . . only hold 50 messages.  If another message comes in, it then has to delete one of the 50 messages that it has in order to make room for that new one.").

Motion to Suppress MOO ¶ 27, at 14.  The Court modifies this fact to reflect the evidence before the Court regarding how cellular telephone companies store or recover text messages, and will address, in fact 48, infra, how an individual cellular telephone stores text messages.

with these folks in Farmington about trying to get the text messages back? . . .   So it was

before . . . about June 29, of 2010.   Does that sound about right?"   A: "Yes."   Q: "And you

interviewed [Dimitri] and took custody of the phone on May 21, prior to that?   Yes?"   A:

"Yes.").

39.     The Farmington Police Department was unable to retrieve Wauneka's outgoing

messages from the morning of May 6, 2010.   See Sept. 19, 2012 Tr. at 31:5-31:13 (Adams, Joe).

40.     The United States filed a criminal complaint against Harry for this matter on May

24, 2010.   See Complaint at 1, filed May 24, 2010 (Doc. 1)("Complaint").   Joe signed the

affidavit accompanying the United States' Complaint.   See Complaint at 7.

41.     Joe is the lead agent in the United States' investigation for this matter.   See Sept.

19, 2012 Tr. at 23:19-23:20 (Adams, Joe)(Q: "Are you the lead agent in U.S. v. Myron Harry?"

A: "Yes.").

42.     On July 9, 2012, Joe contacted a forensic examiner with the FBI regarding

forensically examining Wauneka's cellular telephone.   See Shiprock Police Report of

Communications with FBI (dated July 6, 2012 and July 9, 2012)(Government's Ex. S9); Exhibit

List at 2.

43.     The forensic examination of Wauneka's cellular telephone produced some text

messages which correspond to those of which Joe took photographs.   Compare Results of

Forensic Download of Dimitri Wauneka's Cell Phone (Government Ex. S10), with Photos of May

6 Text Message from Myron Harry (Government Exs. S13-S20).

44.     Certain messages are "locked."   Results of Forensic Download of Dimitri Wauneka's Cell Phone (Government Ex. S10).   See Sept. 19, 2012 Tr. at 58:1-62:16 (Nayback, Guilmette).

45.     The significance of certain text messages being "locked" is unknown.   Sept. 19, 2012 Tr. at 62:15-62:16 (Nayback, Guilmette)(Q: "What does 'Locked' mean?" A: "I'm not sure what 'Locked' means.").

46.     The date and time on Wauneka's cellular telephone may be altered, and, thus, the date and time displayed on the messages retrieved from Wauneka's cellular telephone may be inaccurate by up to twenty-minutes.   See Sept. 19, 2012 Tr. at 61:17-62:4 (Nayback, Guilmette); Results of Forensic Download of Dimitri Wauneka's Cell Phone (Government Ex. S10).

47.     The forensic examiner would have found Wauneka's outgoing messages from May 6, 2010, if they were still physically on his cellular telephone.   See Sept. 19, 2012 Tr. at 65:21-66:23 (Nayback, Guilmette); id. at 66:7-66:11 (Samore, Guilmette).

48.     There is no evidence that Wauneka's outgoing text messages were deleted.   See Sept. 19, 2012 Tr. at 67:11-67:12 (Samore, Guilmette).[11]

---

[11]After considering Harry's additional evidence at the May 2, 2013 hearing, including Elliott's testimony, the Court maintains that there is no evidence that Wauneka's outgoing text messages were deleted.   Harry's understanding of how cellular telephones receive and store text messages has apparently changed since the September 19, 2012 hearing.   At that hearing, he indicated that he thought text messages "normally . . . pass . . . about 15 days to 30 days, something like that, and they're gone."   Sept. 19, 2012 Tr. at 66:12-66:13 (Samore).   When asked why the text messages would not be on the cellular telephone, Jeremy Guilmette said that he could "only speculate as to why they wouldn't be on the phone," and when Harry asked if there was any evidence "that anyone deleted" the text messages, Guilmette responded that "[w]e have no evidence that anyone deleted them."   Sept. 19, 2012 Tr. at 67:5-67:12 (Samore, Guilmette). Guilmette also explained that certain cellular telephones have limited storage and delete earlier messages.   See Sept. 19, 2012 Tr. at 59:15-59:18 (Guilmette)(explaining that "[c]ertain phones,

what they'll do is . . . only hold 50 messages.   If another message comes in, it then has to delete one of the 50 messages that it has in order to make room for that new one").

During the May 2, 2013, hearing, Elliott testified that text messages "on the phone will remain there, . . . unlike the carrier, who only stores messaging for maybe five to seven days." Transcript of Hearing at 29:13-29:15 (Elliott), taken May 2, 2013 ("Tr.")(The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers).   He stated that cellular telephones normally include "both sides of the conversation," Tr. at 29:18-29:20 (Elliott), and that a "[s]martphone would have both sides," Tr. at 33:8-33:10 (Samore, Elliott), while older cellular telephone models would "compartmentalize" text messages into an inbox and outbox, Tr. at 34:3-12 (Court, Elliott).  See Tr. at 34:19-34:23 (Court, Elliott)("Q. (By the Court) And have smart phones always had that capability, or was there a time when they had in boxes and out boxes?  A. They, Your Honor, they had in boxes and out boxes on a phone.").   Elliott compared a cellular telephone's ability to store text messages to a "cup dispenser[:] [a]s the messages accumulate the oldest get deleted out because they're over written by newer messages."  Tr. at 29:20-29:23 (Elliott).   There is some evidence that Wauneka's cellular telephone was a smartphone, see Sept. 19, 2012 Tr. at 65:12 (Guilmette)("I believe it was a Smartphone."), but an older model, see Sept. 19, 2012 Tr. at 65:19-65:20 (Nayback, Guilmette)("Q. It's certainly not an iPhone, I suspect?  A. No.  It's not a brand-new phone, I can tell you that.").   Elliott admitted that he does not know the make, model, or carrier of Wauneka's cellular telephone, see Tr. at 31:9-31:14 (Nayback, Elliott), and that he would need to know the make, model, and carrier to know why Wauneka's cellular telephone had the incoming messages but not the outgoing messages:

> Q.      Can you provide the Court with any explanation when the FBI interrogated this cell phone and it only found one-half, in other words, it found incoming text messages but not outgoing text messages?   Would you have any explanation for that?
>
> A.      It's possible that they may have been deleted by someone.   Without knowing the make, model and cell phone [carrier,] I can't really answer that question.
>
> Q.      So your testimony is that unless someone affirmative hit a "delete" button on the cell phone, that one-half of the text messages should not have been lost?
>
> A.      Well, again, I -- I can't answer that question without knowing the make, model and carrier of the cell phone sir.
>
> Q.      It makes a difference doesn't it, sir, what the make and model of that cell phone was.   Isn't it?

49.     In early July, 2010, Harry's counsel requested Wauneka's outgoing messages from the United States' attorney prosecuting this case.   See Sept. 19, 2012 Tr. at 19:12-19:24 (Samore)("[P]robably early July, . . . I said, 'Kyle, where's the other side of these conversations?'").

50.     The United States did not have Wauneka's outgoing messages at that time, and could not procure them from any other source.   See Sept. 19, 2012 Tr. at 19:19-19:24 (Samore)("[H]e got back to me, and he said, we don't have it; we can't get them back."); Motion to Suppress at 2 ("The prosecutor . . . did his diligent best to recover those records and eventually informed defense counsel that they could not be produced.").

51.     When he requested Wauneka's outgoing text messages, Harry did not inform the United States that the outgoing text messages were potentially exculpatory evidence.   See Motion to Suppress at 2 (asserting that Mr. Samore "personally contacted the prosecutor to request that the

---

A.     That's true.   But any cell phone probably manufactured since about 2010 will retain both sides of the messaging. But, again, [I] have to qualify that.   Some carriers program their phones not to do that.

Q.     So if the make and model of this cell phone was prior to 2010 your analysis would not apply?

A.     I would need to research the make and model. . . . [a]nd carrier to determine what the parameters were for storage.

Sept. 19 2012 Tr. at 31:23-32:21 (Nayback, Elliott).
        The Court maintains that there is no evidence that someone deleted the outgoing messages from Wauneka's cellular telephone.   Although Guilmette testified that Wauneka's cellular telephone is a smartphone, neither he nor Elliott could testify that it stored text messages as a conversation, rather than separating the messages into an inbox and outbox.   Further, there is evidence that Wauneka's cellular telephone stored messages in inbox and outbox folders.   See Sept. 19, 2012 Tr. at 62:12-62:13 (Guilmette)("And the folder that it was in was in the inbox folder."); Photo of May 6 Text Message from Myron Harry (Government Ex. S18)(displaying "Inbox" at the top of the picture of the text message).

missing text messages from Dimit[r]i's side of the conversation by produced," but not stating that Mr. Samore told the United States that Wauneka's messages were material exculpatory evidence); Sept. 19, 2012 Tr. at 19:12-19:24 (Samore)(Harry stating that he requested Wauneka's outgoing messages in "early July," but not stating that he told the United States that Wauneka's outgoing messages were material exculpatory evidence).

## PROCEDURAL BACKGROUND

On June 24, 2010, a grand jury indicted Harry for having knowingly engaged in a sexual act with Doe, who was physically incapable of declining participation and could not communicate her unwillingness to engage in the sexual act, in violation of 18 U.S.C. §§ 1153, 2242(2), and 2246(A).   See Indictment at 1, filed June 24, 2010 (Doc. 14).

The Court issued a Memorandum Opinion and Order, filed February 6, 2013 (Doc. 113)("Motion to Compel MOO"), in which the Court ordered the United States to "turn over to Harry any investigative notes which contain statements made by witnesses whom the United States calls at trial."   Motion to Compel MOO at 1.   The Court ordered the United States to "turn over these statements, at the latest, after those witnesses testify at trial," or, "earlier, if doing so would create a reasonable doubt of Harry's guilt."   Motion to Compel MOO at 1.

The Court then filed the Memorandum Opinion and Order, filed February 19, 2013 (Doc. 114), and an Amended Memorandum Opinion and Order, filed May 13, 2013 ("Motion to Suppress MOO").[12]   In the Motion to Suppress MOO, the Court denied the Defendant's Motion to

---

[12]The Motion to Suppress MOO corrected one sentence in the original Memorandum Opinion and Order:

Suppress Evidence Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75)("Motion

to Suppress").   See Motion to Suppress MOO at 1-2.   The Court explained:

> The Court held an evidentiary hearing on September 19, 2012.   The primary issues
> are: (i) whether the Court should suppress the text messages that Defendant Myron
> Harry sent to Dimitri Wauneka on May 6, 2011, because Plaintiff United States of
> America failed to preserve Wauneka's outgoing text messages to Harry;
> (ii) whether the Court should prohibit the United States from using at trial the text
> messages from Harry at trial because their prejudicial effect substantially
> outweighs their probative value; and (iii) whether the Court should prohibit the
> United States from using at trial the text messages from Harry because they are
> impermissible character evidence.   The Court determines that Wauneka's
> outgoing text messages had a potentially useful value, at best, and that the United
> States did not fail to preserve them in bad faith, and, thus, the United States' failure
> to preserve Wauneka's outgoing text messages did not violate Harry's due-process
> rights.   The Court further concludes that, because Wauneka's outgoing messages
> are not likely to have determined Harry's innocence, the absence of the outgoing
> messages will not render Harry's trial unfair.   The Court also concludes that the
> prejudicial effect of the text messages from Harry is not so great as to outweigh the
> probative value of the messages as demonstrative of Harry's state of mind
> immediately after the alleged assault of Jane Doe.   Lastly, the Court concludes that
> the text messages from Harry are not impermissible character evidence, and, even
> if the text messages are indicative of Harry's character, the United States may use
> the messages to prove Harry's state of mind immediately after the alleged assault,
> as the United States seeks to do.   The Court, thus, denies the Motion to Suppress.

Motion to Suppress MOO at 1.

In the Motion to Reconsider, Harry argues that "a linchpin" of the Motion to Suppress

MOO was the Court's finding that the United States was not responsible for spoliation.   Motion to

---

> In the Memorandum Opinion and Order, filed February 19, 2013 (Doc. 114), the
> Court incorrectly stated: "The Court agrees with Harry that the evidence does
> demonstrate that the United States violated his constitutional rights by failing to
> preserve Wauneka's outgoing text messages."   Memorandum Opinion and Order
> at 50.   This sentence is changed to explain that the Court "agrees with Harry that
> the evidence does not demonstrate that the United States violated his constitutional
> rights . . . ."   Amended Memorandum Opinion and Order at 50 (emphasis added).

Motion to Suppress MOO at 1 n.1.

Reconsider ¶ 5, at 1. He highlights several statements that the Court made in the Motion to Suppress MOO, including: (i) "Officers Joe and St. Germaine were not acting on the Government's behalf in the case when they first interviewed Wauneka and took possession of his telephone," Motion to Suppress MOO at 57; and (ii) "the evidence demonstrates that the text messages were lost before the end of June, 2010, which is most likely before Joe began working alongside or on behalf of the United States," Motion to Suppress MOO at 56. See Motion to Reconsider ¶¶ 5-6, at 1-2 (quoting portions of the Motion to Suppress MOO).

Harry explains that, "[f]ully two weeks after" the Court issued the Motion to Compel MOO, the United States disclosed its investigative notes, and points to four specific notes:

    a.    5-12-10 S Interviewed-denied act called AUSA C. Barth . . . advised will
          get female perspective AUSA Glynett (sic) C-McNabb.

    b.    5-13-10 call USA Glynett sic) C-McNabb.

    c.    5-20-10 went to Albuq-presented case to AUS Glynett (sic) C-McNabb . . .
          AUSA gave new instructions.

    d.    5-21-10 took W Wauneka's phone as evidence by (illegible) L St.
          Germaine.

Motion to Reconsider ¶ 8, at 2 (quoting Follow-Up Record Case Notes (Defendant's Ex. A to the Hearing)("Investigative Notes"). In Harry's view, these notes reveal that "the federal government was involved in this case within six days of the incident," that "the investigators met with the United States' Attorney's Office on May 12, 2010," and that the "BIA (federal) and Navajo Nation officers were working on behalf and at the direction of the United States Attorney[] at the time they lost or destroyed this evidence." Motion to Reconsider ¶¶ 9-11, at 2-3. Harry contends that, because "neither the Court nor Mr. Harry had an opportunity to consider this newly

disclosed evidence," the Court's ruling that he did not demonstrate that "'the United States violated his due process rights by failing to preserve Wauneka's outgoing test messages,' is now clearly error."   Motion to Reconsider ¶ 13, at 3 (quoting Motion to Suppress MOO at 49).   In Harry's view, "the inculpatory and exculpatory value of the incoming and outgoing texts must have been apparent to the investigator"; the statements were inculpatory, because the statements "were being collected as statements" that Harry allegedly made, and they were exculpatory, because there were statements favorable to Harry, such as the message, "I knew.   She was all over me the whole nite."   Motion to Reconsider ¶ 14, at 3.   Harry argues that, "[b]y having failed to preserve the outgoing text messages (i.e., the complete records), the defense was denied an opportunity to review and determine what was in the hands of the prosecution, much less make use of th[ese] favorable materials."   Motion to Reconsider ¶ 15, at 3.

Harry points out that, although the United States did not disclose the case notes until after the Court issued the Motion to Suppress MOO, the Court quoted his counsel as stating that "the Government is responsible for possessing and spoiling the evidence," a statement he asserts is "now provably [sic] correct."   Motion to Reconsider ¶ 16, at 3.   Pursuant to his "ethical obligation of candor to the tribunal," he asserts that failing to "disclose this egregious misrepresentation in the record" would violate his ethical responsibility. Motion to Reconsider ¶¶ 16-17, at 3-4.   He asserts that

> [t]his critical disclosure (or why the Government previously failed to correct the Court's error under its obligation of candor to the tribunal) changes the entire balance of the Court's subject ruling because the United States Attorney was clearly guiding this case from the early few days, prior to the time the cell phone was in its possession, is responsible for the destruction of evidence, which brings the Due Process balance into greater clarity, as well as Fed. R. Evid. 801(2).

Motion to Reconsider ¶ 18, at 4.   Harry argues that, although the Court found "in dicta" that "'Wauneka's outgoing text messages do not appear to be central to the United States case,'" "the Court also now has the benefit of more recent hearings, such as that on April 10, 2013, that confirm, indeed, admission of these one-sided text message[s] are critical for the prosecution to infer culpability."   Motion to Reconsider ¶ 19, at 4 (quoting Motion to Suppress MOO at 58). Harry argues that the "lost or spoiled evidence is exculpatory," and that:

> Without these seeming admissions in one-sided texts that came from the Defendant's phone, this case comes down to a classic "he-said-she-said," which is why the Prosecution has fought so continuously and vigorously for inclusion of Mr. Harry's side of the text messages without ever knowing what provoked this [sic] text messages.

Motion to Reconsider ¶¶ 21, 23, at 5.   Harry argues that "[t]he Court's linchpin finding that 'Mr. Harry has not, therefore, demonstrated the United States violated his due process rights by failing to preserve Wauneka's outgoing text messages,' is now clearly mistaken and, if unaddressed, would be error."   Motion to Reconsider ¶ 27, at 6 (quoting Motion to Suppress MOO at 49).   He asks the Court to reconsider its ruling, impose a "strict" order in limine, or issue a "strong jury instruction that the missing evidence be construed by the jury against the Government."   Motion to Reconsider ¶ 29, at 7.

Harry explains that, at the September 19, 2012 hearing, the United States called Guilmette, who testified that time is of the essence to preserve text messages; Harry contends that Guilmette's testimony may have misled the Court, because "text messages are not lost by passage of time but must affirmatively be deleted."   Amendment ¶¶ 34-35.   Harry points out that Wauneka "testified without challenge that all his text messages to Mr. Harry were on the cell phone when he gave it to the Government's agent."   Amendment ¶ 36, at 2.

The Court held a hearing on May 2, 2013.   <u>See</u> Transcript of Hearing, taken May 2, 2013 ("Tr.").[13]   The Court noted at the outset that it did not think of its finding regarding the federal government's role as the "linchpin" of its ruling, as Harry described it.   Tr. at 8:14-8:18 (Court). The Court explained that, while the federal government's involvement was one reason that it denied the Motion to Suppress, it also relied on other factors, such as "the lack of bad faith" and the "lack of relevance," which "remain intact and . . . would still counsel that the Court deny the motion to reconsider, and the Court continue to not suppress . . . this evidence."   Tr. at 8:20-9:1 (Court).

Harry reiterated his arguments from the Motion to Reconsider and the Amendment, including that, even if not a "linchpin to the Court's ruling," the Court relied on the fact that the federal government was not involved in the investigation until after the text messages were destroyed, but that subsequent discovery has revealed that the federal government was "involved in this case from the beginning, from within six days of the incident."   Tr. at 10:22-11:9 (Samore). Harry referred to the DOJ Memo. and the Ogden Memo., explaining that members of the prosecution team included BIA agents, who were responsible for the law enforcement in this case. <u>See</u> Tr. at 11:10-11:24 (Samore).   He argued that he does not have to show the relevance or importance of the missing text messages to establish that they are exculpatory, but need only establish that the text messages are logical and informative.   <u>See</u> Tr. at 12:25-13:8 (Samore). Harry contended that the Court placed an improper burden on him in the Motion to Suppress MOO -- that he "has some other requirement to state in a conversation with the prosecutor . . . when it

---

[13]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final version may have slightly different page and/or line numbers.

requests something that it be exculpatory," but that defendants never request information from the prosecution without "the implicit hope" and "the basis" that it is exculpatory.  Tr. at 12:9-12:18 (Samore).

Harry contends that the Court's finding that cellular telephones lose text messages over time is incorrect, and that, instead, text messages "come in pa[i]rs," and that "you wouldn't have only Mr. [Harry's] side remain and Mr. Wauneka's be gone."  Tr. at 13:3-13:18 (Samore). Harry explained that, although he wrote in the Motion to Suppress that cellular telephone companies cannot recover text messages after thirty days, that statement is wrong, because text messages do not automatically disappear, and someone must act to delete the messages; he explained that he had based the statement on a conversation his counsel had with Kyle Nayback. See Tr. at 13:22-14:17 (Samore).  Harry emphasized that the applicable standard is not whether the text messages are exculpatory, but whether they are logical and informative, and that "nothing could be more logical . . . than hearing both sides of such a conversation."  Tr. at 14:18-14:21 (Samore).  He contends that, even if the United States wishes they still had the text messages, it "is responsible for [their] destruction."  Tr. at 15:17-15:21 (Samore).  Harry clarified that, when he stated at the September 19, 2012, hearing that he conceded that he could not show that the prosecution acted in bad faith or show intentional destruction, he was "not conceding the issue.  I am respecting the legal standard."  Tr. at 15:22-16:1 (Samore).  He explained, however, that "[t]here is very little doubt in my mind that bad faith was involved or intentional destruction" and that he has "grave concerns," but that he does not "know that for a fact, and . . . can't assert that to the Court, but [that he is] not conceding the issue."  Tr. at 16:3-16:8 (Samore).  Harry said that, while he does not have evidence that the United States acted intentionally or in bad faith, "[w]hat

we do have is hard evidence that this cell text one side was lost."   Tr. at 16:14-16:19 (Samore).

Harry asked the Court to allow him to present three minutes of evidence, to establish that "text messages travel in pa[i]rs" and that they do not "drop off one side of the conversation."   Tr. at 16:20-17:1 (Samore).

The Court asked the United States to respond.   <u>See</u> Tr. at 17:21-17:22 (Court).   The United States introduced the Transcription of Videotaped Interview of Myron Harry, taken July 27, 2012 ("Harry Interview"), to which Harry did not object, and the Court admitted.   Tr. at 17:23-18:11 (Nayback, Court, Samore).   The United States explained that the "essence" of the Harry Interview testimony is the nature of his outgoing texts, which goes to whether the outgoing texts are materially exculpatory.   Tr. at 18:16-19:14 (Nayback).   The United States argued that Harry did not present "any new evidence or any new law that would warrant a change in the Court's ruling that the text messages are admissible as a statement made by the defendant."   Tr. at 19:15-19:18 (Nayback).   It acknowledged that the Court did not include in its Motion to Suppress MOO the notes from Joe on which Harry relies, but explained that the notes do not "discuss anything about retrieving cell phone text messages or deleting or destroying cell phone text messages," that Harry is asking the Court to "draw inferences between meetings of lead case agent and supervisory assistant United States Attorney's and destruction of evidence," but that there is not any evidence of "foul play."   Tr. at 20:9-20:18 (Nayback).   The United States emphasized that Harry "conceded at the suppression hearing on this issue that he cannot establish intentional spoliation," which "should end the Court's inquiry."   Tr. at 20:19-20:23 (Nayback).

The United States argued that Harry "cannot establish that these missing texts amount to material exculpatory evidence."   Tr. at 20:24-21:1 (Nayback).   The United States explained that

Joe "tagged this phone into evidence," "had it forensically interrogated by the Farmington Police Department," and when they could not retrieve the texts, brought it to the FBI, and the United States argued that through Guilmette's testimony, it had established that "there are a number of ways [the text messages] could have been lost."   Tr. at 21:19-22:1 (Nayback).   The United States argued that Joe contacted the telephone company, which "indicated to him that they don't keep records of text messages after 30 days."   Tr. at 22:2-22:4 (Nayback).   In response to Harry's argument -- that "you can't lose one-half of the text messages" -- the United States asserted that it could re-call Guilmette to explain how that could happen, that Wauneka's telephone was an "older version of a phone," and with an inbox and an outbox, with limited memory, and that "there's any number of possibilities" as to how the outgoing messages might have been lost.   Tr. at 22:10-23:19 (Court, Nayback).

The Court also heard testimony from Elliott.   See Tr. at 27:13-39:20 (Elliott, Court, Samore, Nayback).   Harry concluded his argument, emphasizing that "it hardly seems credible that only one side of the conversation would disappear without an affirmative act based on the testimony and based on the record."   Tr. at 39:25-40:3 (Samore).   The United States had no further argument.   See Tr. at 40:6-40:7 (Court, Nayback).   The Court said that it would consider the additional evidence, but that it was inclined to continue to deny the Motion to Suppress.   See Tr. at 40:8-14 (Court).

## LAW REGARDING MOTIONS TO RECONSIDER

Although the Federal Rules of Criminal Procedure do not specifically provide for motions to reconsider, such motions are proper in criminal cases.   See United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014).   See United States v. Christy, 810 F. Supp. 2d 1219, 1249

(D.N.M. 2011)(Browning, J.)(stating that, in the criminal context, "courts ordinarily apply the same standards as those used in civil cases" for motions to reconsider), aff'd, 739 F.3d 534 (10th Cir. 2014)(Kelly, J.).

> A motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.   Specific grounds include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."

United States v. Christy, 739 F.3d at 539 (quoting Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)).   It is within a court's discretion to grant or to deny a motion to reconsider. See United States v. Christy, 739 F.3d at 539 ("A district court should have the opportunity to correct alleged errors in its dispositions."); United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999), abrogated on other grounds by Rosemond v. United States, 134 S. Ct. 1240 (2014); Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).   A motion to reconsider is not an opportunity to rehash arguments previously addressed or to advance new arguments that could have been raised in prior briefing.   See United States v. Christy, 739 F.3d at 534 ("A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.").

Notably, neither rule 59 nor rule 60 of the Federal Rules of Civil Procedure applies to interlocutory orders a district court reconsiders before entry of final judgment.   Rule 59(e) states: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."   Fed. R. Civ. P. 59(e) (emphasis added).   Accord Van Skiver v. United States, 952 F.2d at 1243 ("In this case, plaintiffs' motion to reconsider was not served within ten days of the district court's judgment."); 12 James William Moore, Moore's Federal Practice § 59.11[1][a], at

59-26 (3d ed. 2013)("A motion for a new trial must be filed no later than 28 days after the entry of judgment, regardless of when or whether the parties received notice of the entry of the judgment." (citations omitted)).   As the note to the 1946 amendment to rule 60 emphasizes in a discussion of the choice to add the word "final" within rule 60(b):

> The addition of the qualifying word "final" emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.

Fed. R. Civ. P. 60 note to 1946 amendment.   Accord 12 James William Moore, Moore's Federal Practice § 60.23, at 60-82 ("Rule 60(b) does not govern relief from interlocutory orders, that is to say any orders in which there is something left for the court to decide after issuing the order."); 11 Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2852, at 292 (3d ed. 2012)("[T]he power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b)."   (footnotes omitted)).   The Tenth Circuit has recognized that a district court has broad discretion to reconsider its interlocutory rulings before the entry of judgment.   See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011)("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders.").   That discretion extends to rulings on partial summary judgment motions.   See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1223-24 n.2 (10th Cir. 2008)("The District Court's partial summary judgment ruling was not a final judgment. Thus, Ms. Fye's motion for reconsideration is considered an 'interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'").

- 31 -

In United States v. Christy, the Court initially granted the defendant's motion to suppress. See 785 F. Supp. 2d at 1054.  The United States filed a motion to reconsider, arguing that the evidence was admissible under the inevitable-discovery doctrine.   See 810 F. Supp. 2d at 1222-23.   The Court reconsidered its prior ruling, agreed with the United States, and denied the defendant's motion to suppress.   See 810 F. Supp. 2d at 1282.   On appeal, the Tenth Circuit affirmed the Court's decision to reconsider its prior ruling.   739 F.3d at 539-40.   The Tenth Circuit explained that although the United States had raised inevitable-discovery theories briefly, and without much emphasis during the initial suppression briefings and hearings, because the Court had not ruled on the inevitable-discovery issue when it first granted the suppression motion, "the district court acted well within its discretion in granting the motion to reconsider (at least as to inevitable discovery) in order to rule on an issue it mistakenly overlooked."   739 F.3d at 539. The Tenth Circuit then addressed the merits of the United States' argument regarding inevitable discovery and affirmed the Court's conclusion that the evidence "would have been discovered legally, had the illegal search not discovered it first."   739 F.3d at 543-44.

## LAW REGARDING BRADY v. MARYLAND DUE-PROCESS VIOLATIONS

"The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."   United States v. Padilla, No. CR 09-3598, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning, J.).   In Brady v. Maryland, the Supreme Court of the United States explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   373 U.S. at 87.   In Giglio v. United States, 405 U.S. 150

(1972), the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for Brady purposes."); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  But see United States v. Reese, 745 F.3d 1075, 1084 (10th Cir. 2014)(holding that a new trial was not necessary when government failed to disclose impeachment evidence, because the "evidence impeaching a government witness may not be material if the government's other evidence is strong enough to sustain confidence in the verdict")(citing Smith v. Cain, 132, S. Ct. 627, 630 (2012)).   Finally, the Supreme Court has refined Brady v. Maryland and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"   Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even

- 33 -

without request.").   "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information."   United States v. Ashley, 274 F. App'x 693, 697 (10th Cir. 2008)(unpublished).   See Weatherford v. Bursey, 429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.").

"An 'open file' policy is neither mandated by the Constitution . . . nor is it ipso facto constitutionally sufficient." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 828 (10th Cir. 1995)(internal citations and quotations omitted). "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 828 (internal quotations omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. at 438 (internal citations omitted).

The United States' good faith or bad faith is irrelevant in determining violations of Brady v. Maryland.   See Brady v. Maryland, 373 U.S. at 87.   "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."   Kyles v. Whitley, 514 U.S. at 439.   The United States has an obligation to "volunteer exculpatory evidence

- 34 -

never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.  "'[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure' and it acts at its own peril by failing to comply adequately with an order requiring disclosure of Brady material."  United States v. Lujan, 530 F. Supp. 2d 1224, 1230 (D.N.M. 2008)(Brack, J.)(quoting United States v. Presser, 844 F.2d 1275, 1281 (6th Cir. 1988)).

Under Brady v. Maryland, the Supreme Court has held that an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles v. Whitley, 514 U.S. at 437.  On the other hand, "[t]here is no Brady violation where the defendant knew or should have known of the material, exculpatory information or where the information was available to him from another source."  United States v. Lujan, 530 F. Supp. 2d at 1230 (citing United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007)).

### 1.    **Possession**.

Brady v. Maryland requires disclosure of information only in the government's possession or knowledge, whether actual or constructive.  See United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999), cert denied, 529 U.S. 1077 (2000); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (noting that, because a district attorney's office had actual knowledge that

there was a separate investigation by authorities in a separate county, it was reasonable to impute knowledge possessed by the separate county to prosecution).   The Tenth Circuit explained in Smith v. Secretary of New Mexico Department of Correction that, "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a Brady claim, such proof is by no means necessary."   50 F.3d at 824.  Under Kyles v. Whitley, the prosecution's actual possession of the information is irrelevant.  Every federal prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."   Kyles v. Whitley, 514 U.S. at 437.   Under Brady v. Maryland, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).   On the other hand, "[i]t is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"   United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).   Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005)(Browning, J.)(holding that the United States does not have a duty under Brady v. Maryland to produce evidence it does not possess, or to "seek information from other governments," such as the Navajo Nation, and thus the United States was not required to produce Navajo Nation Police records, even though the United States may have been able to "get the information [Defendant] Badonie seeks merely by requesting them").

"A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'"   United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).   "[A] prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."   Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).   The "prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."   United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)(citing Scott v. Mullin, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002)).   The Tenth Circuit in United States v. Beers held that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of Brady v. Maryland where there is no joint investigation by federal and state officials.   See 189 F.3d at 1304.   See also United States v. Romo, 914 F.2d 889, 899 (7th Cir. 1990)(holding that court did not err in denying request to compel prosecutors to make various inquires of local police in absence of showing by defendant that specific material, exculpatory information existed of which government knew).   The Tenth Circuit in United States v. Beers, however, left open the question whether knowledge possessed by state officials would be imputed to the federal prosecutor where the federal government participated in a joint investigation with state officials.   See 189 F.3d at 1304, 1304 n.2.   The Court has previously determined that the New Mexico State Police ("NMSP") is not closely aligned with a federal prosecution when NMSP officers are government witnesses in the federal prosecution of an illegal alien in possession of a firearm.   United States v. Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 3834061, at *1, *3, *8 (D.N.M. Aug. 12, 2010)(Browning, J.); United

States v. Huerta-Rodriguez, No. CR 09-3206, Complaint at 1-2, filed Oct. 27, 2009 (Doc. 1);

United States v. Huerta-Rodriguez, No. CR 09-3206, Indictment at 1, filed Nov. 4, 2009 (Doc. 11).

In United States v. Huerta-Rodriguez, the Court, accordingly, found that it could not compel the

United States to produce the NMSP officers' personnel files, because the files were stored at the

NMSP office and, thus, not in the United States' possession.   See 2010 WL 3834061, at *4, *10

(holding that the United States cannot be compelled to produce NMSP officers' personnel files,

because the United States was allowed only to review the files at the NMSP office, and could not

remove or photocopy any documents without a subpoena).

        A prosecutor does not have a duty to obtain evidence from third parties.   See United States

v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige

the government to obtain evidence from third parties); United States v. Baker, 1 F.3d 596, 598

(7th Cir. 1993)("Certainly, Brady does not require the government to conduct discovery on behalf

of the defendant."); United States v. Flores, 540 F.2d 432, 437 (9th Cir. 1976)(noting that

government has no duty to fish through public records equally accessible to defense to collate

information); United States v. Lujan, 530 F. Supp. 2d at 1231 (stating there is no affirmative duty

to discover information in possession of independent, cooperating witness and not in

government's possession)(internal citations omitted).   Accordingly, in United States v. Badonie,

the Court determined that it could not properly compel the United States to produce Navajo Nation

files, including the personnel files from Navajo Nation officers whom the United States intended

to call at trial, because the United States did not possess the files.   See 2005 WL 2312480, at *1-3.

The Court explained that, although "the United States may have an obligation to seek information

from 'closely aligned' United States agencies, . . . its obligations does not require it to seek

information from other governments," such as the Navajo Nation.  2005 WL 2312480, at *3

(quoting United States v. Brooks, 966 F.2d at 1503).  The Court held, thus, that because the

personnel files and other evidence which the defendant sought to be produced were in the

possession of the Navajo Nation, the United States could not properly be compelled to produce the

evidence, even though the United States may have been able to "get the information Badonie seeks

merely by requesting" it.  2005 WL 2312480, at *3.[14]

---

[14]The Tenth Circuit has cited United States v. Brooks with approval, but has not indicated that it would adopt the same interpretation of Kyles v. Whitley's holding -- that a state prosecutor has a "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police'" -- as the United States Court of Appeals for the District of Columbia Circuit did in United States v. Brooks.  United States v. Combs, 267 F.3d at 1175 (quoting Kyles v. Whitley, 514 U.S.at 438)(citing United States v. Brooks, 966 F.2d at 1500-04). In United States v. Brooks, the District of Columbia Circuit held that an Assistant United States Attorney had the duty, under Brady v. Maryland, to search, or "have a suitably responsible person in the Metropolitan Police Department review . . . any homicide and any Internal Affairs Division files of the Department that may contain material exculpatory information" pertinent to the credibility of a police officer -- the United States' key witness -- who was killed shortly after testifying against the defendant.  See 966 F.2d at 1501, 1504.  The District of Columbia Circuit focused on the "close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both federal and District crimes, in both the federal and Superior courts), a relationship obviously at work in this prosecution," and held that the United States' duty under Brady v. Maryland "must reach the police department's homicide and Internal Affairs Division files."  966 F.2d at 1503.  By contrast, in United States v. Beers, the Tenth Circuit held that, absent a joint federal-state investigation, a federal prosecutor had no duty to learn of exculpatory materials which state officials possessed.  Compare United States v. Brooks, 966 F.2d at 1501, 1503, with United States v. Beers, 189 F.3d at 1304 (holding that, in regards to a federal prosecutor's duty under Brady v. Maryland, "we decline to extend this principle for federal prosecutors to exculpatory materials in the possession of the state government").  The Tenth Circuit explicitly left open the question whether state law enforcement officers' knowledge would be imputed to federal prosecutors if the state officials were jointly investigating the same crime with the federal government.  See United States v. Beers, 189 F.3d at 1304 n.2 ("We note that there is no evidence that the federal government participated in a joint investigation of Lujan with New Mexico state officials. . . .  [W]e do not decide whether we would impute knowledge possessed by state law enforcement officials in that situation.")

Regarding the implication of United States v. Brook's in determining "how much knowledge possessed by various arms of the State should be imputed to the prosecution," the

Tenth Circuit has described the District of Columbia Circuit's holding as unclear.   Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (citing United States v. Brooks and stating that the "District of Columbia . . . [has] not clearly defined the extent of the obligation").   The Tenth Circuit has discussed United States v. Brooks in two cases: United States v. Combs and Smith v. Secretary of New Mexico Department of Correction.   In neither case did the Tenth Circuit indicate that it would adopt a similar stance as the District of Columbia Circuit has.   See United States v. Combs, 267 F.3d at 1172, 1175 (discussing United States v. Brooks in regards to whether the United States Pretrial Services' knowledge could be imputed to federal prosecutors, and suggesting that the District of Columbia Circuit "suggests that Brady is broadly construed to apply to agencies in reasonable proximity to the prosecution," but declining to "resolve this . . . in this case," because the evidence allegedly withheld was immaterial); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n.36 (discussing United States v. Brooks with respect to whether Torrance County district attorneys' knowledge may be imputed to Bernalillo County district attorneys, "two arms of the State," and describing the District of Columbia Circuit's holding as "not clearly defined," but finding that, because the Bernalillo County district attorneys had actual knowledge of Torrance County's criminal investigation into the same homicide, "it is reasonable to impute the knowledge possessed by each entity to the prosecution under Brady," and noting that this holding "relieves us from having to determine the full extent of when knowledge possessed by an arm of the State will be imputed to the prosecution").   The Tenth Circuit, therefore, has focused on whether state prosecutors have actual knowledge of potentially exculpatory evidence that another arm of the state possessed or whether the suppressed evidence was material, and has declined to determine whether and when police officers or state law enforcement officers' knowledge may be imputed to federal prosecutors.   There is a great need for clarity and bright lines in this area, so that Assistant United States Attorneys know precisely their duties; United States v. Brooks creates too much fuzziness, and the Court is not be inclined to follow it without more express direction from the Tenth Circuit.

The Court determines, however, that, if the Tenth Circuit adopted United States v. Brooks' holding, the Court's decision of United States v. Badonie and United States v. Huerta-Rodriguez would still be sound.   Unlike the "close working relationship" between the United States Attorney for the District of Columbia, "who prosecutes both federal and District crimes, in both federal and Superior courts," United States v. Brooks, 966 F.2d at 1503, the United States Attorney for the District of New Mexico does not prosecute tribal crimes in tribal court.   Thus, the presence of Navajo Nation officers as testifying witnesses in United States v. Badonie does not alone indicate that the Navajo Nation was closely aligned with the United States Attorneys in its prosecution or that the officers were working on the United States' behalf for purposes of Brady v. Maryland, and, probably therefore, neither the Navajo Nation's possession nor knowledge of exculpatory information could be imputed to the United States.   Similarly, the Tenth Circuit has held that the federal government cannot be compelled to produce evidence which state investigators possess where the federal and state entities are not jointly investigating a criminal case.   See United States v. Beers, 189 F.3d at 1304.   Thus, because the NMSP officers in United States v. Huerta-Rodriguez were only testifying witnesses, and not joint investigators, the Court determined that the United States cannot be compelled to produce personnel files which the NMSP possess.

The Brady v. Maryland doctrine is nonetheless interpreted broadly to encourage prosecutors to carry out their "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" United States v. Combs, 267 F.3d 1167, 1174-75 (10th Cir. 2001)(quoting Kyles v. Whitley, 514 U.S. at 437-38). "Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." United States v. Beers, 189 F.3d at 1304. Accordingly, in Smith v. Sec'y of N.M. Dep't of Corr., the Tenth Circuit held that Torrance County's knowledge from a criminal investigation could be imputed to Bernalillo County's district attorney's office investigation into the same matter, because the Bernalillo County district attorney's office had actual knowledge of Torrance County's investigation, and because both entities were "two arms of the State."  50 F.3d at 825 n.36.

The Constitution "does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.'"  United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. 657, 667 (1957).  A defendant's mere allegation that the requested information might be material does not provide him or her with the unsupervised authority to search through the government's files.  See Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987).  The Brady v. Maryland rule is not an

---

[The] Assistant United States Attorney . . . informed the Court that it is the procedure of the United States Attorney's office to request to view the personnel files of testifying witnesses from the New Mexico State Police . . . .  [T]he New Mexico State Police Department does not turn over the officers' personnel files without a subpoena.

United States v. Huerta-Rodriguez, 2010 WL 3834061, at *4.

evidentiary rule that grants broad discovery powers to a defendant, because there "is no general constitutional right to discovery in a criminal case."   Weatherford v. Bursey, 429 U.S. 545, 559 (1977).

> [T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.   The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.

United States v. Agurs, 427 U.S. at 109-10 (internal quotations and citations omitted), overruled on other grounds by, 473 U.S. 667.   See Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir. 2000)("Brady does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up.").

### 2.    Material Exculpatory Evidence.

The holding in Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment."   373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   United States v. Bagley, 473 U.S. at 682.   See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).   A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).   The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."   United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).   The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material."   Douglas v. Workman, 560 F.3d at 1173.   Further, "[t]o be material under Brady,

undisclosed information or evidence acquired through that information must be admissible."

Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy,

890 F.2d 1056, 1059 (9th Cir. 1989)).

> The Supreme Court, in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by
> Brady, only mandates the disclosure of material evidence, the obligation to disclose
> evidence favorable to the defense may arise more broadly under a prosecutor's
> ethical or statutory obligations.   See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley
> (and, hence, in Brady) requires less of the prosecution than the ABA Standards for
> Criminal Justice Prosecution Function and Defense Function 3-3.11(a)
> (3d ed. 1993)").   See also ABA Model Rule of Professional Conduct 3.8(d)
> (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the
> defense of all evidence or information known to the prosecutor that tends to negate
> the guilt of the accused or mitigates the offense, and, in connection with sentencing,
> disclose to the defense and to the tribunal all unprivileged mitigating information
> known to the prosecutor, except when the prosecutor is relieved of this
> responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.   Favorable evidence is only material and, thus, subject to mandated

disclosure when it "could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict."   Cone v. Bell, 556 U.S. at 470 (quoting Kyles v. Whitley,

514 U.S. at 435).

"The government bears the burden of producing exculpatory materials; defendants have no

obligation to first point out that such materials exist."   United States v. Roybal, No. CR 12-3182

JB, 2014 WL 4748136, at *21 (D.N.M. September 4, 2014)(Browning, J.)(citing Kyles v. Whitley,

514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because

"the prosecution, which alone can know what is undisclosed, must be assigned the consequent

responsibility to gauge the likely net effect of all such evidence and make disclosure when the

point of 'reasonable probability' is reached.")); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir.

1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6.   The United States' good faith or bad faith is irrelevant.   See Brady v. Maryland, 373 U.S. at 87; United States v. Quintana, 673 F.2d at 299 ("Under Brady, the good or bad faith of government agents is irrelevant.").   "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."   Kyles v. Whitley, 514 U.S. at 439.   The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."   Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).   On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."   Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.   Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the Government."   United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667)(internal quotation marks omitted).

## LAW REGARDING GOVERNMENT DESTRUCTION OF EVIDENCE

The Tenth Circuit has held that:

"The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes.   Brady and its progeny address exculpatory evidence still in the government's possession.   Arizona v. Youngblood, 488 U.S. 51 . . . (1988) and California v. Trombetta, 467 U.S. 479 . . . (1984) govern cases in which the government no longer possesses the disputed evidence."

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34 (quoting Fero v. Kerby, 39 F.3d at 1472)(internal alterations omitted).    Accord United States v. Gomez, 191 F.3d 1214, 1218-19 (10th Cir. 1999).  The remedy provided when the government violates a defendant's due-process rights under either California v. Trombetta or Arizona v. Youngblood is severe: "[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence." California v. Trombetta, 467 U.S. at 487.    See United States v. Bohl, 25 F.3d at 914 ("Accordingly, after concluding that there has been a violation of Youngblood, the decision to either suppress the government's secondary evidence describing the destroyed material or to dismiss the indictment turns on the prejudice that resulted to the defendant at trial."); United States v. Fletcher, 801 F.2d 1222, 1225 n.3 (10th Cir. 1986)(remanding for a hearing on whether the government violated California v. Trombetta, and, if so, whether the proper remedy would be to suppress evidence derived from the lost or destroyed material, or to dismiss the indictment).

"Under the two-prong Trombetta test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'"    United States v. Bohl, 25 F.3d at 909-10 (quoting California v. Trombetta, 467 U.S. at 489).  "To invoke Trombetta, a defendant must demonstrate that the government destroyed evidence possessing an 'apparent' exculpatory value."    United States v. Bohl, 25 F.3d at 910 (quoting California v. Trombetta, 467 U.S. at 489).  The government commits a constitutional violation when it destroys evidence "that might be expected to play a

significant role in the suspect's defense."  California v. Trombetta, 467 U.S. at 488-89.  "We

think the test to be applied in such circumstances is whether defendant demonstrates that the

evidence is so material that he could not receive a fair trial without it."  United States v. Wilks,

629 F.2d at 675.[15]  In United States v. Wilks, the Tenth Circuit found that lost evidence was not so

---

[15]The Tenth Circuit did not cite to either California v. Trombetta or Arizona v. Youngblood in United States v. Wilks.  See United States v. Wilks, 629 F.2d at 671-75.  In United States v. Wilks, the Tenth Circuit analyzed whether the United States' loss of a lemonade can that was found in a defendant's cell and contained the heroin for which the defendant was charged violated the defendant's due-process rights.  See 629 F.2d at 671-75.  The defendant's argument, however, was that "the trial court abused its discretion in refusing to dismiss the case because an item of evidence was lost by the government."   629 F.2d at 674.   A trial court may dismiss a case when the government's destruction of evidence violates a defendant's due-process rights under California v. Trombetta or Arizona v. Youngblood.  See California v. Trombetta, 467 U.S. at 487 ("[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence.").  The defendant, thus, sought a remedy which would only be available under California v. Trombetta or Arizona v. Youngblood, or possibly Brady v. Maryland, which the United States Court of Appeals for the Ninth Circuit -- but not the Tenth -- has held can lead to a dismissal if the violation rises to the level of flagrant prosecutorial misconduct.  See United States v. Struckman, 611 F.3d 560, 577 (9th Cir. 2010)("Nonetheless, our circuit has recognized that dismissal with prejudice may be an appropriate remedy for a Brady . . . violation . . . where prejudice to the defendant results and the prosecutorial misconduct is flagrant.").  The Tenth Circuit, in United States v. Wilks, noted that the defendant was not alleging "bad faith or intentional withholding or destruction on the part of the government," and, thus, the defendant's theory was not that the government violated his due-process rights under Arizona v. Youngblood.  United States v. Wilks, 629 F.2d at 674.  See United States v. Bohl, 25 F.3d at 910 ("The Court in Youngblood extended Trombetta to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." (quoting Arizona v. Youngblood, 488 U.S. at 58)).  The trial court, therefore, could only have dismissed the case if the government's loss of the lemonade can violated the defendant's due-process rights under California v. Trombetta.  Additionally, the Tenth Circuit cited to United States v. Agurs when it announced that, when a defendant does not demonstrate that evidence was destroyed intentionally or in bad faith, "the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." United States v. Wilks, 629 F.2d at 674.  The Supreme Court applied United States v. Agurs' standard of "constitutional materiality" in California v. Trombetta, indicating that the United States v. Agurs' standard of materiality is applicable when determining whether the government's

- 46 -

material that its loss rendered a defendant's trial unfair, because the evidence "could not prove defendant's innocence . . . ."   629 F.2d at 675.   The defendant was charged with possessing heroin with an intent to distribute, but the government lost a lemonade can containing the heroin that was found in the defendant's cell.   See 629 F.2d at 672, 675.   The defendant asserted that the lemonade can was the one piece of evidence which could exculpate him, because, if his fingerprints were not on the can, the government would have no evidence that he possessed the heroin.   See 629 F.2d at 674.   The Tenth Circuit noted that the absence of the defendant's fingerprints on the lemonade can would be material to his defense, but disagreed that the loss of the can caused his trial to be unfair, because the can could not, alone, prove his innocence.   See 629 F.2d at 674-75.   Another inmate had testified that he placed the can with the heroin in the defendant's cell, but the United States undermined this confession with other evidence.   See 629 F.2d at 674.   The Tenth Circuit determined that the "absence of Wilks' fingerprints on the can . . . would provide cumulative evidence," given that another inmate confessed to the offense.   629 F.2d at 674-75.   Because the lemonade can could not alone prove the defendant's innocence, and would be cumulative to the other inmate's confession, the Tenth Circuit determined that the loss of the lemonade can did not render the defendant's trial unfair and violate his due-process rights. See 629 F.2d at 674-75.

---

loss of evidence violates a defendant's due-process rights under United States v. Trombetta. California v. Trombetta, 467 U.S. at 488-89 (citing United States v. Agurs, 427 U.S. at 109-110). The Court concludes, thus, that in United States v. Wilks, the Tenth Circuit was applying California v. Trombetta's test to determine whether the government's loss of the lemonade can violated the defendant's due-process rights, even though the Tenth Circuit does not cite to California v. Trombetta in its opinion.

If the exculpatory value of evidence that the United States failed to preserve is "indeterminate," then the defendant must show: (i) that the evidence was "'potentially useful' for the defense;" and (ii) "that the government acted in bad faith in destroying the evidence." United States v. Bohl, 25 F.3d at 910 (quoting Arizona v. Youngblood, 488 U.S. at 58). "Potentially useful evidence" is "evidence of which 'no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" United States v. Bohl, 25 F.3d at 910 (emphasis in original)(quoting Arizona v. Youngblood, 488 U.S. at 57). Unlike asserted violations of Brady v. Maryland, for which the prosecutor's state of mind is irrelevant, if a defendant asserts that the prosecution violated his or her due-process rights by failing to preserve potentially exculpatory evidence, the defendant may prevail under Arizona v. Youngblood only if he or she demonstrates that the prosecution's failure to preserve the evidence was done in bad faith. See United States v. Pedraza, 27 F.3d 1515, 1527 (10th Cir. 1994)("[I]f the government destroys or otherwise fails to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so.").

> Thus, while the state of mind of the prosecutor is irrelevant to the question under Brady of whether the prosecution failed to disclose material exculpatory evidence, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Arizona v. Youngblood, 488 U.S. 51, 57 . . . (1988)(emphasis added).

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34.

The "inquiry into bad faith 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" United States v. Bohl, 25 F.3d at 911 (alterations in original)(quoting Arizona v. Youngblood, 488 U.S. at 56 n.*). "[T]he

district court's determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates . . . ."  United States v. Richard, 969 F.2d 849, 853 (10th Cir. 1992)(internal quotations omitted).  "The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." United States v. Richard, 969 F.2d at 853-54 (citing United States v. Zambrana, 841 F.2d 1320, 1343 (7th Cir. 1988)).  "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."  United States v. Bohl, 25 F.3d at 912 (citing Arizona v. Youngblood, 488 U.S. at 58).  In determining whether the government failed to preserve evidence in bad faith, the Tenth Circuit first considers whether the government was on notice of the potentially exculpatory evidence, and whether the potential exculpatory value of the evidence is based on more than mere speculation or conjecture.  See United States v. Bohl, 25 F.3d at 911 (noting that the government "was explicitly placed on notice that [defendants] Bell and Bohl believed the tower legs were potentially exculpatory," and that the "potentially exculpatory value was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests on the legs might lead to exculpatory evidence").  Second, the Tenth Circuit also looks to whether the government had "possession or the ability to control the disposition" of potentially exculpatory evidence at the time the government is put on notice to its existence.  United States v. Bohl, 25 F.3d at 912. Third, the Tenth Circuit weighs whether the evidence "was central to the government's case." United States v. Bohl, 25 F.3d at 912 (noting that, in defense to the charge of conspiring to defraud the United States by failing to conform with construction contracts that required a particular structural composition, "the evidence disposed of here was central to the government's case," and

"nothing was more probative on the issue of the steel composition," and, thus, because the evidence was destroyed, the defendants could only "rebut the government's test results . . . [with] a general denial of the allegations and seek to undermine the credibility of the government's chemical analyses of the allegedly nonconforming steel").   Fourth, the Tenth Circuit considers whether the government is able to offer an "innocent explanation for its failure to preserve" potentially exculpatory evidence.   United States v. Bohl, 25 F.3d at 912-13 ("[E]ven if the government destroys or facilitates the disposition of evidence knowing of its potentially exculpatory value, there might exist innocent explanations for the government's conduct that are reasonable under the circumstances to negate any inference of bad faith.").

## ANALYSIS

The Court will grant the Motion to Reconsider in part and to the extent that Harry has presented new evidence that could affect the Court's determination that the United States did not violate Harry's due process rights.   After considering the evidence and amending the factual findings, however, the Court concludes that Harry has not presented any evidence or arguments that change the Court's conclusion.   The Court will not suppress the text messages.

## I.    THE COURT WILL RECONSIDER ITS PRIOR RULING.

The Court may reconsider a prior decision when there is an intervening change in the controlling law, it has new evidence that was previously unavailable, or to "correct clear error or prevent manifest injustice."   United States v. Christy, 739 F.3d at 539.   Harry has presented evidence that was not previously available to him, and Harry contends that the Court should reconsider its ruling in light of the new evidence to prevent constitutional error.   The Court will reconsider its prior decision in the Motion to Suppress MOO.

## II.   **THE COURT WILL CONTINUE TO DENY THE MOTION TO SUPPRESS**.

The evidence that Harry submits as part of the Motion to Reconsider could impact two facts: when the United States was involved in the prosecution and whether there is evidence that someone deleted Wauneka's outgoing text messages.   After reconsidering Harry's new evidence, including Joe's Investigation Notes, the Ogden Memo., the DOJ Memo., and Elliott's testimony, the Court has amended its conclusions regarding when the United States was involved in the prosecution.   Because Joe communicated with and received advice from United States prosecutors beginning on May 12, 2010, the Court has concluded that Joe was working alongside and on the United States' behalf when he received Wauneka's cellular telephone.   The Court has not amended, however, its conclusion that there is no evidence that someone deleted the outgoing text messages on Wauneka's cellular telephone.

Joe was working alongside and on behalf of the United States when he received Wauneka's cellular telephone on May 21, 2010.   On May 12, 2010, Joe called the United States' Attorney's Office for advice on the case.   See Investigation Notes at 1-2.   On May 13, 2010, Joe again discussed the case with and shared evidence with the United States' Attorney's Office.   See Investigation Notes at 1-2.   Significantly, on May 20, 2011 -- the day before Joe received Wauneka's cellular telephone -- Joe presented the case to, and received "instructions" from, an Assistant United States' Attorney.   See Investigative Notes at 1-2.   This relationship between Joe and the United States was more than the United States merely knowing that Joe possessed certain information and Joe being a witness in the case.   Cf. United States v. Badonie, 2005 WL 2312480 at *3; United States v. Huerta-Rodriguez, 2010 WL 3834061, at *4, *10.   While in United States v. Beers, the Tenth Circuit held that federal prosecutors have no duty to disclose impeachment

information in the possession of a state government, the Tenth Circuit did not decide whether it

"would impute knowledge possessed by state law enforcement officials" to the federal

government in the case of a "joint investigation" by the federal government and state officials.

See 189 F.3d at 1304 n.2.   Here, Joe not only possessed the evidence, he actively communicated

with, and received directions from, the federal government.   See Investigation Notes at 1-2.

From May 12, 2010, to May 20, 2010, Joe communicated with, and shared evidence with, the

United States.   See Investigation Notes at 1-2.[16]   This investigation qualifies as a joint one at the

point that Joe let the outgoing texts be expunged.   See United States v. Beers, 189 F.3d at 1304

n.2.   On May 20, 2010, however, Joe's relationship with the United States went a step further.

On May 20, 2010, Joe presented his case to an Assistant United States' Attorney and then received

instructions from the Assistant United States' Attorney, and the very next day, Joe received

Wauneka's cellular telephone.   See Investigative Notes at 1-2.   At this point, there was more than

mere knowledge and cooperation between Joe and the United States; Joe actively received

instructions from the United States.   See Investigative Notes at 1-2.   While the Tenth Circuit has

---

[16]Several Circuits consider a joint investigation between the federal government and state officials in determining whether the federal government has a duty to disclose information in the possession of the state officials.   The United States Court of Appeals for the Third Circuit considers: (i) whether the party with the information is "acting on the government's behalf or is under its control"; (ii) whether the state and federal governments "are part of a team" and "are participating in a joint investigation or are sharing resources"; and (iii) whether the federal government has "ready access to the evidence."   United States v. Risha, 445 F.3d 298, 304 (3d Cir. 2006)(internal quotation marks omitted).   In United States v. Brooks, the District of Columbia Circuit held that the federal government has a duty to disclose information in the possession of a metropolitan police department, when there was a "close working relationship between" the police department and the federal government.   966 F.2d at 1503.   In United States v. Antone, the United States Court of Appeals for the Fifth Circuit held that the federal government had a duty to disclose information in the possession of a state law enforcement agency when state and federal agencies pooled their resources in forming a joint investigative task force.   See 603 F.2d 566, 570 (5th Cir. 1979).

left open the question whether a joint investigation between the federal government and a state government could lead to a duty to disclose under Brady, see United States v. Beers, 189 F.3d at 1304 n.2 ("We note that there is no evidence . . . [of] a joint investigation . . . .   Therefore, we do not decide whether we would impute [onto the federal government] knowledge possessed by state law enforcement officials in that situation"), a law enforcement officer acting on instructions from the federal government, results in the officer acting on behalf of the United States for Brady purposes, see Kyles v. Whitley, 514 U.S. at 437 ("[An] individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").   The Court, therefore, concludes, based on the new evidence presented by Harry, that Joe was acting on behalf of the United States.

Contrary to the Court's Motion to Suppress MOO, Harry argues that the exculpatory value of the outgoing text messages was apparent:

> [T]he inculpatory and exculpatory value of the incoming and outgoing texts must have been apparent to the investigator as it is clear that these statements were being collected as statements allegedly made by Mr. Harry, the defendant.   The favorable exculpatory evidence to be collected was also clear -- there is an apparent adoption of statements favorable to Mr. Harry -- "I knw.   She was all over me the whole nite." [--] to warrant the preservation and disclosure of the outgoing text messages as well.

Motion to Reconsider ¶ 14, at 3.   The Court disagrees.   Harry has not presented any new evidence or argument to change its previous conclusion, while the United States has pointed to the Harry Interview, in which Harry testified regarding the general content of his text message communications with Wauneka:

> They got my keys, and I finally got in my car, and I was sitting there for a while, then my friend, Dimitri, was texting me, and telling me, "How could you do this?

I was your friend.   How could you do this to me?"   And I was like, "What did I do, Dimitri?"

"[Jane Doe] -- or somebody said you raped [Jane Doe].   You know, Drea said she saw you."

I said, "Okay."   And I was confused and I was drunk, sometimes I don't know what to think.   I was thinking like was it midnight or not (inaudible).   It's just that point in time where I was out.   And I don't know what was going on.   All I remember was waking up at that time and helping these girls take Dimitri to his room.

So I was texting him back, and I told him, I said, "Well, I'm sorry for what I did.   And I don't know what happened, but if [Jane Doe] said I raped her, then I don't know, I'm not going to say nothing about that.   Just tell her that I'm sorry, and I'm not in my right mind," I told him that.

Harry Interview at 14:11-15:6.   The Court maintains that any assertion that Wauneka's text messages would be exculpatory to Harry is "based purely on speculation and conjecture," which does not meet the standard of apparent exculpatory value that California v. Trombetta requires. United States v. Martinez, 744 F.2d 76, 80 (10th Cir. 1984)(holding that a defendant's argument that evidence "might have contained exculpatory information" goes to the "weight and sufficiency of the government's case," but does not demonstrate that the failure to preserve the evidence was a constitutional violation under California v. Trombetta).   The value of the outgoing texts is indeterminate because there is no evidence showing that Wauneka's outgoing text messages "possess an exculpatory value that was apparent before the evidence was destroyed"; thus the Court will apply the analysis of Arizona v. Youngblood.   California v. Trombetta, 467 U.S. at 489.

Harry contends that the Court applied the incorrect standard in the Motion to Suppress MOO; he asserts that he does not need to demonstrate that the missing texts are exculpatory, but

just that they would have been logical or informative.   See Tr. at 12:2-12:8 (Samore).   The Court clarifies that, had there been persuasive evidence that the exculpatory value of the text messages was apparent before the evidence was destroyed, it would have applied the California v. Trombetta test: "Under the two-prong Trombetta test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'"   United States v. Bohl, 25 F.3d at 909-10 (quoting California v. Trombetta, 467 U.S. at 489).   Because there is no evidence that the exculpatory value of the text messages was apparent to Joe, Harry, or anyone else, the California v. Trombetta test is not met under the apparent prong.   See 467 U.S. at 489.

Harry does not have to prove that the evidence was exculpatory to establish a due-process violation, however.   When the "exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence."   United States v. Bohl, 25 F.3d at 910 (quoting Arizona v. Youngblood, 488 U.S. at 58).   The Court applied the Arizona v. Youngblood standard in the Motion to Suppress MOO and will continue to apply that standard here.   Thus, Harry's concern that the Court is requiring him to prove that the evidence was exculpatory is incorrect.   While Harry contends that he needs to establish that the evidence is "logical and informative," Tr. at 12:2-12:8, the Court will apply the Arizona v. Youngblood standard that the evidence is "potentially useful," Arizona v. Youngblood, 488 U.S. at 58.   Harry has done that much; the outgoing text messages may have been useful for Harry's cross-examination of Wauneka or for impeachment.   They would complete the conversation and

give context to Harry's text message replies.   The Court concludes that Harry has satisfied the

first prong of the Arizona v. Youngblood standard.   See Arizona v. Youngblood, 488 U.S. at 58.

The second prong of Arizona v. Youngblood requires that Harry prove "that the

government acted in bad faith in destroying the evidence."   Arizona v. Youngblood, 488 U.S.

at 58.   Under this prong, the Court concluded that: (i) "[t]here is no evidence that the United

States' prosecutors or investigators were on notice of the exculpatory value of Wauneka's

outgoing text message[s] before they were lost," because Harry did not tell "the United States that

the outgoing messages were exculpatory or potentially useful when he requested them," Motion to

Suppress MOO at 54-55; (ii) "the United States does not seem to have ever possessed the outgoing

text messages," but rather, that the "Navajo Nation, through Joe or St. Germaine" possessed the

text messages "before Joe began working alongside or on behalf of the United States," Motion to

Suppress MOO at 55-56; (iii) "the evidence demonstrates that Joe was negligent, at most, in not

retrieving Wauneka's outgoing text messages while they were available," because "the

exculpatory value of the outgoing messages was not apparent," Motion to Suppress MOO at 58;

and (iv) the "outgoing text messages do not appear to be central to the United States' case," Motion

to Suppress MOO at 58.   Harry's argument in the Motion to Reconsider challenges the first point

-- that he had to tell the United States prosecutors that the evidence was exculpatory -- and his

additional evidence impacts the second point -- that the United States did not possess the text

messages.

Regarding the first point, the Court notes that its "inquiry into bad faith 'must necessarily

turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was

lost or destroyed.'"   United States v. Bohl, 25 F.3d at 911 (quoting Arizona v. Youngblood,

488 U.S. at 57 n.*).   Harry is correct that he is not under any obligation to inform the United

States that the evidence he is seeking is exculpatory, and further that any defendant who "requests

something from the prosecution" has the "implicit hope" that it is exculpatory.   Tr. at

12:15-12:18.   The problem with Harry's argument, however, is that, because the text messages'

exculpatory value was not apparent when Joe read them, or today, there must have been some

other information leading the United States to realize the exculpatory value of the evidence when it

was lost or destroyed.   That information did not have to come from Harry for the United States to

realize that the text messages were exculpatory.   Nevertheless, unlike in United States v. Bohl,

where the defendants informed the United States that, because the tower legs from radio and radar

transmission towers were constructed pursuant to the FAA contract the defendants allegedly

breached, and thus needed to be preserved because their composition was material to the issue

whether the defendants complied with the contract, see 25 F.3d at 911, neither Harry nor anyone

else informed the United States that Wauneka's outgoing text messages were material exculpatory

evidence to his defense.

Regarding the second point -- that the United States did not possess the text messages -- the

Court now concludes that, because Joe was acting on behalf of the United States when he saw the

text messages for the first time, the United States possessed the text messages at one time.   This

point was not, as Harry argues, the "linchpin" of the Court's decision, however.   Motion to

Reconsider ¶ 5, at 1.   Although the United States may have possessed the text messages, the

Court emphasizes that there is no evidence that anyone deleted the text messages, and that, at most,

Joe acted negligently in not preserving the images.   Harry clarifies that he does not concede that

there was no bad faith, but the only evidence to which he can point is that half of the text message

conversation is missing.   See Tr. at 16:1-16:19 (Samore).   Because there are a number of ways half of the conversation could have been lost, especially because the Court has found that Wauneka's cellular telephone separated the messages into an inbox and outbox, the Court concludes that Harry cannot establish bad faith on the record before the Court.   The Court determines, thus, that the United States' failure to preserve Wauneka's outgoing text messages, which were of a potentially useful value at best, was not done in bad faith and, therefore, was not a violation of Harry's due-process rights.   The Court will deny the Motion to Reconsider to the extent it requests that the Court grant the Motion to Suppress.

**IT IS ORDERED** that the Motion to Reconsider Court's Ruling of February 19 on Suppression of Evidence, filed April 26, 2013 (Doc. 138), is granted in part and denied in part, and that the Amendment to Motion to Reconsider Court's Ruling of February 19 on Suppression of Evidence, filed April 30, 2013 (Doc. 145), is granted in part and denied in part.   The Court has reconsidered its ruling in the Memorandum Opinion and Order, filed February 19, 2013 (Doc. 114), but it will continue to deny the Defendant's Motion to Suppress Evidence Based on Spoliation or Incompleteness, filed June 26, 2012 (Doc. 75).

_____
UNITED STATES DISTRICT JUDGE

- 58 -

*Counsel:*

Damon P. Martinez
   United States Attorney
Kyle T. Nayback
   Assistant United States Attorney
David Adams
   Special Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

     *Attorney for the Defendant*